UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JPMORGAN CHASE BANK, N.A. | ) | FILED COPY: MAY 22, 2008 |
| AND | ) | 08CV3004   EDA |
| JPMORGAN SECURITIES, INC. | ) | JUDGE NORDBERG |
| Plaintiffs, | ) | MAGISTRATE JUDGE DENLOW |
| | ) | Case No.＿＿＿＿＿＿ |
| v. | ) | |
| | ) | Judge:＿＿＿＿＿＿ |
| LESLIE (PETER) DEGROOT, | ) | |
| PETER FORAN, FEI WANG, | ) | |
| MICHAEL DICOSOLA, | ) | |
| DAVID JAKUBS, KITTY SCHREIBER, | ) | |
| GRAEME WILSON, CLAIRE CHOINERE,) | | |
| ALAN ARRRIETA, NADINE AZZAM | ) | |
| and UBS FINANCIAL SERVICES, INC. | ) | |
| Defendants. | ) | |

## PLAINTIFFS' VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF

Plaintiffs, JPMORGAN CHASE BANK, N. A. and JPMORGAN SECURITIES, INC. (hereinafter, "JPMC"), alleges as follows:

1.      JPMC brings this action against its Former Employees Defendants, Leslie (Peter) DeGroot, Peter Foran, Fei Wang, Michael Dicosola, David Jakubs, Kitty Schreiber, Graeme Wilson, Claire Choinere, Alan Arrrieta, Nadine Azzam, (hereinafter, the "Former Employees"), all of whom resigned *en masse* on Friday, May 16, 2008 at approximately 1:00 p.m. in the Chicago office of JPMC and whom are in breach of the promise to refrain from disclosure of JPMC confidential business information.  Defendants DeGroot, Foran, Wang,  Dicosola, and Jakubs are also in breach of their contractual promises to refrain from solicitation of JPMC clients they came into contact with while at JPMC.

2.      In addition JPMC brings this action against Defendant, UBS Financial Services, Inc. (UBS) for its tortious interference with expectancy and tortious interference with contract

for its role in continuing to solicit JPMC employees and JPMC clients through the use of confidential information supplied to it by the Former Employees.

## JURISDICTION

3.    Jurisdiction as to the claims against the Former Employees and UBS is based upon diversity, 28 U.S.C. § 1332.

4.    JPMorgan Chase Bank, N.A. is a citizen of the State of Ohio and has as its primary place of business the State of Ohio.  J.P. Morgan Securities Inc. is incorporated in Delaware and has its principle place of business is New York.

5.    UBS is a citizen of the state of New York and has as its place of business the State of New York.

6.    The Former Employees are all citizens of the State of Illinois.

7.    JPMC believes in good faith that is damages against the Former Employees and UBS exceed the sum of $75,000, exclusive of interests and costs because the Former Employees have given access to UBS , confidential and sensitive information regarding JPMC's high wealth clients and UBS and the Former Employees are using this information to solicit these clients and in the process divert tens of millions of dollars in annual revenue and incalculable losses to the goodwill JPMC has developed with its clients.

## VENUE

8.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(a). Defendant, Former Employees resides in this District and the acts complained of, including the Former

2

Employees' breach of the Non-Solicitation and Confidentiality Agreement as well as the tortious interference with expectancy and contract by UBS occurred in substantial part in this District.

## FACTUAL BACKGROUND

### JPMC's Team Based Business Model

9.    JPMC has developed a team based approach to providing a whole spectrum of related banking, investment and wealth management services for its high net wealth banking clients which JPMC refers to as Personal Client Service ("PCS"). Perry Mangione Affidavit "Mangione Affid." at paras. 3- 7.

10.    Perry Mangione is a Director of three of the PCS Teams based in the Chicago and Wheaton Illinois JPMC offices. *Id.* at para. 3.

11.    The JPMC team-based business model has been in place for at least the last four years and has multiple points of client contact from the various PCS team members including the Fiduciary Advisors, Trust Advisors, Wealth Advisors and Investment Advisors. *Id.* at para. 9.

12.    The lead individual in managing the client relationship within this team tends to be Client Advisors typically take the lead in managing the relationship between the client and the rest of the JPMC PCS Team. *Id.* at para. 6.

13.    Other members of the team, each tasked with specific duties include, Private Bankers who handle credit and cash management for the client; Fiduciary Advisors, who are what has traditionally been referred to as Trust Officers, and who mange the clients assets where the JPMC is acting in a fiduciary capacity; Wealth Advisors, who assist the client in financial

and estate planning; and, Investment Advisors, who assist clients in selecting investment products suited to the specific needs of the each particular high net worth client. *Id.* at para. 7.

14.    JPMC defines high net worth clients as those with between $1 Million to $25 Million in net worth and typically, many of these clients are extremely sensitive about maintaining their confidentiality and identity regarding the membership in this group, with many going so far as to utilize trusts and other mechanisms to maintain their confidentiality. *Id.* at para. 8.

15.    Within these PCS teams, the primary source of business is a funneling of clients who are prequalified by the JPMC Middle Market Commercial Bankers or other internal JPMC business units through referrals to the Private Client Services team members. *Id.* at para. 10.

16.    JPMC clients are generally first directed to a Client Advisor, then on to a Private Banker, Investment Advisor or other team member as appropriate for the particular client's unique needs. *Id.* at para. 11.

17.    The Chicago PCS teams rely heavily, and in many cases, almost exclusively on this internal referral program and all of our team members are continually reminded to cross-sell within this PCS team-based system. *Id.* at para. 12.

18.    Investment Advisors or Investment Assistants at JPMC do not make cold calls. *Id* at para. 13.

19.    With respect to the Former Employees I have knowledge that they have very little if any externally generated business that is not a product of the internal team referral business model. *Id.* at para. 31.

## UBS's Business

20.     UBS is a competitor of JPMC and has recently developed in the United States a personal wealth management approach somewhat similar to that of JPMC.   (Mangione Affid. at para. 41.)

21.     Dennis Drecher of UBS recently told Investment Advisors from JPMC that UBS would be building out this business model in UBS' Chicago office in the near future. Covert Affid. at para. 15.

## The Investment Advisors' Employment with JPMC

22.     Investment Advisors and Investment Assistants are required to hold a Series 7 License and a Series 66 License  or alternatively a Series 7 and a Series 63 License  and Series 65 License. *Id.* at para. 14.

23.     All of the Former Employees who were Investment Advisors with JPMC were promoted from within JPMC to their most recent positions as Investment Advisors. *Id.*  at para. 15.

## The Former Employees Expressly Agreed Not to Solicit JPMC Clients and to Not Disclose Confidential Information

24.     As part of the regular course of business, as a condition of employment and as a prerequisite to being eligible for incentive compensation, JPMC requires the Investment Advisors and Private Bankers I supervise to sign a Supervision, Confidentiality, and Non-Solicitation Agreement("Non-Solicitation Agreement"). *Id.* at para. 16.

25.     This Non-Solicitation  Agreement  imposes  certain  continuing  obligations  on employees that survive their employment with JPMC, including restricting departing employees

for a period of twelve months from soliciting and/or recruiting JPMC employees; soliciting JPMC

customers; or using JPMC proprietary, confidential and trade secret information. *Id.* at para. 17.

26.    In the one instance I am aware of where an Advisor refused to sign the required

Non-Solicit Agreement, he was immediately terminated from employment with JPMC. *Id.* at

para. 19.

27.    As an additional condition of employment,  JPMC requires all employees from

the Chief Executive Officer down, to sign the JPMC Code of Conduct, which also includes

confidentiality and non-disclosure provisions. *Id.* at para. 20.

28.    JPMC requires its Investment Advisors and Private Bankers to sign the Non-

Solicit Agreement and requires all PCS employees to affirm the Code of Conduct in order to

protect the information it has developed at great expense over a significant period of time.  This

includes information specific to its high net worth clients that is not readily available from other

public sources of information. *Id.* at para. 21.

29.    DeGroot, Foran, Wang, Dicosola and Jakubs all signed Non-Solicitation

Agreements on or about May and June of 2006. The signed agreements for these Former

Employees are attached as Exhibits A – E to the Affidavit. *Id.* at 29.

30.    Among the provisions of the Supervision, Confidentiality and Non-Solicitation

Agreements are the following:

> **Section 6. SPECIAL OBLIGATIONS OF EMPLOYEE**.   You
> understand that in the course of your association with JPMC you hold a
> position of trust and as a result of that position JPMC will provide you
> with "Confidential Information" related to JPMC's business.  The term
> "Confidential Information" as used in this Agreement, includes but is not
> limited to information described as such in the Code of Conduct and: (a)
> information received from third parties under confidential conditions; (b)
> confidential customer data, including but not limited to customer and
> prospect names, addresses, phone numbers, financial portfolio, financial

account information, financial needs, investment preferences and similar information whether or not in tangible form developed or compiled by JPMC or by you in connection with your employment by JPMC; (c) information concerning established business relationships; (d) non-public information about JPMC's employees; (e) all records and documents concerning the business and affairs of JPMC, including without limitation, methods, procedures, devices and other means used by JPMC in the conduct of its business; (f) "trade secrets" as that term is defined by the Uniform Trade Secret Act (UTSA), which term shall be deemed to include each item of "Confidential Information" specifically described in this Section 6, and (g) software and other technical, business or financial information, the use or disclosure of which might reasonably be construed to be contrary in the interest of JPMC or its clients.  You understand that such "Confidential Information" will be disclosed to you in confidence and for use only in connection with your employment with JPMC and therefore agree to the following restrictions:

SECTION 6.1 CONFIDENTIALITY

Upon leaving JPMC's employ for any reason (voluntarily or otherwise), or upon JPMC's request at any time, you agree to immediately return to JPMC all Confidential Information in your possession, under your control or which you received or prepared in connection with your employment; and you agree not to retain any copies (whether manually or mechanically produced, including electronic or software versions), summaries, compilations, or excerpts thereof.  You also agree to return upon leaving JPMC's employ, or at any time we request, any equipment including but not limited to computers, personal digital assistants, pagers or telephones issued to you for use in your employment, and not to destroy or copy any information contained thereon.

You agree (a) to keep Confidential Information confidential at all times during and after your employment with JPMC; (b) for as long as Confidential Information remains confidential, not to disclose or communicate Confidential Information to any third party unless permitted by JPMC policy, required by law, or with JPMC's written consent, and (c) not to use Confidential Information for your own behalf or for the benefit of a third party.

SECTION 6.2 NON-SOLICITATION OF CUSTOMERS AND EMPLOYEES

You acknowledge that JPMC's relationships with its customers are extremely valuable and are the result of the investment of substantial time, resources, and effort in developing them and keeping them confidential. In consideration of the provision of Confidential Information to you, your

7

employment and continued employment, as well as all payments to you, including all compensation received from JPMC and its affiliates and commissions and other compensation paid to you in connection with the JPMC products, you agree for a period of twelve (12) months after the termination of your employment, regardless of the circumstances of the termination, not to, directly or indirectly, acting alone or with others, solicit or attempt to solicit, induce to leave or divert or attempt to induce to leave or divert from doing business with JPMC, any JPMC customer with whom you had professional contact, for whom you had responsibility or with respect to whom you were privy to any information during the last two years of your employment with JPMC.

This section does not apply to customer relationships you established prior to commencing employment with JPMC, provided that you can substantiate through documents or other suitable evidence that the relationship preceded your commencement of employment with JPMC. You have identified any persons you believe are subject to this exclusion prior to the signing of this Agreement, and any such persons as to whom you have provided suitable documentation are listed in Exhibit "A" attached hereto, which Exhibit shall be initiated and dated by you and your supervisor. The absence of any such Exhibit shall be conclusive evidence that this exclusion does not apply.

Nothing in this Agreement prevents you from seeking or accepting employment with any other financial institution, bank, trust company, brokerage firm or other competing entity after your term of employment with JPMC.

You also agree, for a period of 12 months after the termination of your employment for any reason, not to directly or indirectly (1) hire or solicit any current JPMC employee, candidate for employment or former JPMC employee who resigned from JPMC within twelve months of any such solicitation, to apply for or accept employment with any business competing with JPMC, or (2) to otherwise induce any then current JPMC employee or candidate for employment with JPMC to become employed by any business competing with JPMC.

You also agree that you will not disrupt, damage, impair, or interfere with JPMC's business or reputation in any manner.

You also agree that JPMC may contact any person or entity with whom you become employed or associated during the term of these restrictions to inform them of the existence of this Agreement and the substance of the restrictions contained herein.

SECTION 6.3 REMEDIES

By signing below, you agree that any breach, evasion, violation or threatened violation of any term of this Section 6 by you will cause immediate and irreparable injury to JPMC that cannot be adequately remedied by monetary damages and will entitle JPMC to immediate relief and/or specific performance in any court of competent jurisdiction and/or before the NASD or NYSE, as well as to all other legal or equitable remedies and UTSA remedies, where applicable, to which JPMC may be entitled, including but not limited to the right to compel arbitration of disputes. Your covenants set forth in this Section 6 are independent of any other provisions of this Agreement; and the existence of any claim or causes of action by you against JPMC, whether predicated on this Agreement or otherwise, shall not constitute a defense to JPMC obtaining relief as described in this section. If JPMC is (in its sole judgment) compelled to institute legal proceedings and/or arbitration to enforce this Agreement, you agree to reimburse JPMC for its actual attorney fees and other expenses incurred in the successful prosecution or settlement of such proceedings, in addition to its damages or other remedies.

*Id.* at 29.

31.     The Agreement includes a "carve-out" provision for clients that the Investment Advisor of Private Banker had relationships with prior to working for JPMC. This "Carve-out provisions required the employee to specifically list those clients that might fit within the carve-out on an Exhibit A to the Agreement. None of the former Investment Advisor employees listed any clients on an Exhibit A to his Agreement with JPMC. *Id.* at para. 18.

32.     All JPMC employees are required to sign the JPMC Code of Conduct. *Id.* at 20.

33.     The signed Code of Conduct affirmations for these Former Employees are attached as Exhibits F – O to the Affidavit. *Id.* at para. 29. The Code of Conduct contained the following commitments:

9

3.    CONFIDENTIAL INFORMATION

We are all responsible for the safeguarding of confidential information, whether it is information entrusted to us by our customers, information regarding JPMorgan Chase's businesses and activities, or information about other employees.

### 3.1    Information about the firm, its customers, its employees, and others

You may have access to confidential information related to the firm's business.  Information related to the firm's business includes information about the firm, as well as information related to the firm's customers, counterparties, or advisory clients (all of which the Code refers to as customers), business partners, suppliers, and your fellow employees.

You may not, either during your period of service or thereafter, directly or indirectly use or disclose to anyone any such confidential information, except as permitted by the Code and other policies applicable to you.

You should observe the following principles when dealing with information relating to the firm's business:

(a)    Assume that most information that you have about the firm and its business, or about its past, present, or prospective customers, suppliers, and employees, is confidential, unless the contrary is clear.

(b)    Treat all personal information about individuals as confidential.

(c)    Before sharing confidential information with others in the firm, be sure that you are permitted to do so.  Do not disclose confidential customer information to other employees who are not involved with the transaction or service for which the information was provided to the firm – even if you believe the disclosure might be useful in the context of other firm business – unless you are authorized to do so.

(d)    Do not disclose confidential information to anyone outside the firm unless you are authorized to do so.  Where such disclosure is authorized, a confidentiality or privacy agreement may be required; check with the Legal Department.

(e)    If you are permitted to share confidential information, use your judgment to limit the amount of information shared and disclose it only on a need-to-know basis in order to provide the services we are engaged to provide.  Ensure that the recipient knows the information is confidential

and has been instructed about restrictions on further use and dissemination.

(f)     Comment or provide information on matters related to the firm's business only if it is part of your job function or you are otherwise authorized to do so.

(g)     Protect confidential information when communicating electronically – for instance, by e-mail or through the internet.

(h)     Remember that all forms of communication are covered, including written, telephonic, and electronic communications such as website chartrooms, e-mail, and instant messaging.

(i)     Consult your manager or your Compliance officer if you have any question about whether information can be shared.

### 3.3     Special rules regarding customer information and data privacy legislation

Each of us has a special responsibility to protect the confidentiality of information related to customers.  This responsibility may be imposed by law, may arise out of agreements with our customers, or may be based on policies or practices adopted by the firm.  Certain jurisdictions have regulations relating specifically to the privacy of individuals and/or business and institutional customers.  Various business units and geographic areas within JPMorgan Chase have internal policies regarding customer privacy.  You should be familiar with those that apply to you. Customer information should never be disclosed to anyone outside the firm except as permitted by law and in the proper conduct of our business, where disclosure is required by legal process, or where the Legal and Compliance Department otherwise determines it is appropriate.

### 5.11     Post-employment responsibilities

As a condition of continued employment with JPMorgan Chase, employees will have certain responsibilities after their employment with JPMorgan Chase terminates.  These responsibilities include an obligation to return all firm assets in their possession, maintain the confidentiality of information, refrain from insider trading based on information obtained in the course of employment by JPMorgan Chase, and, if requested, assist JPMorgan Chase with investigations, litigation, and the protection of intellectual property relating to their employment.  Senior-Level Employees have additional obligations for one year after they leave JPMorgan Chase, including prohibitions on the solicitation and hiring of JPMorgan Chase employees and solicitation of certain customers.  You

are responsible for knowing which post-employment restrictions and
requirements apply to you.

*Id.* at para. 29.

34.     The former Investment Assistant employees, Kitty Schreiber, Graeme Wilson,
Claire Choinere, Alan Arrrieta, Nadine Azzam all affirmed their commitment to the
JPMC code of conduct as well. *Id.* para. 29.

### The Investment Advisors' Access to JPMC's Confidential Information

35.     The information made available to the Former Employees during the course of
their employment by JPMC and its high net wealth clients is exactly the information listed as
"Confidential Information" in the Agreement and described in the Code of Conduct, and
includes information received from third parties under confidential conditions such as the clients;
confidential customer data, including but not limited to customer and prospect names, addresses,
phone numbers, financial portfolio, financial account information, financial needs, investment
preferences and similar information compiled by JPMC or by the Investment Advisors in
connection with their employment by JPMC. This also includes information concerning
established business relationships and non-public information about JPMC's employees. *Id.* at
para. 22.

36.     The information about these high net worth clients has been developed primarily
through lengthy associations between JPMC Middle Market Commercial Bankers or other
internal JPMC business units and the clients and during the course of providing these banking
services to these high net worth clients, JPMC Middle Market Commercial Bankers gradually
come to learn the specific needs of each of the banking clients. *Id.* at para. 23.

37.    This very private and personal information from the clients includes their personal plans and aspirations for everything from their day to day personal and business cash flow needs and concerns, to their plans for acquisitions of businesses, their personal wealth management goals and strategies, their private and personal goals and plans for wealth transfer through estate planning, their personal and private plans for charitable donations, their personal and private plans and historic approaches to investments. *Id.* at para. 24.

38.    It takes a great deal of trust and personal commitment over a period of time for our high net worth clients to be comfortable enough with our Commercial Middle Market Bankers, and other members of our PCS Team before the clients will accept an internal referral to one of our PCS Investment Advisors. *Id.* at para. 25.

39.    To that end JPMC assures its clients of the confidentiality of this information through implementation of our Privacy Policy.  Clients rely on this policy when they share private and personal information with us and the clients expect that JPMC will keep this information safe and confidential. *Id.* at para. 26.

40.    Only then are the Middle Market Commercial Bankers in a position to make a referral of these high net worth clients to other members of the Private Client Services Team. *Id.* at para. 27.

## JPMC's Protection of its Trade Secrets.

41.    After taking time to engender the trust required between the high net worth clients and JPMC to carefully gather information from the JPMC high net worth clients about their specific private and personal banking, wealth management, trust and estate planning needs over

the course of many years, JPMC takes great pains to maintain the confidentiality of this very personal financial information which it has received from its clients. *Id.* at para. 52.

42.    Security and confidentiality measures to protect this information include limiting physical access to our offices through security guards, restricted access from the general public lobby to our office, additional limited access from each elevator lobby to locked and password or pass card protected locked doors on each floor of our offices. *Id.* at para. 53.

43.    All computers are protected by passwords. An additional password is required to access to client information. *Id.* at para. 54.

44.    Additional confidentiality and security measures at JPMC include protecting all computer access with passwords. An additional password is required for access to client information. *Id.* at para. 55.

45.    A Computer Use Policy and Technology Use Policy severely limit how the computers can be used for anything other than JPMC purposes. For example, this includes a prohibition on use of personal media storage banning the use of devices such as flash drives or thumb drives. These are specifically prohibited from ever being attached to any JPMC computers and JPMC e-mail cannot be accessed from outside internet service providers. *Id.* at para. 56.

46.    Our e-mail is protected by encryption and firewalls to limit access both internally and externally. In addition, JPMC periodically conducts audits of these procedures to ensure that they are being followed. *Id.* at para. 57.

14

47.    In addition, JPMC periodically conducts audits of these procedures to ensure that they are being followed.  In addition, JPMC has made it a condition of employment for its Investment Advisors as well as other members of the PCS Team to sign the Non-Solicit Agreement.  Technology usage policy and JPMC does not allow access to any JPMC email from other internet service providers.  Additional steps to protect disclosure include the JPMC Global Secure Shred Disposal Policy for All Paper Documents to prevent against inadvertent paper disclosure.  *Id.* at para. 58.

48.    In the past JPMC vigorously and successfully prosecuted and enforced the JPMC non-solicitation and confidentiality provisions of the Non-Solicitation Agreement and the predecessor agreement signed in the past by JPMC employees.  *Id.* at para. 59.

49.    JPMC has made the affirmative business decision not to enter into any industry protocol or other agreement with competitors such as the Protocol for Recruiting Brokers referenced in Stephen Gomberg's letter dated May 20, 2008. *Id.* at para. 60.

50.    JPMC does not seek to limit the ability of the Former Employees to obtain employment with competitors or to otherwise fairly compete with JPMC.  *Id.* at para. 61.

51.    JPMC seeks only to limit unfair competition by the misuse, misappropriation and disclosure of its confidential business information and the solicitation of its high net worth clients and current employees in the first twelve months after they leave their employment with JPMC.  To this end, JPMC requires employees to honor their continuing obligations and agreement to refrain from unfair competition. *Id.* at para. 62.

**The Mass Departure by the Former Employees**

52.    On Friday, May 16, 2008, in the early afternoon,  while Perry Mangione, their boss was out of the office attending his son's school concert a mass departure of the Former Employees took place. *Id.* at para. 32.

53.    Mangione immediately returned to the office where he learned that Leslie (Peter) DeGroot, Peter Foran, Fei Wang, Michael Dicosola, David Jakubs, Kitty Schreiber, Graeme Wilson, Claire Choinere, Alan Arrrieta, Nadine Azzam , the Former Employees, had all turned in their resignations to JPMC Compliance Officer, Dejan Milev. *Id.* at para. 33.

54.    The Former Employees provided only a resignation letters.  (See Exhibit P to Mangione Affid.)  They gave no advance notice of their departure.  They neither requested to take any client information or other confidential information with them, nor did they give notice or otherwise indicate that they were or intended to take any such information with them. Moreover, at no time were they given any permission to take with them any client or other JPMC confidential information.  Neither did the Former Employees give any indication that they intended to solicit clients or current employees of JPMC upon or after their departure. *Id.* at para. 34.

55.    Upon the Former Employees' departure, our remaining team began contacting JPMC clients to assure them there would be no interruption in their service and that JPMC would continue to provide the same high level of service the entire PCS team provided them in the past. *Id.* at para. 35.

**The Solicitation of JPMC's Client's by the Former Employees and UBS**

56.    As JPMC employees contacted clients on Saturday May 17, 2008 through Wednesday, May 21, 2008, they repeatedly heard from JPMC clients that they had in many instances been contacted by the Former Employees in the days since May 16. *Id.* at para. 36.

57.    On Saturday morning, May 17, 2008, the JPMC team continued placing calls to JPMC clients and continued to hear from many of the clients that they had already been contacted directly via telephone by the Former Employees. *Id.* at para. 37.

58.    Other JPMC employees began reporting to Mangione that the Former Employees were contacting JPMC clients outside of the clients the Former Employees had been assigned to when they worked at JPMC. *Id.* at para. 38.

59.    As JPMC PCS Client Advisors and other JPMC employees talked with many of theses clients and then relayed the information to Mangione, it was learned by JPMC that clients had received overnight packages from UBS Financial Service, Inc. ("UBS") referencing the fact that JPMC former employees were now affiliated with UBS and that Former Employees wanted to continue to relationship they had started with the clients while at JPMC. *Id.* at para. 39.

60.    In every case, the client reported that the solicitation from UBS and the former employees was unwelcome and not initiated or requested by the client. *Id.* at para. 40.

61.    UBS is a competitor of JPMC and has recently developed in the United States a personal wealth management approach somewhat similar to that of JPMC. *Id.* at para. 41.

62.    A number of JPMC clients forwarded these packages to JPMC. *Id.* at para. 42.

63.    An example of the packages JPMC received is attached to the Mangione affidavit. *Id.* at para. 43.

64.    These overnight packages from the Former Employees included a letter sent by UBS to the client by name which directed the client to sign the enclosed authorization to transfer their accounts to UBS and then to return the form in the enclosed pre-addressed and postage paid overnight envelope to UBS. *Id.* at para. 43.

65.    A number of other clients forwarded the packages to JPMC via mail with notes attached in which the client stated to Mangione or members of the PCS team he manages that client was offended by the solicitations by UBS *Id.* at para. 44.

66.    Mangione also received forwarded emails from other JPMC clients in which they stated that the JPMC Investment Advisor assigned to their accounts had contacted them in the weeks just before May 16, 2008 to set up meetings or dinners with them in the week after May 2008, after the departing employees had resigned. *Id.* at para. 45;  Carter Affid.

67.    For example, Judy Loseman, an employee of JPMC forwarded to Mangione documentation regarding her telephone conversation with a client.  The client stated that Peter Foran claimed he left JPMC because  JPMC has "a different focus – focusing on the much larger account than that of" the client .  Peter Foran  also called Judy Loseman and told her that he was pushed to use JPMC products. *Id.* at para. 46; Loseman Affid.

68.    Another client told Leah Taylor, an employee of JPMC that Fei Wang told him that he was leaving JPMC the weekend before May 16. *Id.* at para. 47.

69.    Another client called Joseph Carter, a Vice President of the Bank and stated that Fei Wang had scheduled a dinner with him and his wife the week before he called to announce that he had moved to UBS and still wanted to keep the appointment and talk to them about bringing their business over to UBS. *Id.* at para. 48.

70.    Other clients contacted Mangione and his team to tell JPMC that they received phone calls from Peter DeGroot in which he stated that "there was no one left at JPMC to service their accounts" and other reported that DeGroot told them that he had left JPMC because he was uncomfortable with the investment products he was directed by JPMC to provide to the clients. These clients expressed concern that DeGroot was stating that JPMC told him to make investment advice that was not in the best interest of the clients. *Id.* at para. 49.

71.    Other JPMC clients reported that they were given the impression that the change was merely cosmetic, leaving them with the impression that they would continue to be assigned to the same JPMC Investment Advisor and that their accounts would still be with a division of JPMC if they signed the transfer documents. *Id.* at para. 50.

72.    The loss of goodwill with these clients is incalculable and many of the clients have indicated that their trust in the confidentiality and security of their account information at JPMC has been shaken by the events of the last few days. *Id.* at para. 51.

### The Gomberg Letter Confirms UBS Now Has the JPMC's Confidential Information

73.    On May 20, 2008, Steven Gomberg, Counsel for the Former Employees sent a letter ("the Gomberg Letter") to Counsel for JPMC. Declaration of William J. Daley.

74.    The Gomberg Letter admits that the Former Employees have what the letter characterizes as the "client information". *Id.*

75.    The Gomberg Letter claims that the Former Employees and UBS are justified in using the "client information" in reliance on a Broker Protocol. *Id.*

76.    JPMC is not a signatory to any so called Broker Protocol.

19

77.    The Gomberg Letter give no reassurance that the solicitation or misuse of JPMC's confidential business information will stop.  *Id*

.    **The Solicitation of JPMC Clients Continues Unabated**

78.    As of the moment these pleadings were filed, there has not been a break in the solicitations and they continue unabated to this moment. For example

a. Margaret Rowley, a Managing Director of JPMC states in her affidavit:

On May 16, 2008, I spoke with a business owner and PCS client with whom I have a long term relationship.  He stated that on May 16, 2008, Peter DeGroot had telephoned him and stated that he and a team had left JPMC to accept employment with UBS and wanted to speak with the client about moving his business to UBS.

On May 19, 2008, I again spoke with this client who informed me that at 7:30am on Saturday, May 17, 2008, he received an overnight delivery from UBS sent on behalf of Peter DeGroot.  He told me he was upset to have received the unsolicited package and concerned by what appeared to be Peter DeGroot's use of his customer information – information he believed to be confidential and protected by JPMC.

On May 19, 2008, I spoke with a second client who stated that he had received an unsolicited phone call from Peter DeGroot.

Also on May 19, 2008, I spoke with a third client who stated that he had received an unsolicited phone call from Peter DeGroot regarding moving business from JPMC to UBS.  The client stated he would not move his accounts.

On May 20, 2008, I spoke with a client who stated that he had spoken with Peter DeGroot about his move to UBS and was considering transferring business to UBS as a result of this conversation.

*See,* Affidavit of Margaret Rowley

b. Elizabeth Connelly, the Regional Director for Private Client Services at JPMC states in her affidavit

On May 22, 2008, I met with Kent Suarez, Chief Financial Officer for  Children's Home & Aid Society.

Mr. Suarez informed me that on May 16, 2008, he received an email form Peter

Foran that stated "Here is what I put together as a possible transition to a growth portfolio." On May 19, 2008, Suarez received a telephone call from Peter Foran. A true and correct copy of this email I received from Mr. Suarez are attached hereto as Exhibit A.

Mr. Suarez also provided me with a mailing he received on May 17, 2008 from UBS on behalf of Peter Foran that included prefilled account transfer papers and "sign here" tabs. A true and correct copy of this packet is attached hereto as Exhibit B.

Mr. Suarez communicated his dissatisfaction to me regarding this unsolicited mailing and stated he felt such a mailing was improper.

Since May 16, 2008, I have received various reports that Peter Foran and the other Defendants in this matter have made unsolicited communications to JPMC clients.

c.

79.     This morning, May 22, 2008, JPMC began receiving transfer documents from a number of the JPMC clients solicited by the Former Employees. Mangione Affid at paras. 64,65.

80.     As many of the clients have informed Perry Mangione and others at JPMC, the Former Employees pre-positioned themselves for their post-JPMC solicitations of JPMC clients by setting up dinner meetings, golf outings and events with the JPMC clients before the Former Employees left JPMC without revealing to the JPMC clients that the purpose of the upcoming meetings would be to solicit the JPMC clients to follow the Former Employees to UBS. Carter Affid.

81.     JPMC's investigation of the Former Employees departure has revealed the Former Employees began formulating the plan for their coordinated departure in at least January of 2008. Covert Affid.

82.    The Former employees met with a number of other financial firms in and effort to shop the business generated by the JPMC clients to these other firms. *Id.*

83.    UBS eventually offered significant signing bonuses in at least one case as much as $1.4 Million to leave JPMC and come to UBS with JPMC's clients. *Id.*

84.    A contract was shown to the Former Employees which included bonuses based on their ability to match or exceed their  trailing twelve months revenue at JPMC. *Id.*

<u>**COUNT I**</u>
<u>**BREACH OF CONTRACT – NON-SOLICITATION**</u>
<u>**(against the Former Employees)**</u>

85.    JPMC realleges and incorporates by reference Paragraphs 1 through 84.

86.    PMC brings this Count against the Former Employees for breach of contract based on their disclosure of confidential information to UBS.

87.    All of the Former Employees signed the Agreement.

88.    All of the Former Employees received valid consideration for signing the Agreement.

89.    The Agreement contains promises by the Former Employees to refrain from soliciting JPMC clients for a period of twelve months after the Former Employees depart employment with JPMC.

90.    Despite this very clear promise to refrain from solicitation, the Former Employees have engaged and continue to engage in a deliberate, coordinated and ongoing course of conduct which includes a campaign of targeted solicitations of JPMC clients via the mail, telephone, internet and in person meetings.

91.     Despite repeated warnings from JPMC, the Former Employees have shown no indication that they will cease this course of conduct.

92.     JPMC invested a great deal in creating the goodwill between it and its clients and the ongoing breach of the non-solicitation clause of the Agreement by the Former Employees has and continues to cause incalculable damage to JPMC.

<div align="center">

**COUNT II**
**BREACH OF CONTRACT – DISCLOSURE**
**OF CONFIDENTIAL INFORMATION**
**(against the Former Employees)**

</div>

93.     JPMC realleges and incorporates by reference Paragraphs 1 through 84.

94.     JPMC brings this Count against the Former Employees for breach of contract based on their disclosure of confidential information to UBS.

95.     All of the Former Employees signed the Agreement.

96.     All of the Former Employees received valid consideration for signing the Agreement.

97.     The Agreement contains promises by the Former Employees to refrain from disclosing JPMC's confidential information.

98.     Despite this very clear promise to refrain from disclosing JPMC's confidential information, the Former Employees have engaged and continue to use the confidential information to engage in a deliberate, coordinated and ongoing course of conduct which includes a campaign of targeted solicitations of JPMC clients via the mail, telephone, internet and in person meetings

99.    Despite repeated warnings from JPMC, the Former Employees have shown no indication that they will cease this course of conduct.

100.    JPMC invested a great deal of time and money in gathering and protecting the confidential information about its clients and the ongoing breach of the confidentiality clause of the Agreement by the Former Employees has and continues to cause incalculable damage to JPMC.

## COUNT III
## TORTIOUS INTERFERENCE WITH CONTRACT
### (against UBS)

101.    JPMC realleges and incorporates by reference Paragraphs 1 through 84.

102.    JPMC brings this Count against UBS for tortious interference with contract.

103.    JPMC realleges and incorporates by reference Paragraphs 1 through 85.

104.    JPMC brings this Count against UBS for tortious interference with contract.

105.    JPMC has a legitimate expectancy that it will continue to do business with and service its long-term clients, including, clients that Former Employees moved to UBS.

106.    JPMC has a legitimate expectancy that Former Employees will honor the terms of contractual promises with JPMC and that their employers, including UBS, will likewise respect the terms of those contracts.

107.    UBS knew of the existence or should have known about the existence of the Former Employees contractual obligations to refrain from solicitation of JPMC clients the Former Employees came into contact with while employed at JPMC and to refrain from disclosure of JPMC confidential business information.

108.    Despite having knowledge of JPMC's expectancy, UBS attempted to and has certain clients of JPMC  to discontinue their business relationships with JPMC through the use of

24

confidential information provided by Former Employees, and/or through solicitation of the

certain clients by Former Employees.

109.    This action violated Former Employees' written promises to JPMC and legal

prohibitions against such conduct.

110.    As a result of UBS's actions, which constitute tortious interference with contract,

JPMC has been injured and faces irreparable injury. JPMC has lost and is threatened with losing

its clients, income, and goodwill in amounts that may be impossible to determine unless UBS is

enjoined and restrained by Order of this Court, as alleged above.

## COUNT IV
## TORTIOUS INTERFERENCE WITH EXPECTANCY
### (against  UBS)

111.    JPMC realleges and incorporates by reference Paragraphs 1 through 84.

112.    JPMC has a legitimate expectancy that it will continue to do business with and

service its long-term clients, including, clients that Former Employees moved to UBS.

113.    JPMC has a legitimate expectancy that Former Employees will honor the terms of

contractual promises with JPMC and that their employers, including UBS, will likewise respect

the terms of those contracts.

114.    UBS knew of the existence or should have known about the existence of the

Former Employees contractual obligations to refrain from solicitation of JPMC clients the

Former Employees came into contact with while employed at JPMC and to refrain from

disclosure of JPMC confidential business information.

115.    Despite having knowledge of JPMC's expectancy, UBS attempted to and has

certain clients of JPMC  to discontinue their business relationships with JPMC through the use of

confidential information provided by Former Employees, and/or through solicitation of the certain clients by Former Employees.

116.    This action violated Former Employees' written promises to JPMC and legal prohibitions against such conduct.

117.    As a result of UBS's actions, which constitute tortious interference with contract, JPMC has been injured and faces irreparable injury. JPMC has lost and is threatened with losing its clients, income, and goodwill in amounts that may be impossible to determine unless UBS is enjoined and restrained by Order of this Court, as alleged above.

## COUNT V
## VIOLATIONS OF THE ILLINOIS TRADE SECRET ACT
### (All Defendants)

118.    JPMC incorporates by reference the allegations contained in paragraphs 1-84 as if fully set forth herein as Paragraph 119.

119.    JPMC brings this Count against UBS and the Former Employees for actual and/or threatened misappropriation of-trade, secrets in violation of the Illinois Trade Secrets Act, 765 ILCS 1065/1 *et seq*.

120.    JPMC has protectable trade secrets in its customers' confidential, non-public personal information.  This information includes customer identities, addresses and telephone numbers, social security numbers, transactional histories, tax information, financial portfolio, financial account information, financial needs, and investment preferences.

121.    The proprietary business and customer information of JPMC constitutes trade secrets because JPMC derives independent economic value from that information, and such information is not generally known or readily ascertainable by proper means by other persons

who can obtain economic value from its disclosure or use, and because the information is the subject of reasonable efforts to maintain its secrecy.

122.    UBS and The Former Employees have actually misappropriated and threaten to further misappropriate JPMC's trade secrets without JPMC's consent in violation of the Illinois Trade Secrets Act.

123.    UBS has employed The Former Employees and they serves in functions for UBS similar to their previous roles at JPMC and thus will inevitably utilize and/or disclose JPMC's trade secrets and/or confidential information for the benefit of UBS.

124.    UBS and The Former Employees have been, and will be unjustly enriched by the misappropriation of JPMC's trade secrets and/or confidential information and, unless restrained, will continue to threaten to use, actually use, divulge, inevitably disclose, acquire, and/or otherwise misappropriate JPMC's trade secrets and confidential information.

125.    UBS' and The Former Employees' misappropriation has been willful and malicious.

126.    The misappropriation of its trade secrets has injured JPMC, and JPMC faces irreparable injury. JPMC has already lost several clients and is threatened with losing additional clients, income, and goodwill in amounts that may be impossible to determine, unless UBS and The Former Employees are enjoined and restrained by order of this Court, as alleged above.

## **RELIEF**

127. JPMC does not seek any form of relief that would prevent the Former Employees from being employed in their chose field. JPMC seeks only that relief that will enforce its contractual and other rights for the agreed upon 12 month time period; enforce its contractual and property rights to prevent the use of it confidential and proprietary information; remedy the damages that JPMC has incurred as a results of the Former Employees and UBS's unfair and unlawful competition; and relief that will prevent JPMC from incurring any further such damages.

WHEREFORE, JPMC requests that:

a.      This Court issue a Temporary Restraining Order and Preliminary Injunction restraining and enjoining Defendants, UBS and Leslie (Peter) DeGroot, Peter Foran, Fei Wang, Michael Dicosola, David Jakubs, Kitty Schreiber, Graeme Wilson, Claire Choinere, Alan Arrrieta, Nadine Azzam, (hereinafter, the "Former Employees") until further Order of this Court:

i.      from directly or indirectly, acting alone or with others, solicit or attempt to solicit, induce to leave or divert or attempt to induce to leave or divert from doing business with JPMC, any JPMC customer with whom any of the Former Employees had contact, for whom any of the Former Employees had responsibility or with respect to whom any of the Former Employees were privy to any information during the last two years of the Former Employees employment with JPMC

ii.     using or disclosing at any time in the future JPMC's confidential business information, trade secrets, proprietary information and/or property

B.      That, as required by their agreements with JPMC and as required under Illinois and New York law, Former Employees be ordered in the form of a mandatory preliminary injunction to return any JPMC property that has been misappropriated from JPMC; and.

C.      That after a trial in this action as to the counts not covered by the FINRA Arbitration, a permanent injunction be issued to the same effect as the preliminary injunction requested above; and,

D.      That JPMC be granted as relief money damages, including lost profits, exemplary damages all other appropriate damages as well as all interest, costs and disbursements in this action, including reasonable attorney's fees and other such relief as this Court may deem just and proper.

Respectfully Submitted,

JPMORGAN CHASE BANK, N.A.  and JPMORGAN CHASE & CO.

By: _____
One of the Attorneys for Plaintiff

Dated: May 21, 2008

Gregory H. Andrews, ARDC No. 6209480
Dykema Gossett PLLC
10 S. Wacker Drive
Suite 2300
Chicago, Illinois 60606
(312) 876-1700

## VERIFICATION

I, Perry Mangione, Managing Director, Private Client Services for JPMORGAN Chase Bank, N.A., state, pursuant to 28 U.S.C. § 1746, that I am authorized to make this verification on behalf of JPMORGAN CHASE BANK, N.A. and JPMORGAN SECURITIES, INC. and that the facts set forth in the forgoing Verified Complaint are true and correct to the best of my knowledge, information, and belief. I verify under penalty of perjury that the foregoing is true and correct.

Perry J. Mangione

Dated: May 22, 2008

CHICAGO\2452596.2
ID\GHA

STATE OF ILLINOIS     )
                      )
COUNTY OF COOK     )

## AFFIDAVIT OF DONNA GALLERY

I, DONNA GALLERY, the undersigned, hereby state that if sworn as a witness under oath, I would testify to the following facts based on personal knowledge and information:

1.    I am currently a Vice President and Private Banker for Private Client Services (PCS) at JPMorgan Chase Bank, N.A ("JPMC") in Chicago, Illinois.

2.    On May 19, 2008, I received a call from a Middle Market Business Owner PCS client.

3.    This client informed me that on Friday, May 16, 2008 he received a UPS package sent by UBS on behalf of Peter DeGroot. This package included correspondence that invited the client to transfer his business to UBS and included account transfer documents with some of the information necessary to complete the transfer already filled in.

Further, Affiant Sayeth Not.

Donna Gallery

Subscribed and sworn to before me
this 22ⁿᵈ day of   MAY  , 2008.

Notary Public

"OFFICIAL SEAL"
VALER EMINI
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 2/19/2012

1

STATE OF ILLINOIS      )
                           )
COUNTY OF COOK      )

### AFFIDAVIT OF JOSEPH E. CARTER

      I, JOSEPH CARTER, the undersigned, hereby state that if sworn as a witness under oath, I would testify to the following facts based on personal knowledge and information:

      1.      I am currently a Vice President and Private Banker for Private Client Services (PCS) at JPMorgan Chase Bank, N.A ("JPMC") in Chicago, Illinois.

      2.      On May 17, 2008, I was informed by a PCS client who informed me that before departing JPMC, Fei Wang had scheduled a dinner with her and her husband. The client further informed me that after Fei Wang had left JPMC, he again contacted the client requesting to keep the dinner appointment and stated that he wanted to talk to them about moving their business to UBS.

Further, Affiant Sayeth Not.

_____
Joseph E. Carter

Subscribed and sworn to before me
this 22ᴺᴰ day of ___MAY___ , 2008.

_____
Notary Public

"OFFICIAL SEAL"
VALER EMINI
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 2/19/2012

1

STATE OF ILLINOIS          )
                           )
COUNTY OF COOK             )

## AFFIDAVIT OF MARGARET ROWLEY

I, MARGARET ROWLEY, the undersigned, hereby state that if sworn as a witness under oath, I would testify to the following facts based on personal knowledge and information:

1.    I am currently a Managing Director and Client Advisor for Private Client Services (PCS) at JPMorgan Chase Bank, N.A ("JPMC") in Chicago, Illinois.

2.    On May 16, 2008, I spoke with a business owner and PCS client with whom I have a long term relationship. He stated that on May 16, 2008, Peter DeGroot had telephoned him and stated that he and a team had left JPMC to accept employment with UBS and wanted to speak with the client about moving his business to UBS.

3.    On May 19, 2008, I again spoke with this client who informed me that at 7:30am on Saturday, May 17, 2008, he received an overnight delivery from UBS sent on behalf of Peter DeGroot. He told me he was upset to have received the unsolicited package and concerned by what appeared to be Peter DeGroot's use of his customer information – information he believed to be confidential and protected by JPMC.

4.    On May 19, 2008, I spoke with a second client who stated that he had received an unsolicited phone call from Peter DeGroot.

5.    Also on May 19, 2008, I spoke with a third client who stated that he had received an unsolicited phone call from Peter DeGroot regarding moving business from JPMC to UBS. The client stated he would not move his accounts.

6.    On May 20, 2008, I spoke with a client who stated that he had spoken with Peter DeGroot about his move to UBS and was considering transferring business to UBS as a result of this conversation.

7.    On May 20, 2008, I spoke with a second client who received an unsolicited package from UBS sent on behalf of Peter DeGroot that included account transfer documents. This client stated that he was upset by this unsolicited mailing, threw it in the trash, and then contacted me to express his dissatisfaction.

1

8.     Since May 19, 2008, various other clients have communicated to me that Peter DeGroot has left unsolicited voicemails with them.


Further, Affiant Sayeth Not.


_Margaret M Rowley_
Margaret Rowley


Subscribed and sworn to before me
this 22nd day of ___MAY___, 2008.

_____
Notary Public

"OFFICIAL SEAL"
VALER EMINI
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 2/19/2012

STATE OF ILLINOIS       )
                               )
COUNTY OF COOK      )

### AFFIDAVIT OF JUDITH LOSEMAN

I, JUDITH LOSEMAN, the undersigned, hereby state that if sworn as a witness under oath, I would testify to the following facts based on personal knowledge and information:

1.     I am currently a Vice President and Senior Private Banker for Private Client Services (PCS) at JPMorgan Chase Bank, N.A ("JPMC") in Chicago, Illinois.

2.     On May 16, 2008, a JPMC PCS institutional client with whom I have had a long-standing relationship telephoned to inform me that Peter Foran had contacted him.

3.     Foran stated during his conversation with the client that JPMC is going down a different path and looking for larger clients than this client. He told the client that I would feel the same. I do not.

4.     On May 16, 2008, Peter Foran telephoned me and admitted that he had contacted this client. He stated that he told the client that JPMC is pushing products that are inappropriate for this client's needs.

5.     On May 21, 2008, I again spoke with this client who confirmed that Foran had again contacted him and stated "disturbing things." As of the signing of this affidavit I have not been able to contact this client for follow-up.

Further, Affiant Sayeth Not.

_____
Judith Loseman

Subscribed and sworn to before me
this 22 day of ____MAY____, 2008.

_____
Notary Public

"OFFICIAL SEAL"
VALER EMINI
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 2/19/2012

1

STATE OF ILLINOIS          )
                           )
COUNTY OF COOK             )

### AFFIDAVIT OF ELIZABETH CONNELLY

I, ELIZABETH CONNELLY, the undersigned, hereby state that if sworn as a witness under oath, I would testify to the following facts based on personal knowledge and information:

1.    I am currently the Regional Director for Private Client Services (PCS) at JPMorgan Chase Bank, N.A ("JPMC") in Chicago, Illinois.

2.    On May 22, 2008, I met with Kent Suarez, Chief Financial Officer for Children's Home & Aid Society.

3.    Mr. Suarez informed me that on May 16, 2008, he received an email form Peter Foran that stated "Here is what I put together as a possible transition to a growth portfolio." On May 19, 2008, Suarez received a telephone call from Peter Foran. A true and correct copy of this email I received from Mr. Suarez are attached hereto as Exhibit A.

4.    Mr. Suarez also provided me with a mailing he received on May 17, 2008 from UBS on behalf of Peter Foran that included prefilled account transfer papers and "sign here" tabs. A true and correct copy of this packet is attached hereto as Exhibit B.

5.    Mr. Suarez communicated his dissatisfaction to me regarding this unsolicited mailing and stated he felt such a mailing was improper.

6.    Since May 16, 2008, I have received various reports that Peter Foran and the other Defendants in this matter have made unsolicited communications to JPMC clients.

Further, Affiant Sayeth Not.

_Elizabeth Connelly_
Elizabeth Connelly

Subscribed and sworn to before me
this 22 day of _May_ , 2008.

_Mary H Malone_
Notary Public

"OFFICIAL SEAL"
Mary H. Malone
Notary Public, State of Illinois
My Commission Exp. 10/19/2008

1

TO_____ DATE _5/19_ TIME _10:01_

WHILE YOU WERE OUT

M _Peter Foran_ ————→ 773-919-5136

PHONE_____

| TELEPHONED | CALLED TO SEE YOU | WANTS TO SEE YOU |
| PLEASE CALL | WILL CALL AGAIN | RUSH |
| | RETURNED YOUR CALL | |

REMARKS_____

_____

_____

_____

SIGNED_____

PRINTED IN U.S.A.

L1-A2335

**From:** &lt;peter.d.foran@jpmorgan.com&gt;
**To:** "Kent Suarez" &lt;Ksuarez@childrenshomeandaid.org&gt;
**Date:** 5/16/2008 11:33:54 AM
**Subject:** Portfolio

Kent-

Hope you are well. Here is what I put together as a possible transition to a growth portfolio. Let me know your thoughts. Regards, Peter

Please note that we moved effective December 10, 2007. My new contact information is outlined below:

Peter D. Foran
Sr. Investment Advisor
JPMorgan Private Client Services
Mail Code IL1-1245
10 S. Dearborn Street 11th Floor
Chicago, IL 60603
Telephone (312)-732-7711
Fax (312) 732-7817
E-mail: peter.d.foran@jpmorgan.com

Products and services, including fiduciary and custody products and services, are offered through JPMorgan Chase Bank, N.A. and its affiliates. Securities (including mutual funds) and certain investment advisory services are provided by J.P. Morgan Securities Inc., member NYSE, NASD and SIPC, or Chase Investment Services Corp., member NASD and SIPC. J.P. Morgan Securities Inc. and Chase Investment Services Corp. are affiliates of JPMorgan Chase Bank, N.A. Insurance products are provided by various insurance companies and offered through JPMorgan Insurance Agency, Inc. Products not available in all states.

Investment accounts and insurance products are not a bank deposit • Not FDIC insured • Not insured by any federal government agency • Not guaranteed by the bank • May lose value

Generally, this communication is for informational purposes only and it is not intended as an offer or solicitation for the purchase or sale of any financial instrument or as an official confirmation of any transaction. In the event you are receiving the offering materials attached below related to your interest in hedge funds or private equity, this communication may be intended as an offer or solicitation for the purchase or sale of such fund(s). All market prices, data and other information are not warranted as to completeness or accuracy and are subject to change without notice. Any comments or statements made herein do not necessarily reflect those of JPMorgan Chase & Co., its subsidiaries and affiliates.

This transmission may contain information that is privileged, confidential, legally privileged, and/or exempt from disclosure

under applicable law. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or use of the information contained herein (including any reliance thereon) is STRICTLY PROHIBITED. Although this transmission and any attachments are believed to be free of any virus or other defect that might affect any computer system into which it is received and opened, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by JPMorgan Chase & Co., its subsidiaries and affiliates, as applicable, for any loss or damage arising in any way from its use. If you received this transmission in error, please immediately contact the sender and destroy the material in its entirety, whether in electronic or hard copy format. Thank you.
Please refer to http://www.jpmorgan.com/pages/disclosures for disclosures relating to UK legal entities.

 **UBS**

UBS Financial Services Inc.
One North Wacker Drive
Suite 3700
Chicago, IL 60606
Tel. 312-525-7500
Fax 312-525-7501
Toll Free 888-827-8469

*773-919-5136*

May 16, 2008

Children's Home & Aid Society
Attn: Kent Suarez, CFO
125 South Wacker Drive 14th floor
Chicago, IL 60606

Dennis J. Drescher
Managing Director
Private Wealth Management
dennis.drescher@ubs.com

www.ubs.com

Dear Mr. Kent Suarez:

As the Managing Director of the UBS Private Wealth Management office in Chicago, Illinois, I am proud to announce that Peter D. Foran has accepted a position as Senior Vice President - Investments with our firm. He is among a select number of Private Wealth Advisors who were invited to join this office, exemplifying our commitment to providing you and your family an enhanced level of service and expanded access to UBS's global capabilities.

Peter chose UBS for many reasons, among the most important being:

- UBS is a top tier investment banking and securities firm, and one of the largest global asset managers. In Switzerland, UBS is the market leader in retail and commercial banking. As a Private Wealth Advisor, he is backed by UBS AG - the world's largest wealth manager[1] and the world's best private bank.[2]

- Access to dedicated Specialists and resources with expertise in a wide range of areas, including asset allocation, wealth management and charitable planning strategies that are unique to clients with substantial means.

- Lending capabilities supported by the strong long term rating and substantial balance sheet of our parent company, UBS AG.

- At UBS, wealth management is our core business. With locations in over 50 countries and over $2.23 trillion in client assets, we offer access to a truly global perspective on markets and economies around the world.[3]

On behalf of Peter and his team, I wanted to personally contact you. We would be honored to have you join us at UBS. I am confident that our team is well-qualified to assist you with the complex investment and financial planning decisions you face on an ongoing basis.

Enclosed are the necessary forms to help ensure a smooth and efficient transition. Please review and sign the forms where indicated and return them in the overnight envelope at your earliest convenience.

We look forward to continuing to provide the high level of service which you deserve and have come to expect from Peter and his team. Please do not hesitate to contact me in the interim with any questions or comments you may have. My direct number is (312) 525-7500. Peter and his team can be reached directly at (312) 525-7622. You may contact either of us toll free at (888) 827-8469.

Sincerely,

Dennis J. Drescher

[1] Scorpio Partnership, June 2007
[2] Euromoney, 2007
[3] Invested assets with UBS AG $2.23 trillion as of March 31, 2008

# Checklist of required information:

Please return your signed forms with the following information.

- **<u>Your most recent account statement for each account.</u>**

- If you have a TRUST account, please provide us with a copy of the first page, trustee powers, and signature pages of your trust document.

- If you have an ESTATE account, please provide a copy of the court appointment.

- Legal address (if you have moved in the past 6 months, return with copy of driver's licenses and copy of utility bill.)

- Social Security / Tax ID Number, Date of Birth, Phone Numbers: Home and Business, Employer's name, address and occupation.

- If you have a RETIREMENT account, please provide your beneficiary information on the account form where indicated. For those subject to Required Minimum Distribution, please include a copy of your December statement.

- If your account has checking, bill pay, or electronic funds transfer, please return a voided check.

- If you have a BUSINESS account, please provide us with legal operating agreement.

Please **<u>DO NOT</u>** use white out on any part of the account forms. Simply initial next to any change you make on the form (misspellings, inaccurate information, etc). Any changes to the forms will be corrected and handled by our office to ensure proper account opening.

*Please be sure to complete the "Financial Information" Section. It is extremely important that we have accurate financial information on your accounts. This information will be kept strictly confidential.*



 **UBS**

B 1026

**UBS Financial Services Inc.**

Account Number _____

TIN _____

# Account Transfer

`TF`

## About Your UBS Financial Services Inc. Account

Account Title

**Children's Home & Aid Society**

**For Retirement Accounts Only**—Account is to be transferred into a:

☐ Traditional IRA   ☐ Traditional IRA Rollover   ☐ SEP IRA   ☐ Roth IRA   ☐ Qualified Plan

☐ SIMPLE IRA   ☐ CODA SEP-IRA   ☐ Coverdell Education Savings Account

The account is transferring from a qualified retirement plan by means of a direct rollover into a*:

☐ Traditional IRA   ☐ SEP IRA   ☐ Rollover IRA   ☐ CODA SEP IRA

*Pursuant to IRS Regulations, qualified retirement plan assets cannot be rolled over to a SIMPLE IRA or Roth IRA.

## About the Account You Are Transferring

Please refer to your statement for the following information **and attach a complete copy of your most recent statement for this account.**

Please complete a separate form for each account you transfer (photocopies are acceptable).

**Children's Home & Aid Society**

Name(s) and Title of Account on your statement

_____

Your Account Number

_____

SS#/TIN: _____

2nd SS#/TIN: _____

**JP Morgan Chase**

Name of Firm/Fund Company          Broker Clearing #

**10 South Dearborn St.**

Street Address of Firm/Fund Company

**Chicago, IL 60603**

City                          State        Zip

## Type of Transfer You Are Making  Please answer the following questions

**Do you wish to transfer your entire account?** ☐ Yes   ☐ No

If you answered "yes," skip to the next question. If you answered "no," and the transfer is not coming directly from an insurance or mutual fund company, please provide the following information for the assets you intend to transfer.

Indicate the number of shares of each asset you wish to transfer or write "all."

| Description of Asset | Quantity | Description of Asset | Quantity |
|---|---|---|---|
| 1. | | 4. | |
| 2. | | 5. | |
| 3. | | 6. | |

**Are you transferring directly from an insurance or mutual fund company?** ☐ Yes   ☐ No

If you answered "no," skip to the next question. If you answered "yes," please provide the following information for each annuity or mutual fund you intend to transfer. (Some assets are not transferable. If the asset is not transferable, UBS Financial Services Inc. may be named broker-dealer and/or custodian at the company, or the assets can be sold. Requests to sell positions are dependent upon the delivering firm receiving and processing the request and may take several weeks to complete. Liquidations can also be processed by calling the delivering firm.)

| Name of Fund/Annuity | Account Number | Quantity (indicate # of shares or "All") |
|---|---|---|
| 1. | | |
| 2. | | |
| 3. | | |
| 4. | | |

## UBS Financial Services Inc. Branch Use Only

For in-kind transfer of directly held mutual funds, establish a BIN number and reference here: 0__ __ __ __ __ __ __ __ __ **00**
To request a BIN number, open a Star Case to Mutual Funds, Conversion In/Out

AC-XFR (Rev. 2/08)

©2008 UBS Financial Services Inc. All rights reserved. Member SIPC. 1

STATE OF ILLINOIS    )
                           )
COUNTY OF COOK     )

## AFFIDAVIT OF PERRY MANGIONE

I, PERRY MANGIONE, the undersigned, hereby state that if sworn as a witness under oath, I would testify to the following facts based on personal knowledge and information:

1.    I am currently a Managing Director for Private Client Services (PCS) at J.P. Morgan Chase Bank, N.A ("JPMC") in Chicago, Illinois.

2.    I have been employed by JPMC since approximately 2004.

3.    In my job as Managing Director, I am responsible for supervising the work of three teams of Private Client Services advisors and each of the three teams consists of Investment Advisors, Investment Assistants, Fiduciary Advisors, Fiduciary Client Service Associates, Wealth Advisors Private Bankers, and Banking Client Service Associates.

4.    The goal of the group I am in charge of managing is to provide investment, trust, wealth management and financial planning services to JPMC high net worth clients.

5.    My own compensation is primarily based on successfully managing my three teams of PCS Advisors to ensure that the JPMC PCS Teams generate revenue - including revenue from referrals made by the JPMC Middle Market Commercial Bankers.

6.    Within the teams that I manage, PCS Client Advisors typically take the lead in managing the relationship between the client and the rest of the JPMC PCS Team.

7.    Other members of the team, each tasked with specific duties include: Private Bankers who handle credit and cash management for the client; Fiduciary Advisors, who are what has traditionally been referred to as Trust Officers, and who mange the clients assets where the JPMC is acting in a fiduciary capacity; Wealth Advisors, who assist the client in financial and estate planning; and, Investment Advisors, who assist clients in selecting investment products suited to the specific needs of the each particular high net worth client.

8.    JPMC defines high net worth clients as those with between $1 Million to $25 Million in net worth and many of these clients are extremely sensitive about maintaining their confidentiality and identity regarding the membership in this group, with several going so far as to utilize trusts and other mechanisms to maintain their confidentiality.

9.    This PCS team-based business model has been in place for all of the four years that I have been with the Bank and has multiple points of client contact from the various PCS team members including the Fiduciary Advisors, Trust Advisors, Wealth Advisors and Investment Advisors.

10.    Within the teams that I manage, one of the primary source of business is a funneling of clients who are prequalified by the JPMC Middle Market Commercial Bankers or other JPMC business units through referrals to the Private Client Services team members.

11.    Within the teams that I manage, clients are generally first directed to a Client Advisor, then on to a Private Banker, Investment Advisor or other team member as appropriate for the particular client's unique needs.

12.    My teams rely heavily, and in many cases, almost exclusively on this internal referral program and all of our team members are continually reminded to cross-sell within this PCS team-based system.

13.    Investment Advisors or Investment Assistants within my team at JPMC do not make cold calls.

14.    Investment Advisors and Investment Assistants are required to hold a Series 7 License and a Series 66 License or alternatively a Series 7 and a Series 63 License and Series 65 License.

15.    All of the former employees who were Investment Advisors with JPMC were hired or promoted from within JPMC to their most recent positions as Investment Advisors.

16.    As part of the regular course of business, as a condition of employment and as a prerequisite to being eligible for incentive compensation, JPMC requires the Investment Advisors and Private Bankers I supervise to sign a Supervision, Confidentiality, and Non-Solicitation Agreement ("the Agreement").

17.    This Non-Solicitation Agreement imposes certain continuing obligations on employees that survive their employment with JPMC, including restricting departing employees for a period of twelve months from soliciting and/or recruiting JPMC employees; soliciting JPMC customers; or using JPMC proprietary, confidential and trade secret information.

18.    The Agreement includes a "carve-out" provision for clients that the Investment Advisor had relationships with prior to working for JPMC. This "Carve-out" provisions required the employee to specifically list those clients that might fit within the carve-out on an Exhibit A to the Agreement. None of the former Investment Advisor employees listed any clients on an Exhibit A to his Agreement with JPMC.

19.    In the one instance I am aware of where an Advisor refused to sign the required Non-Solicit Agreement, he was immediately terminated from employment with JPMC.

20.    As an additional condition of employment, JPMC requires all employees from the Chief Executive Officer down, to sign the JPMC Code of Conduct, which also includes confidentiality and non-disclosure provisions.

21.    JPMC requires its Investment Advisors to sign the Non-Solicit Agreement and requires all PCS employees to affirm the Code of Conduct in order to protect the information it has developed at great expense over a significant period of time. This includes information

specific to its high net worth clients that is not readily available from other public sources of information.

22.     The information made available to the former employees during the course of their employment by JPMC and its high net wealth clients is exactly the information listed as "Confidential Information" in the Agreement and described in the Code of Conduct, and includes information received from third parties under confidential conditions such as the clients; confidential customer data, including but not limited to customer and prospect names, addresses, phone numbers, financial portfolio, financial account information, financial needs, investment preferences and similar information compiled by JPMC or by the Investment Advisors in connection with their employment by JPMC.    This also includes information concerning established business relationships and non-public information about JPMC's employees.

23.     With respect to my team, the information about these high net worth clients has been developed primarily through lengthy associations between JPMC Middle Market Commercial Bankers or other JPMC business units and the clients and during the course of providing these banking services to these high net worth clients, JPMC Middle Market Commercial Bankers gradually come to learn the specific needs of each of the banking clients.

24.     This very private and personal information from the clients includes their personal plans and aspirations for everything from their day to day personal and business cash flow needs and concerns, to their plans for acquisitions of businesses, their personal wealth management goals and strategies, their private and personal goals and plans for wealth transfer through estate planning, their personal and private plans for charitable donations, their personal and private plans and historic approaches to investments.

25.     It takes a great deal of trust and personal commitment over a period of time for our high net worth clients to be comfortable enough with our Commercial Middle Market Bankers, and other members of our PCS Banking Team before the clients will accept an internal referral to one of our PCS Investment Advisors.

26.     To that end we assure our clients of the confidentiality of this information through implementation of our Privacy Policy.  Clients rely on this policy when they share private and personal information with us and the clients expect that we will keep this information safe and confidential.

27.     Only then are the Middle Market Commercial Bankers in a position to make a referral of these high net worth clients to other members of the Personal Services Client Team.

28.     Among the forty-five individuals I had direct or indirect supervision over during the past four years, I supervised Leslie (Peter) DeGroot, Peter Foran, Fei Wang, Michael Dicosola, David Jakubs, Kitty Schreiber, Graeme Wilson, Claire Choinere, Alan Arrieta, Nadine Azzam (the "former employees").

29.     DeGroot, Foran, Wang, Dicosola and Jakubs all signed Non-Solicitation Agreements on or about May and June of 2006. The signed Agreements for these former employees are attached as Exhibits A – E to the Affidavit.

30.    All of the former employees signed the JPMC Code of Conduct. The signed Code of Conduct affirmations for these former employees are attached as Exhibits F – O to the Affidavit.

31.    With respect to the former employees I have knowledge that they have very little if any externally generated business that is not a product of the internal team referral business model detailed herein.

32.    On Friday, May 16, 2008, in the early afternoon, I was out of the office attending my son's school concert when I received a telephone call from Jamie Covert who told me that there was a mass exodus of the JPMC Investment Advisors in progress.

33.    I immediately returned to the office where I learned that Leslie (Peter) DeGroot, Peter Foran, Fei Wang, Michael Dicosola, David Jakubs, Kitty Schreiber, Graeme Wilson, Claire Choinere, Alan Arrrieta, Nadine Azzam had all turned in their resignations to my Compliance Officer, Dejan Milev.

34.    The former employees provided only resignation letters such as the one for Mr. DiCosola attached as Exhibit P to my affidavit. They gave no advance notice of their departure. They neither requested to take any client information or other confidential information with them, nor did they give notice or otherwise indicate that they were or intended to take any such information with them. Moreover, at no time were they given any permission to take with them any client or other JPMC confidential information. Neither did the former employees give any indication that they intended to solicit clients or current employees of JPMC upon or after their departure.

35.    Upon the former employees' departure, our remaining team began contacting JPMC clients to assure them there would be no interruption in their service and that JPMC would continue to provide the same high level of service the entire PCS team provided them in the past

36.    As we contacted clients on Saturday May 17, 2008 through Wednesday, May 21, 2008, we repeatedly heard from our clients that they had in many instances been contacted by the former employees in the days since May 16.

37.    On Saturday morning, May 17, 2008, our team continued placing calls to our clients and we continued to hear from many of them that they had already been contacted directly via telephone by the former employees.

38.    Other JPMC employees began reporting to me that the former employees were contacting JPMC clients outside of the clients the former employees had been assigned to when they worked at JPMC.

39.    As we talked with many of theses clients, I learned that they had received overnight packages from UBS Financial Service, Inc. ("UBS") referencing the fact that our former employees were now affiliated with UBS and that they wanted to continue to relationship they had started with the client while at JPMC.

4

40.    In every case, the client reported that the solicitation from UBS and the former employees was unwelcome and not initiated or requested by the client.

41.    UBS is a competitor of JPMC and has recently developed in the United States a personal wealth management approach somewhat similar to that of JPMC.

42.    A number of our clients forwarded these packages to us.

43.    An example of the packages we received is attached to my affidavit.    These overnight packages from the former employees included a letter sent by UBS to the client by name which directed the client to sign the enclosed authorization to transfer their accounts to UBS and then to return the form in the enclosed pre-addressed and postage paid overnight envelope to UBS.

44.    A number of other clients forwarded the packages to us via mail with notes such as the one attached in which the client stated to me or members of the team I manage that they were offended by the solicitations by UBS  See Exhibit Q. Perry - any word on whether the client will agree to provide an affidavit?

45.    I also received emails from other JPMC clients sent me e-mails in which they stated that the JPMC Investment Advisor assigned to their accounts had contacted them in the weeks just before May 16, 2008 to set up meetings or dinners with them in the week after May 2008, after the departing employees had resigned.

46.    For example, Judy Loseman, an employee of JPMC forwarded to me her documentation regarding her telephone conversation with a client.    The client stated that Peter Foran claimed he left JPMC because JPMC has "a different focus – focusing on the much larger account than that of" the client.    Peter Foran also called Judy Loseman and told her that he was pushed to use JPMC products.

47.    Another client told Leah Taylor, an employee of JPMC that Fei Wang told him that he was leaving JPMC the weekend before May 16.

48.    Another client called Joseph Carter a Vice President of the Bank and stated that Fei Wang had scheduled a dinner with him and his wife the week before he called to announce that he had moved to UBS and still wanted to keep the appointment and talk to them about bringing their business over to UBS.

49.    Other advisors contacted me to tell me that they received phone calls from Peter DeGroot in which he stated that "there was no one left at JPMC to service their accounts" and other reported that DeGroot told them that he had left JPMC because he was uncomfortable with the investment products he was directed by JPMC to provide to the clients.    These clients expressed concern that DeGroot was stating that JPMC told him to make investment advice that was not in the best interest of the clients.

50.    Other JPMC clients reported that they were given the impression that the change was merely cosmetic, leaving them with the impression that they would continue to be assigned

to the same JPMC Investment Advisor and that their accounts would still be with a division of JPMC if they signed the transfer documents.

51.    The loss of goodwill with these clients is incalculable and many of the clients have indicated that their trust in the confidentiality and security of their account information at JPMC has been shaken by the events of the last few days.

52.    After taking time to engender the trust required between the high net worth clients and JPMC to carefully gather information from the JPMC high net worth clients about their specific private and personal banking, wealth management, trust and estate planning needs over the course of many years, JPMC takes great pains to maintain the confidentiality of this very personal financial information which it has received from its clients.

53.    Security and confidentiality measures to protect this information include limiting physical access to our offices through security guards, restricted access from the general public lobby to our office, additional limited access from each elevator lobby to locked and password or pass card protected locked doors on each floor of our offices.

54.    All computers are protected by passwords. An additional password is required to access to client information.

55.    Additional confidentiality and security measures at JPMC include protecting all computer access with passwords. An additional password is required for access to client information.

56.    A Computer Use Policy (See Attached as Exhibit R) and Technology Use Policy severely limit how the computers can be used for anything other than JPMC purposes. For example, this includes a prohibition on use of personal media storage banning the use of devices such as flash drives or thumb drives. This policy specifically prohibited from ever being attached to any JPMC computers and JPMC e-mail cannot be accessed from outside internet service providers.

57.    Our e-mail is protected by encryption and firewalls to limit access both internally and externally. In addition, JPMC periodically conducts audits of these procedures to ensure that they are being followed.

58.    As stated, JPMC has also made it a condition of employment for its Investment Advisors as well as other members of the PCS Team to sign the Non-Solicit Agreement. Additionally, per JPMC's technology usage policy we do not allow access to any JPMC email from other internet service providers or allow employees to access their JPMC emails from non-JPMC computers. Additional steps to protect disclosure of confidential information include the JPMC Global Secure Shred Disposal Policy for All Paper Documents that was implemented to prevent against inadvertent paper disclosure. (See Attached, Exhibit S to my affidavit).

59.    In the past we have vigorously and successfully prosecuted and enforced the JPMC non-solicitation and confidentiality provisions of the Non-Solicitation Agreement and the predecessor agreement signed in the past by JPMC employees.

60.    JPMC has made the affirmative business decision not to enter into any industry protocol or other agreement with competitors. such as the Protocol for Recruiting Brokers referenced in Attorney, Stephen Gomberg's letter dated May 20, 2008. (See Declaration of Attorney William J. Daley).

61.    JPMC does not seek to limit the ability of the former employees to obtain employment with competitors or to otherwise fairly compete with JPMC.

62.    JPMC seeks only to limit unfair competition by the misuse, misappropriation and disclosure of its confidential business information and the solicitation of its high net worth clients and current employees in the first twelve months after they leave their employment with JPMC.  To this end, JPMC requires employees to honor their continuing obligations and agreement to refrain from unfair competition.

63.    Within hours of the former employees departure, I requested JPMC's legal department to send the attached letter reminding the former employees of their obligations under the Agreement and the Code of Conduct. Exhibit T.

64.    In addition to the acts detailed herein, from my ongoing phone calls and those reported to me by my PCS team members, it is apparent that the former employees are continuing to aggressively solicit and target JPMC's high net worth clients, even those that the former employees did not have direct contact with as part of their employment at JPMC.  I understand that this solicitation continues as of my signing of this affidavit, and despite the earlier written warnings to them.

65.    As a result of the ongoing solicitations I have received notice that as of today accounts worth at least $800,000.00 in assets have requested transfer to UBS in a direct response to the solicitations by the Former Employees.

Further, Affiant Sayeth Not.


_____

Perry Mangione


Subscribed and sworn to before me
this 22nd day of ___MAY___, 2008.

_____
Notary Public

"OFFICIAL SEAL"
VALER EMINI
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 2/19/2012

# EXHIBIT A

# Supervision, Confidentiality, and Non-Solicitation Agreement (PCS)

Page 1 of 5

| Employee Name (first, middle initial, last) | Employee Identification Number |
|---|---|
| Leslie P. Degroot | E063180 |

This Agreement is entered into on the ___15___ day of ___June___, ___2006___, among the undersigned individual (hereinafter referred to as "you"), and JPMorgan Chase & Co. and its subsidiaries, including but not limited to, JPMorgan Chase Bank, N.A. a national banking association, JPMorgan Securities, Inc., ("JPMSI") a Delaware corporation registered and licensed as a broker-dealer and a member of the NASD and NYSE, Banc One Securities Corporation ("BOSC"), an Ohio corporation registered and licensed as a broker-dealer and a member of the NASD, JPMorgan Insurance Agency, Inc. ("AGENCY"), a Delaware corporation registered and licensed as an insurance agency in various states, and Bank One Trust Company, N.A. ("Trust"), a national banking association. JPMorgan Chase & Co. and its subsidiaries (and including any predecessor companies) are referred to collectively in the Agreement as "JPMC". This Agreement is intended to supersede and will automatically terminate prior agreements between you and BOSC, JPMSI, AGENCY, Trust or any other JPMC subsidiary or any predecessor organization concerning your conduct, responsibilities and compensation as a registered securities representative, licensed insurance agent or other investment management professional. Your obligations in this Agreement are in addition to the general obligations you have as a JPMC employee under JPMC policies, stock plans and awards and the Code of Conduct, all as in effect from time to time.

IN CONSIDERATION OF the mutual promises and covenants herein contained, JPMC and you agree as follows:

## SECTION 1. RELATIONSHIP OF PARTIES

You are an at-will employee of a JPMC subsidiary bank or other JPMC company. Nothing in this Agreement changes anything relating to the at-will employment relationship or creates any new or different rights to continued employment or benefits.

You are being offered the opportunity to represent JPMC in making available to customers and prospective customers certain products and services sold through one or more regulated JPMC subsidiaries and to participate in the compensation programs applicable to such products from time to time. The products and services include products that are regulated as securities and/or insurance and which cannot be sold except by appropriately licensed persons. This Agreement governs your relationship with the applicable JPMC subsidiary with respect to the sale of regulated products and services as well as with respect to fiduciary and private banking services. When acting to promote, sell or service products which are regulated as insurance, you will be representing and under the supervision and control of AGENCY. When you are acting to promote, sell or service products that are regulated as securities, you will be representing, employed in the business of and under the supervision and control of BOSC and/or JPMSI. When you are acting to promote, sell or service products which are dually regulated as insurance and securities (e.g., variable annuities and life insurance products), you will be representing and under the dual supervision and control of BOSC and/or JPMSI and AGENCY.

If, during your employment by JPMC, you are requested to promote, sell or service products which involve the securities business of BOSC and/or JPMSI and/or the insurance business of AGENCY and therefore come under the supervision and control of BOSC and/or JPMSI and/or AGENCY, you will be required to obtain and maintain all necessary licenses, registrations and carrier appointments with any federal, state or other regulatory authority. You will also be required to comply with all rules, regulations, policies and procedures and standards established by the applicable JPMC subsidiary for the conduct of its business. If you were previously licensed as a securities registered representative or as an insurance agent, you will take any steps necessary under applicable laws to transfer your association to BOSC and/or JPMSI and AGENCY. You will not represent and will agree to terminate your appointment with any insurance carriers except those authorized and arranged by AGENCY from time to time. Additionally, you will not service any customer with respect to products sold by insurance carriers or other providers not approved by JPMC.

## SECTION 2. TERM

This Agreement shall continue indefinitely unless JPMC releases you in writing from your obligations hereunder.

## SECTION 3. DUTIES, RESPONSIBILITIES, AND POSITION

Your activities related to the sale of securities or insurance products shall be limited to those specific activities authorized and directed by BOSC, JPMSI and AGENCY.

You acknowledge that you have received, read and will adhere to the JPMC Code of Conduct (or similar document applicable to employees of any predecessor company to JPMC) as such Code may be amended from time to time. The duties set forth in this Agreement are in addition to and do not abrogate your obligations under any such Code of Conduct or other operational, procedural or other policies applicable to JPMC employees generally.

You agree to be aware of and adhere to all of the rules, regulations, requirements, standards, policies and procedures established by the applicable JPMC subsidiary for conduct of its representatives as set forth in compliance manuals and procedures manuals,

REVISED 4/2006

## EXHIBIT A

Employee Initials

# Supervision, Confidentiality, and Non-Solicitation Agreement (PCS)

Page 2 of 5

as such manuals may be unilaterally modified from time to time You may be suspended at any time from selling BOSC, JPMSI, AGENCY, or fiduciary products or services with or without cause by the entity having authority for any such product.

You agree to adhere to all applicable rules, regulations, and reporting requirements of the Securities and Exchange Commission, the NASD, the New York Stock Exchange, the Municipal Securities Rulemaking Board, the Federal Reserve Board, the Office of the Comptroller of Currency, all applicable national and regional stock exchanges, the relevant state securities, insurance and banking regulatory authorities and all procedures of clearing brokers or insurance carriers with which BOSC, JPMSI or AGENCY may become associated at any time during the term of this Agreement.

## SECTION 4. LICENSES

You represent and warrant to BOSC, JPMSI and AGENCY that you are a licensed securities registered representative and/or a licensed insurance agent in good standing, or will obtain such appropriate license within the time specified by BOSC, JPMSI or AGENCY, as applicable, in all states in which you are required to be licensed or registered. You agree not to sell any insurance products through AGENCY or accept any compensation in connection with the sale of any insurance policy until the appropriate insurance carrier appointments are in place in all applicable states.

You further warrant that, except as disclosed in writing to JPMC, there are no prior or pending investigations, customer complaints, civil or criminal lawsuits, administrative actions/complaints, or prior or pending arbitrations against you. You understand that you are required to immediately notify your management and the appropriate compliance officer of any investigations, complaints, lawsuits, or arbitrations instituted against or involving you.

You acknowledge that BOSC and/or JPMSI is required to file a Form U5 upon your termination as a registered securities representative associated with BOSC and/or JPMSI. You hereby waive any claims against JPMSI and BOSC relating to the filing or content of the Form U5.

## SECTION 5. PRIOR OBLIGATIONS

You represent that you have provided JPMC with a copy of any written (or provided the full terms of any verbal) agreement or arrangement that purports to restrict you from competing with a prior employer or from soliciting a prior employer's customers or employees, or that in any way may restrict or interfere with your ability to perform the responsibilities of your position. You agree that you will not enter into any such agreement with a prior employer without the written consent of JPMC. You further understand that you may not disclose to JPMC or use in connection with your employment with JPMC any protected trade secrets or protected confidential or proprietary information of another entity or party, including any prior employer, unless and until such information becomes public either through the owner's failure to adequately protect such information or because it is readily ascertainable through proper means or you are permitted to disclose such information or materials by such other party or entity.

You agree that during the term of this Agreement, you shall not own any private stock or have any direct or indirect financial interest in any other organization engaged in any securities, insurance, investment advisory or similar business without the written consent of BOSC's, JPMSI's or AGENCY's respective Compliance Department. Nothing in this provision shall limit your right to invest in securities that are publicly traded, except that the written consent of the applicable Compliance Department will be required with regard to stock ownership, or other financial interest, in any securities or similar business which is publicly traded if a control relationship exists between such entity and you or your family. In addition, any personal investments must be managed in accordance with the JPMC and Asset & Wealth Management personal trading policies applicable to your position, copies of which are available from the Compliance Department.

## SECTION 6. SPECIAL OBLIGATIONS OF EMPLOYEE

You understand that by entering into this Agreement and by virtue of your association with JPMC, you hold a position of trust and as a result of that position JPMC will provide you with "Confidential Information" related to JPMC's business. The term "Confidential Information" as used in this Agreement, includes but is not limited to information described as such in the Code of Conduct and: (a) information received from third parties under confidential conditions; (b) confidential customer data, including but not limited to customer and prospect names, addresses, phone numbers, financial portfolio, financial account information, financial needs, investment preferences and similar information whether or not in tangible form developed or compiled by JPMC or by you in connection with your employment by JPMC; (c) information concerning established business relationships; (d) non-public information about JPMC's employees; (e) all records and documents concerning the business and affairs of JPMC, including without limitation methods, procedures, devices and other means used by JPMC in the conduct of its business (f) "trade secrets" as that term is defined by the Uniform Trade Secrets Act (UTSA), which term shall be deemed to include each item of Confidential Information specifically described in this Section 6; and (g) software and other technical, business or financial information, the use or disclosure of which might reasonably be construed to be contrary to the interest of JPMC or its clients. You understand that such

*LPD*

# Supervision, Confidentiality, and Non-Solicitation Agreement (PCS)

Page 3 of 5

---

Confidential Information will be disclosed to you in confidence and for use only in connection with your employment with JPMC and therefore agree to the following restrictions:

## SECTION 6.1 CONFIDENTIALITY

Upon leaving JPMC's employ for any reason (voluntarily or otherwise), or upon JPMC's request at any time, you agree to immediately return to JPMC all Confidential Information in your possession, under your control or which you received or prepared in connection with your employment; and you agree not to retain any copies (whether manually or mechanically produced, including electronic or software versions), summaries, compilations, or excerpts thereof. You also agree to return upon leaving JPMC's employ, or at any time we request, any equipment including but not limited to computers, personal digital assistants, pagers or telephones issued to you for use in your employment, and not to destroy or copy any information contained thereon.

You agree (a) to keep Confidential Information confidential at all times during and after your employment with JPMC; (b) for as long as Confidential Information remains confidential, not to disclose or communicate Confidential Information to any third party unless permitted by JPMC policy, required by law, or with JPMC's written consent; and (c) not to use Confidential Information for your own benefit or for the benefit of a third party.

## SECTION 6.2 NON-SOLICITATION OF CUSTOMERS AND EMPLOYEES

*You acknowledge that JPMC's relationships with its customers are extremely valuable and are the result of the investment of substantial time, resources, and effort in developing them and keeping them confidential. In consideration of the provision of Confidential Information to you, your employment and continued employment, as well as all payments to you, including all compensation received from JPMC and its affiliates and commissions and other compensation paid to you in connection with the JPMC products, you agree for a period of twelve (12) months after the termination of your employment, regardless of the circumstances of the termination, not to, directly or indirectly, acting alone or with others, solicit or attempt to solicit, induce to leave or divert or attempt to induce to leave or divert from doing business with JPMC, any JPMC customer with whom you had professional contact, for whom you had responsibility or with respect to whom you were privy to any information during the last two years of your employment with JPMC.*

*This section does not apply to customer relationships you established prior to commencing employment with JPMC, provided that you can substantiate through documents or other suitable evidence that the relationship preceded your commencement of employment with JPMC. You have identified any persons you believe are subject to this exclusion prior to the signing of this Agreement, and any such persons as to whom you have provided suitable documentation are listed in Exhibit "A" attached hereto, which Exhibit shall be initialed and dated by you and your supervisor. The absence of any such Exhibit shall be conclusive evidence that this exclusion does not apply.*

*Nothing in this Agreement prevents you from seeking or accepting employment with any other financial institution, bank, trust company, brokerage firm or other competing entity after your term of employment with JPMC.*

*You also agree, for a period of 12 months after the termination of your employment for any reason, not to directly or indirectly: (1) hire or solicit any current JPMC employee, candidate for employment or former JPMC employee who resigned from JPMC within twelve months of any such solicitation, to apply for or accept employment with any business competing with JPMC, or (2) to otherwise induce any then current JPMC employee or candidate for employment with JPMC to become employed by any business competing with JPMC.*

*You also agree that you will not disrupt, damage, impair, or interfere with JPMC's business or reputation in any manner.*

*You also agree that JPMC may contact any person or entity with whom you become employed or associated during the term of these restrictions to inform them of the existence of this Agreement and the substance of the restrictions contained herein.*

## SECTION 6.3 REMEDIES

By signing below, you agree that any breach, evasion, violation or threatened violation of any term of this Section 6 by you will cause immediate and irreparable injury to JPMC that cannot be adequately remedied by monetary damages and will entitle JPMC to immediate injunctive relief and/or specific performance in any court of competent jurisdiction and/or before the NASD or NYSE, as well as to all other legal or equitable remedies and UTSA remedies, where applicable, to which JPMC may be entitled, including but not limited to the right to compel arbitration of disputes. Your covenants set forth in this Section 6 are independent of any other

# Supervision, Confidentiality, and Non-Solicitation Agreement (PCS)

Page 4 of 5

provisions of this Agreement; and the existence of any claim or causes of action by you against JPMC, whether predicated on this Agreement or otherwise, shall not constitute a defense to JPMC obtaining relief as described in this section. If JPMC is (in its sole judgment) compelled to institute legal proceedings and/or arbitration to enforce this Agreement, you agree to reimburse JPMC for its actual attorney fees and other expenses incurred in the successful prosecution or settlement of such proceedings, in addition to its damages or other remedies.

## SECTION 6.4  REASONABLENESS OF COVENANTS

You acknowledge that you have carefully considered the nature and extent of the restrictions upon you and the rights and remedies conferred upon JPMC under this Section 6, and have had the opportunity to retain legal counsel at your own expense to review this Agreement. You acknowledge that these restrictions are reasonable in time and scope, are designed to eliminate competition which would be unfair to JPMC, are fully required to protect the legitimate interests of JPMC and its customers and do not confer a benefit upon JPMC which is disproportionate to any detriment to you.

You acknowledge that the terms and conditions of this Agreement incorporate and/or supplement the terms and conditions of your employment at JPMC and are reasonable and necessary to protect the valued business interests of JPMC and that you have received good and valuable consideration for entering into this Agreement.

You acknowledge that ~~you were made aware of this Agreement at the time you accepted employment with JPMC or at the time you were afforded the opportunity of receiving sales-related compensation for the sale of non-deposit investment products; and~~ that you are signing ~~X~~ *this agreement* knowingly and voluntarily and are accepting or continuing employment with full understanding of its terms and conditions, ~~and you will not challenge the enforceability of terms of this Agreement.~~ *employee*

## SECTION 6.5  SAVINGS CLAUSE

The provisions contained in this Section 6 shall survive the termination of this Agreement for whatever cause and shall be binding upon and inure to the benefit of the respective heirs, administrators, executors, assigns and successors in interest of you and JPMC.

## SECTION 7.  COMPENSATION/COMMISSION DRAWS

In connection with your services hereunder, you may be eligible for incentive compensation in accordance with certain compensation programs as in effect for certain subsidiaries and products from time to time. JPMC reserves the right to change such programs at any time, in its sole discretion.

## SECTION 8.  NOTICES

All notices, requests, demands, or other communications provided for by this Agreement shall be in writing and personally delivered to the party entitled thereto or sent by registered or certified mail, facsimile or electronic mail or private courier with receipt or other confirmation of delivery.

## SECTION 9.  ARBITRATION

Any dispute, controversy or claim which relates in any way to this Agreement and which has not been resolved by the parties using an informal dispute resolution process or which does not require immediate injunctive relief to avoid irreparable injury to any party shall be subject to arbitration in accordance with the rules and procedures of the NASD or NYSE, as appropriate.

The fact that arbitration has commenced shall not impair the exercise of any termination rights in accordance with the provisions of this Agreement, nor impair any rights JPMC may have under Section 6, including, but not limited to, the right to obtain injunctive relief in a court of competent jurisdiction.

## SECTION 10.  AMENDMENT OR MODIFICATION; WAIVER

No provision of this Agreement may be amended, modified or waived unless such amendment, modification, or waiver is agreed to in writing, and signed by you and by an authorized officer of JPMC. Except as otherwise specifically provided in this Agreement, no waiver by any party of any breach by the other party hereto of any provision of this Agreement to be performed by such other party shall be deemed a waiver of a subsequent breach of such provision or a waiver of a similar or dissimilar provision at the same or at any prior or subsequent time.

## SECTION 11.  SEVERABILITY

In the event that any Section of this Agreement or the application thereof shall be determined to be invalid or unenforceable for any reason, the remaining Sections of this Agreement shall be unaffected thereby and shall remain in full force and effect to the fullest extent permitted by law.

Employee Initials

# Supervision, Confidentiality, and Non-Solicitation Agreement (PCS)

Page 5 of 5

If it is determined by any court, or by an arbitrator in accordance with Section 9, that any restrictive covenants contained herein, or any part thereof, are unenforceable because of the duration or scope of such provision, the duration or scope of such provision, as the case may be, shall be reduced so that such provision becomes enforceable and, in its reduced form, such provision shall then be enforced.

## SECTION 12. ASSIGNMENT; SUCCESSORS TO JPMC

Except as otherwise provided herein, this Agreement shall be binding upon and inure to the benefit of any successor or assignee of JPMC or any JPMC subsidiary, including, without limitation, any corporation or corporations acquiring directly or indirectly all or substantially all of the assets of JPMC whether by merger, consolidation, sale or otherwise. This Agreement is not assignable by you.

## SECTION 13. APPLICABLE LAW

This Agreement shall be deemed to have been made and formed in the State of New York and shall be governed by and construed in accordance with the laws of the State of New York regardless of the location of its execution or performance and without regard to the principles of conflicts of laws.

## SECTION 14. ENTIRE AGREEMENT

This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof; all prior Agreements, representations, statements, negotiations, and undertakings are superseded hereby, provided, however, that the duties and obligations set forth in this Agreement are in addition to and do not abrogate your obligations under JPMC's policies, the Code of Conduct and any other non-solicitation or non-compete agreement with JPMC or any of its affiliates, all as in effect from time to time.

## SECTION 15. NOTICE TO PROSPECTIVE EMPLOYERS

Prior to accepting employment with any other person or entity during the 12 months following the termination of your employment with JPMC for any reason, you will provide any prospective employer with a copy of this Agreement.

**YOU MUST COMPLETE THE FOLLOWING SECTION IF YOU ARE EMPLOYED IN LOUISIANA:** (You specifically agree that if you are not located in Louisiana, this Section does not apply to you)

The agreements and restrictions in Section 6 shall be effective in the following specified parishes within the State of Louisiana:

_____

## EMPLOYEE SIGNATURE

Your signature below confirms your understanding and acceptance of all of the terms and conditions of this Agreement.

Employee Signature
X _____

Date
6 / 15 / 06

Employee Initials

# EXHIBIT B

**Supervision, Confidentiality,
and Non-Solicitation Agreement (PCS)**

Page 1 of 5

330 89 0136
828 111

| Employee Name (first, middle initial, last) | Employee Identification Number |
|---|---|
| Michelangelo Di Cosola | E102419 |

This Agreement is entered into on the ___11th___ day of ___May___, ___2006___, among the undersigned individual (hereinafter referred to as "you"), and JPMorgan Chase & Co. and its subsidiaries, including but not limited to, JPMorgan Chase Bank, N.A. a national banking association, JPMorgan Securities, Inc., ("JPMSI") a Delaware corporation registered and licensed as a broker-dealer and a member of the NASD and NYSE, Banc One Securities Corporation ("BOSC"), an Ohio corporation registered and licensed as a broker-dealer and a member of the NASD, JPMorgan Insurance Agency, Inc. ("AGENCY"), a Delaware corporation registered and licensed as an insurance agency in various states, and Bank One Trust Company, N.A. ("Trust"), a national banking association. JPMorgan Chase & Co. and its subsidiaries (and including any predecessor companies) are referred to collectively in the Agreement as "JPMC". This Agreement is intended to supersede and will automatically terminate prior agreements between you and BOSC, JPMSI, AGENCY, Trust or any other JPMC subsidiary or any predecessor organization concerning your conduct, responsibilities and compensation as a registered securities representative, licensed insurance agent or other investment management professional. Your obligations in this Agreement are in addition to the general obligations you have as a JPMC employee under JPMC policies, stock plans and awards and the Code of Conduct, all as in effect from time to time.

IN CONSIDERATION of the mutual promises and covenants herein contained, JPMC and you agree as follows:

## SECTION 1.  RELATIONSHIP OF PARTIES

You are an at-will employee of a JPMC subsidiary bank or other JPMC company. Nothing in this Agreement changes anything relating to the at-will employment relationship or creates any new or different rights to continued employment or benefits.

You are being offered the opportunity to represent JPMC in making available to customers and prospective customers certain products and services sold through one or more regulated JPMC subsidiaries and to participate in the compensation programs applicable to such products from time to time. The products and services include products that are regulated as securities and/or insurance and which cannot be sold except by appropriately licensed persons. This Agreement governs your relationship with the applicable JPMC subsidiary with respect to the sale of regulated products and services as well as with respect to fiduciary and private banking services. When acting to promote, sell or service products which are regulated as insurance, you will be representing and under the supervision and control of AGENCY. When you are acting to promote, sell or service products that are regulated as securities, you will be representing, employed in the business of and under the supervision and control of BOSC and/or JPMSI. When you are acting to promote, sell or service products which are dually regulated as insurance and securities (e.g., variable annuities and life insurance products), you will be representing and under the dual supervision and control of BOSC and/or JPMSI and AGENCY.

If, during your employment by JPMC, you are requested to promote, sell or service products which involve the securities business of BOSC and/or JPMSI and/or the insurance business of AGENCY and therefore come under the supervision and control of BOSC and/or JPMSI and/or AGENCY, you will be required to obtain and maintain all necessary licenses, registrations and carrier appointments with any federal, state or other regulatory authority. You will also be required to comply with all rules, regulations, policies and procedures and standards established by the applicable JPMC subsidiary for the conduct of its business. If you were previously licensed as a securities registered representative or as an insurance agent, you will take any steps necessary under applicable laws to transfer your association to BOSC and/or JPMSI and AGENCY. You will not represent and will agree to terminate your appointment with any insurance carriers except those authorized and arranged by AGENCY from time to time. Additionally, you will not service any customer with respect to products sold by insurance carriers or other providers not approved by JPMC.

## SECTION 2.  TERM

This Agreement shall continue indefinitely unless JPMC releases you in writing from your obligations hereunder.

## SECTION 3.  DUTIES, RESPONSIBILITIES, AND POSITION

Your activities related to the sale of securities or insurance products shall be limited to those specific activities authorized and directed by BOSC, JPMSI and AGENCY.

You acknowledge that you have received, read and will adhere to the JPMC Code of Conduct (or similar document applicable to employees of any predecessor company to JPMC) as such Code may be amended from time to time. The duties set forth in this Agreement are in addition to and do not abrogate your obligations under any such Code of Conduct or other operational, procedural or other policies applicable to JPMC employees generally.

You agree to be aware of and adhere to all of the rules, regulations, requirements, standards, policies and procedures established by the applicable JPMC subsidiary for conduct of its representatives as set forth in compliance manuals and procedures manuals,

REVISED 4/2006

**EXHIBIT B**

# Supervision, Confidentiality, and Non-Solicitation Agreement (PCS)

Page 2 of 5

as such manuals may be unilaterally modified from time to time You may be suspended at any time from selling BOSC, JPMSI, AGENCY, or fiduciary products or services with or without cause by the entity having authority for any such product.

You agree to adhere to all applicable rules, regulations, and reporting requirements of the Securities and Exchange Commission, the NASD, the New York Stock Exchange, the Municipal Securities Rulemaking Board, the Federal Reserve Board, the Office of the Comptroller of Currency, all applicable national and regional stock exchanges, the relevant state securities, insurance and banking regulatory authorities and all procedures of clearing brokers or insurance carriers with which BOSC, JPMSI or AGENCY may become associated at any time during the term of this Agreement.

## SECTION 4.  LICENSES

You represent and warrant to BOSC, JPMSI and AGENCY that you are a licensed securities registered representative and/or a licensed insurance agent in good standing, or will obtain such appropriate license within the time specified by BOSC, JPMSI or AGENCY, as applicable, in all states in which you are required to be licensed or registered. You agree not to sell any insurance products through AGENCY or accept any compensation in connection with the sale of any insurance policy until the appropriate insurance carrier appointments are in place in all applicable states.

You further warrant that, except as disclosed in writing to JPMC, there are no prior or pending investigations, customer complaints, civil or criminal lawsuits, administrative actions/complaints, or prior or pending arbitrations against you. You understand that you are required to immediately notify your management and the appropriate compliance officer of any investigations, complaints, lawsuits, or arbitrations instituted against or involving you.

You acknowledge that BOSC and/or JPMSI is required to file a Form U5 upon your termination as a registered securities representative associated with BOSC and/or JPMSI. You hereby waive any claims against JPMSI and BOSC relating to the filing or content of the Form U5.

## SECTION 5.  PRIOR OBLIGATIONS

You represent that you have provided JPMC with a copy of any written (or provided the full terms of any verbal) agreement or arrangement that purports to restrict you from competing with a prior employer or from soliciting a prior employer's customers or employees, or that in any way may restrict or interfere with your ability to perform the responsibilities of your position. You agree that you will not enter into any such agreement with a prior employer without the written consent of JPMC.  You further understand that you may not disclose to JPMC or use in connection with your employment with JPMC any protected trade secrets or protected confidential or proprietary information of another entity or party, including any prior employer, unless and until such information becomes public either through the owner's failure to adequately protect such information or because it is readily ascertainable through proper means or you are permitted to disclose such information or materials by such other party or entity.

You agree that during the term of this Agreement, you shall not own any private stock or have any direct or indirect financial interest in any other organization engaged in any securities, insurance, investment advisory or similar business without the written consent of BOSC's, JPMSI's or AGENCY's respective Compliance Department. Nothing in this provision shall limit your right to invest in securities that are publicly traded, except that the written consent of the applicable Compliance Department will be required with regard to stock ownership, or other financial interest, in any securities or similar business which is publicly traded if a control relationship exists between such entity and you or your family.  In addition, any personal investments must be managed in accordance with the JPMC and Asset & Wealth Management personal trading policies applicable to your position, copies of which are available from the Compliance Department.

## SECTION 6.  SPECIAL OBLIGATIONS OF EMPLOYEE

You understand that by entering into this Agreement and by virtue of your association with JPMC, you hold a position of trust and as a result of that position JPMC will provide you with "Confidential Information" related to JPMC's business. The term "Confidential Information" as used in this Agreement, includes but is not limited to information described as such in the Code of Conduct and: (a) information received from third parties under confidential conditions; (b) confidential customer data, including but not limited to customer and prospect names, addresses, phone numbers, financial portfolio, financial account information, financial needs, investment preferences and similar information whether or not in tangible form developed or compiled by JPMC or by you in connection with your employment by JPMC; (c) information concerning established business relationships; (d) non-public information about JPMC's employees; (e) all records and documents concerning the business and affairs of JPMC, including without limitation methods, procedures, devices and other means used by JPMC in the conduct of its business (f) "trade secrets" as that term is defined by the Uniform Trade Secrets Act (UTSA), which term shall be deemed to include each item of Confidential Information specifically described in this Section 6; and (g) software and other technical, business or financial information, the use or disclosure of which might reasonably be construed to be contrary to the interest of JPMC or its clients. You understand that such

# Supervision, Confidentiality, and Non-Solicitation Agreement (PCS)

Page 3 of 5

---

Confidential Information will be disclosed to you in confidence and for use only in connection with your employment with JPMC and therefore agree to the following restrictions:

## SECTION 6.1  CONFIDENTIALITY

Upon leaving JPMC's employ for any reason (voluntarily or otherwise), or upon JPMC's request at any time, you agree to immediately return to JPMC all Confidential Information in your possession, under your control or which you received or prepared in connection with your employment; and you agree not to retain any copies (whether manually or mechanically produced, including electronic or software versions), summaries, compilations, or excerpts thereof. You also agree to return upon leaving JPMC's employ, or at any time we request, any equipment including but not limited to computers, personal digital assistants, pagers or telephones issued to you for use in your employment, and not to destroy or copy any information contained thereon.

You agree (a) to keep Confidential Information confidential at all times during and after your employment with JPMC; (b) for as long as Confidential Information remains confidential, not to disclose or communicate Confidential Information to any third party unless permitted by JPMC policy, required by law, or with JPMC's written consent; and (c) not to use Confidential Information for your own benefit or for the benefit of a third party.

## SECTION 6.2  NON-SOLICITATION OF CUSTOMERS AND EMPLOYEES

*You acknowledge that JPMC's relationships with its customers are extremely valuable and are the result of the investment of substantial time, resources, and effort in developing them and keeping them confidential. In consideration of the provision of Confidential Information to you, your employment and continued employment, as well as all payments to you, including all compensation received from JPMC and its affiliates and commissions and other compensation paid to you in connection with the JPMC products, you agree for a period of twelve (12) months after the termination of your employment, regardless of the circumstances of the termination, not to, directly or indirectly, acting alone or with others, solicit or attempt to solicit, induce to leave or divert or attempt to induce to leave or divert from doing business with JPMC, any JPMC customer with whom you had professional contact, for whom you had responsibility or with respect to whom you were privy to any information during the last two years of your employment with JPMC.*

*This section does not apply to customer relationships you established prior to commencing employment with JPMC, provided that you can substantiate through documents or other suitable evidence that the relationship preceded your commencement of employment with JPMC. You have identified any persons you believe are subject to this exclusion prior to the signing of this Agreement, and any such persons as to whom you have provided suitable documentation are listed in Exhibit "A" attached hereto, which Exhibit shall be initialed and dated by you and your supervisor. The absence of any such Exhibit shall be conclusive evidence that this exclusion does not apply.*

*Nothing in this Agreement prevents you from seeking or accepting employment with any other financial institution, bank, trust company, brokerage firm or other competing entity after your term of employment with JPMC.*

*You also agree, for a period of 12 months after the termination of your employment for any reason, not to directly or indirectly: (1) hire or solicit any current JPMC employee, candidate for employment or former JPMC employee who resigned from JPMC within twelve months of any such solicitation, to apply for or accept employment with any business competing with JPMC, or (2) to otherwise induce any then current JPMC employee or candidate for employment with JPMC to become employed by any business competing with JPMC.*

*You also agree that you will not disrupt, damage, impair, or interfere with JPMC's business or reputation in any manner.*

*You also agree that JPMC may contact any person or entity with whom you become employed or associated during the term of these restrictions to inform them of the existence of this Agreement and the substance of the restrictions contained herein.*

## SECTION 6.3  REMEDIES

By signing below, you agree that any breach, evasion, violation or threatened violation of any term of this Section 6 by you will cause immediate and irreparable injury to JPMC that cannot be adequately remedied by monetary damages and will entitle JPMC to immediate injunctive relief and/or specific performance in any court of competent jurisdiction and/or before the NASD or NYSE, as well as to all other legal or equitable remedies and UTSA remedies, where applicable, to which JPMC may be entitled, including but not limited to the right to compel arbitration of disputes. Your covenants set forth in this Section 6 are independent of any other

Employee Initials

# Supervision, Confidentiality, and Non-Solicitation Agreement (PCS)

Page 4 of 5

provisions of this Agreement; and the existence of any claim or causes of action by you against JPMC, whether predicated on this Agreement or otherwise, shall not constitute a defense to JPMC obtaining relief as described in this section. If JPMC is (in its sole judgment) compelled to institute legal proceedings and/or arbitration to enforce this Agreement, you agree to reimburse JPMC for its actual attorney fees and other expenses incurred in the successful prosecution or settlement of such proceedings, in addition to its damages or other remedies.

## SECTION 6.4  REASONABLENESS OF COVENANTS

You acknowledge that you have carefully considered the nature and extent of the restrictions upon you and the rights and remedies conferred upon JPMC under this Section 6, and have had the opportunity to retain legal counsel at your own expense to review this Agreement. You acknowledge that these restrictions are reasonable in time and scope, are designed to eliminate competition which would be unfair to JPMC, are fully required to protect the legitimate interests of JPMC and its customers and do not confer a benefit upon JPMC which is disproportionate to any detriment to you.

You acknowledge that the terms and conditions of this Agreement incorporate and/or supplement the terms and conditions of your employment at JPMC and are reasonable and necessary to protect the valued business interests of JPMC and that you have received good and valuable consideration for entering into this Agreement.

You acknowledge that ~~you were made aware of this Agreement at the time you accepted employment with JPMC or at the time you were offered the opportunity of receiving sales-related compensation for the sale of non-deposit investment products, and~~ that you are signing knowingly and voluntarily and are accepting or continuing employment with full understanding of its terms and conditions ~~and you will not challenge the enforceability or terms of this Agreement.~~ *this Agreement*

*Mgr*          *employee*

## SECTION 6.5  SAVINGS CLAUSE

The provisions contained in this Section 6 shall survive the termination of this Agreement for whatever cause and shall be binding upon and inure to the benefit of the respective heirs, administrators, executors, assigns and successors in interest of you and JPMC.

## SECTION 7.  COMPENSATION/COMMISSION DRAWS

In connection with your services hereunder, you may be eligible for incentive compensation in accordance with certain compensation programs as in effect for certain subsidiaries and products from time to time. JPMC reserves the right to change such programs at any time, in its sole discretion.

## SECTION 8.  NOTICES

All notices, requests, demands, or other communications provided for by this Agreement shall be in writing and personally delivered to the party entitled thereto or sent by registered or certified mail, facsimile or electronic mail or private courier with receipt or other confirmation of delivery.

## SECTION 9.  ARBITRATION

Any dispute, controversy or claim which relates in any way to this Agreement and which has not been resolved by the parties using an informal dispute resolution process or which does not require immediate injunctive relief to avoid irreparable injury to any party shall be subject to arbitration in accordance with the rules and procedures of the NASD or NYSE, as appropriate.

The fact that arbitration has commenced shall not impair the exercise of any termination rights in accordance with the provisions of this Agreement, nor impair any rights JPMC may have under Section 6, including, but not limited to, the right to obtain injunctive relief in a court of competent jurisdiction.

## SECTION 10.  AMENDMENT OR MODIFICATION; WAIVER

No provision of this Agreement may be amended, modified or waived unless such amendment, modification, or waiver is agreed to in writing, and signed by you and by an authorized officer of JPMC. Except as otherwise specifically provided in this Agreement, no waiver by any party of any breach by the other party hereto of any provision of this Agreement to be performed by such other party shall be deemed a waiver of a subsequent breach of such provision or a waiver of a similar or dissimilar provision at the same or at any prior or subsequent time.

## SECTION 11.  SEVERABILITY

In the event that any Section of this Agreement or the application thereof shall be determined to be invalid or unenforceable for any reason, the remaining Sections of this Agreement shall be unaffected thereby and shall remain in full force and effect to the fullest extent permitted by law.

Employee Initials

# Supervision, Confidentiality, and Non-Solicitation Agreement (PCS)

Page 5 of 5

---

If it is determined by any court, or by an arbitrator in accordance with Section 9, that any restrictive covenants contained herein, or any part thereof, are unenforceable because of the duration or scope of such provision, the duration or scope of such provision, as the case may be, shall be reduced so that such provision becomes enforceable and, in its reduced form, such provision shall then be enforced.

### SECTION 12. ASSIGNMENT; SUCCESSORS TO JPMC

Except as otherwise provided herein, this Agreement shall be binding upon and inure to the benefit of any successor or assignee of JPMC or any JPMC subsidiary, including, without limitation, any corporation or corporations acquiring directly or indirectly all or substantially all of the assets of JPMC whether by merger, consolidation, sale or otherwise. This Agreement is not assignable by you.

### SECTION 13. APPLICABLE LAW

This Agreement shall be deemed to have been made and formed in the State of New York and shall be governed by and construed in accordance with the laws of the State of New York regardless of the location of its execution or performance and without regard to the principles of conflicts of laws.

### SECTION 14. ENTIRE AGREEMENT

This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof; all prior Agreements, representations, statements, negotiations, and undertakings are superseded hereby, provided, however, that the duties and obligations set forth in this Agreement are in addition to and do not abrogate your obligations under JPMC's policies, the Code of Conduct and any other non-solicitation or non-compete agreement with JPMC or any of its affiliates, all as in effect from time to time.

### SECTION 15. NOTICE TO PROSPECTIVE EMPLOYERS

Prior to accepting employment with any other person or entity during the 12 months following the termination of your employment with JPMC for any reason, you will provide any prospective employer with a copy of this Agreement.

**YOU MUST COMPLETE THE FOLLOWING SECTION IF YOU ARE EMPLOYED IN LOUISIANA:** (You specifically agree that if you are not located in Louisiana, this Section does not apply to you)

The agreements and restrictions in Section 6 shall be effective in the following specified parishes within the State of Louisiana:

---

EMPLOYEE SIGNATURE

Your signature below confirms your understanding and acceptance of all of the terms and conditions of this Agreement.

| Employee Signature | Date |
|---|---|
| X | 5/11/06 |

Employee Initials

# EXHIBIT C

**·Supervision, Confidentiality,
and Non-Solicitation Agreement (PCS)**
Page 1 of 5

*3/979770688*
*879422*

| Employee Name (first, middle initial, last) | Employee Identification Number |
|---|---|
| PETER D FORAN | P000846 |

This Agreement is entered into on the _____ day of _____, _____, among the undersigned individual (hereinafter referred to as "you"), and JPMorgan Chase & Co. and its subsidiaries, including but not limited to, JPMorgan Chase Bank, N.A. a national banking association, JPMorgan Securities, Inc., ("JPMSI") a Delaware corporation registered and licensed as a broker-dealer and a member of the NASD and NYSE, Banc One Securities Corporation ("BOSC"), an Ohio corporation registered and licensed as a broker-dealer and a member of the NASD, JPMorgan Insurance Agency, Inc. ("AGENCY"), a Delaware corporation registered and licensed as an insurance agency in various states, and Bank One Trust Company, N.A. ("Trust"), a national banking association. JPMorgan Chase & Co. and its subsidiaries (and including any predecessor companies) are referred to collectively in the Agreement as "JPMC". This Agreement is intended to supersede and will automatically terminate prior agreements between you and BOSC, JPMSI, AGENCY, Trust or any other JPMC subsidiary or any predecessor organization concerning your conduct, responsibilities and compensation as a registered securities representative, licensed insurance agent or other investment management professional. Your obligations in this Agreement are in addition to the general obligations you have as a JPMC employee under JPMC policies, stock plans and awards and the Code of Conduct, all as in effect from time to time.

IN CONSIDERATION of the mutual promises and covenants herein contained, JPMC and you agree as follows:

## SECTION 1. RELATIONSHIP OF PARTIES

You are an at-will employee of a JPMC subsidiary bank or other JPMC company. Nothing in this Agreement changes anything relating to the at-will employment relationship or creates any new or different rights to continued employment or benefits.

You are being offered the opportunity to represent JPMC in making available to customers and prospective customers certain products and services sold through one or more regulated JPMC subsidiaries and to participate in the compensation programs applicable to such products from time to time. The products and services include products that are regulated as securities and/or insurance and which cannot be sold except by appropriately licensed persons. This Agreement governs your relationship with the applicable JPMC subsidiary with respect to the sale of regulated products and services as well as with respect to fiduciary and private banking services. When acting to promote, sell or service products which are regulated as insurance, you will be representing and under the supervision and control of AGENCY. When you are acting to promote, sell or service products that are regulated as securities, you will be representing, employed in the business of and under the supervision and control of BOSC and/or JPMSI. When you are acting to promote, sell or service products which are dually regulated as insurance and securities (e.g., variable annuities and life insurance products), you will be representing and under the dual supervision and control of BOSC and/or JPMSI and AGENCY.

If, during your employment by JPMC, you are requested to promote, sell or service products which involve the securities business of BOSC and/or JPMSI and/or the insurance business of AGENCY and therefore come under the supervision and control of BOSC and/or JPMSI and/or AGENCY, you will be required to obtain and maintain all necessary licenses, registrations and carrier appointments with any federal, state or other regulatory authority. You will also be required to comply with all rules, regulations, policies and procedures and standards established by the applicable JPMC subsidiary for the conduct of its business. If you were previously licensed as a securities registered representative or as an insurance agent, you will take any steps necessary under applicable laws to transfer your association to BOSC and/or JPMSI and AGENCY. You will not represent and will agree to terminate your appointment with any insurance carriers except those authorized and arranged by AGENCY from time to time. Additionally, you will not service any customer with respect to products sold by insurance carriers or other providers not approved by JPMC.

## SECTION 2. TERM

This Agreement shall continue indefinitely unless JPMC releases you in writing from your obligations hereunder.

## SECTION 3. DUTIES, RESPONSIBILITIES, AND POSITION

Your activities related to the sale of securities or insurance products shall be limited to those specific activities authorized and directed by BOSC, JPMSI and AGENCY.

You acknowledge that you have received, read and will adhere to the JPMC Code of Conduct (or similar document applicable to employees of any predecessor company to JPMC) as such Code may be amended from time to time. The duties set forth in this Agreement are in addition to and do not abrogate your obligations under any such Code of Conduct or other operational, procedural or other policies applicable to JPMC employees generally.

You agree to be aware of and adhere to all of the rules, regulations, requirements, standards, policies and procedures established by the applicable JPMC subsidiary for conduct of its representatives as set forth in compliance manuals and procedures manuals,

REVISED 4/2006

**EXHIBIT C**

Employee Initials

## Supervision, Confidentiality, and Non-Solicitation Agreement (PCS)

Page 2 of 5

as such manuals may be unilaterally modified from time to time You may be suspended at any time from selling BOSC, JPMSI, AGENCY, or fiduciary products or services with or without cause by the entity having authority for any such product.

You agree to adhere to all applicable rules, regulations, and reporting requirements of the Securities and Exchange Commission, the NASD, the New York Stock Exchange, the Municipal Securities Rulemaking Board, the Federal Reserve Board, the Office of the Comptroller of Currency, all applicable national and regional stock exchanges, the relevant state securities, insurance and banking regulatory authorities and all procedures of clearing brokers or insurance carriers with which BOSC, JPMSI or AGENCY may become associated at any time during the term of this Agreement.

### SECTION 4. LICENSES

You represent and warrant to BOSC, JPMSI and AGENCY that you are a licensed securities registered representative and/or a licensed insurance agent in good standing, or will obtain such appropriate license within the time specified by BOSC, JPMSI or AGENCY, as applicable, in all states in which you are required to be licensed or registered. You agree not to sell any insurance products through AGENCY or accept any compensation in connection with the sale of any insurance policy until the appropriate insurance carrier appointments are in place in all applicable states.

You further warrant that, except as disclosed in writing to JPMC, there are no prior or pending investigations, customer complaints, civil or criminal lawsuits, administrative actions/complaints, or prior or pending arbitrations against you. You understand that you are required to immediately notify your management and the appropriate compliance officer of any investigations, complaints, lawsuits, or arbitrations instituted against or involving you.

You acknowledge that BOSC and/or JPMSI is required to file a Form U5 upon your termination as a registered securities representative associated with BOSC and/or JPMSI. You hereby waive any claims against JPMSI and BOSC relating to the filing or content of the Form U5.

### SECTION 5. PRIOR OBLIGATIONS

You represent that you have provided JPMC with a copy of any written (or provided the full terms of any verbal) agreement or arrangement that purports to restrict you from competing with a prior employer or from soliciting a prior employer's customers or employees, or that in any way may restrict or interfere with your ability to perform the responsibilities of your position. You agree that you will not enter into any such agreement with a prior employer without the written consent of JPMC. You further understand that you may not disclose to JPMC or use in connection with your employment with JPMC any protected trade secrets or protected confidential or proprietary information of another entity or party, including any prior employer, unless and until such information becomes public either through the owner's failure to adequately protect such information or because it is readily ascertainable through proper means or you are permitted to disclose such information or materials by such other party or entity.

You agree that during the term of this Agreement, you shall not own any private stock or have any direct or indirect financial interest in any other organization engaged in any securities, insurance, investment advisory or similar business without the written consent of BOSC's, JPMSI's or AGENCY's respective Compliance Department. Nothing in this provision shall limit your right to invest in securities that are publicly traded, except that the written consent of the applicable Compliance Department will be required with regard to stock ownership, or other financial interest, in any securities or similar business which is publicly traded if a control relationship exists between such entity and you or your family. In addition, any personal investments must be managed in accordance with the JPMC and Asset & Wealth Management personal trading policies applicable to your position, copies of which are available from the Compliance Department.

### SECTION 6. SPECIAL OBLIGATIONS OF EMPLOYEE

You understand that by entering into this Agreement and by virtue of your association with JPMC, you hold a position of trust and as a result of that position JPMC will provide you with "Confidential Information" related to JPMC's business. The term "Confidential Information" as used in this Agreement, includes but is not limited to information described as such in the Code of Conduct and: (a) information received from third parties under confidential conditions; (b) confidential customer data, including but not limited to customer and prospect names, addresses, phone numbers, financial portfolio, financial account information, financial needs, investment preferences and similar information whether or not in tangible form developed or compiled by JPMC or by you in connection with your employment by JPMC; (c) information concerning established business relationships; (d) non-public information about JPMC's employees; (e) all records and documents concerning the business and affairs of JPMC, including without limitation methods, procedures, devices and other means used by JPMC in the conduct of its business (f) "trade secrets" as that term is defined by the Uniform Trade Secrets Act (UTSA), which term shall be deemed to include each item of Confidential Information specifically described in this Section 6; and (g) software and other technical, business or financial information, the use or disclosure of which might reasonably be construed to be contrary to the interest of JPMC or its clients. You understand that such

Employee Initials

# Supervision, Confidentiality, and Non-Solicitation Agreement (PCS)

Page 3 of 5

Confidential Information will be disclosed to you in confidence and for use only in connection with your employment with JPMC and therefore agree to the following restrictions:

## SECTION 6.1  CONFIDENTIALITY

Upon leaving JPMC's employ for any reason (voluntarily or otherwise), or upon JPMC's request at any time, you agree to immediately return to JPMC all Confidential Information in your possession, under your control or which you received or prepared in connection with your employment; and you agree not to retain any copies (whether manually or mechanically produced, including electronic or software versions), summaries, compilations, or excerpts thereof.  You also agree to return upon leaving JPMC's employ, or at any time we request, any equipment including but not limited to computers, personal digital assistants, pagers or telephones issued to you for use in your employment, and not to destroy or copy any information contained thereon.

You agree (a) to keep Confidential Information confidential at all times during and after your employment with JPMC; (b) for as long as Confidential Information remains confidential, not to disclose or communicate Confidential Information to any third party unless permitted by JPMC policy, required by law, or with JPMC's written consent; and (c) not to use Confidential Information for your own benefit or for the benefit of a third party.

## SECTION 6.2  NON-SOLICITATION OF CUSTOMERS AND EMPLOYEES

*You acknowledge that JPMC's relationships with its customers are extremely valuable and are the result of the investment of substantial time, resources, and effort in developing them and keeping them confidential.  In consideration of the provision of Confidential Information to you, your employment and continued employment, as well as all payments to you, including all compensation received from JPMC and its affiliates and commissions and other compensation paid to you in connection with the JPMC products, you agree for a period of twelve (12) months after the termination of your employment, regardless of the circumstances of the termination, not to, directly or indirectly, acting alone or with others, solicit or attempt to solicit, induce to leave or divert or attempt to induce to leave or divert from doing business with JPMC, any JPMC customer with whom you had professional contact, for whom you had responsibility or with respect to whom you were privy to any information during the last two years of your employment with JPMC.*

*This section does not apply to customer relationships you established prior to commencing employment with JPMC, provided that you can substantiate through documents or other suitable evidence that the relationship preceded your commencement of employment with JPMC.  You have identified any persons you believe are subject to this exclusion prior to the signing of this Agreement, and any such persons as to whom you have provided suitable documentation are listed in Exhibit "A" attached hereto, which Exhibit shall be initialed and dated by you and your supervisor.  The absence of any such Exhibit shall be conclusive evidence that this exclusion does not apply.*

*Nothing in this Agreement prevents you from seeking or accepting employment with any other financial institution, bank, trust company, brokerage firm or other competing entity after your term of employment with JPMC.*

*You also agree, for a period of 12 months after the termination of your employment for any reason, not to directly or indirectly: (1) hire or solicit any current JPMC employee, candidate for employment or former JPMC employee who resigned from JPMC within twelve months of any such solicitation, to apply for or accept employment with any business competing with JPMC, or (2) to otherwise induce any then current JPMC employee or candidate for employment with JPMC to become employed by any business competing with JPMC.*

*You also agree that you will not disrupt, damage, impair, or interfere with JPMC's business or reputation in any manner.*

*You also agree that JPMC may contact any person or entity with whom you become employed or associated during the term of these restrictions to inform them of the existence of this Agreement and the substance of the restrictions contained herein.*

## SECTION 6.3  REMEDIES

By signing below, you agree that any breach, evasion, violation or threatened violation of any term of this Section 6 by you will cause immediate and irreparable injury to JPMC that cannot be adequately remedied by monetary damages and will entitle JPMC to immediate injunctive relief and/or specific performance in any court of competent jurisdiction and/or before the NASD or NYSE, as well as to all other legal or equitable remedies and UTSA remedies, where applicable, to which JPMC may be entitled, including but not limited to the right to compel arbitration of disputes. Your covenants set forth in this Section 6 are independent of any other

REVISED 4/2006

Employee Initials

# Supervision, Confidentiality, and Non-Solicitation Agreement (PCS)

Page 4 of 5

provisions of this Agreement; and the existence of any claim or causes of action by you against JPMC, whether predicated on this Agreement or otherwise, shall not constitute a defense to JPMC obtaining relief as described in this section. If JPMC is (in its sole judgment) compelled to institute legal proceedings and/or arbitration to enforce this Agreement, you agree to reimburse JPMC for its actual attorney fees and other expenses incurred in the successful prosecution or settlement of such proceedings, in addition to its damages or other remedies.

## SECTION 6.4 REASONABLENESS OF COVENANTS

You acknowledge that you have carefully considered the nature and extent of the restrictions upon you and the rights and remedies conferred upon JPMC under this Section 6, and have had the opportunity to retain legal counsel at your own expense to review this Agreement. You acknowledge that these restrictions are reasonable in time and scope, are designed to eliminate competition which would be unfair to JPMC, are fully required to protect the legitimate interests of JPMC and its customers and do not confer a benefit upon JPMC which is disproportionate to any detriment to you.

You acknowledge that the terms and conditions of this Agreement incorporate and/or supplement the terms and conditions of your employment at JPMC and are reasonable and necessary to protect the valued business interests of JPMC and that you have received good and valuable consideration for entering into this Agreement.

You acknowledge that ~~you were made aware of this Agreement at the time you accepted employment with JPMC or at the time you were offered the opportunity of receiving sales-related compensation for the sale of non-deposit investment products, and that~~ you are signing ~~it~~ _this agreement_ knowingly and voluntarily and are accepting or continuing employment with full understanding of its terms and conditions ~~and you will not challenge the enforceability or terms of this Agreement.~~

## SECTION 6.5 SAVINGS CLAUSE

The provisions contained in this Section 6 shall survive the termination of this Agreement for whatever cause and shall be binding upon and inure to the benefit of the respective heirs, administrators, executors, assigns and successors in interest of you and JPMC.

## SECTION 7. COMPENSATION/COMMISSION DRAWS

In connection with your services hereunder, you may be eligible for incentive compensation in accordance with certain compensation programs as in effect for certain subsidiaries and products from time to time. JPMC reserves the right to change such programs at any time, in its sole discretion.

## SECTION 8. NOTICES

All notices, requests, demands, or other communications provided for by this Agreement shall be in writing and personally delivered to the party entitled thereto or sent by registered or certified mail, facsimile or electronic mail or private courier with receipt or other confirmation of delivery.

## SECTION 9. ARBITRATION

Any dispute, controversy or claim which relates in any way to this Agreement and which has not been resolved by the parties using an informal dispute resolution process or which does not require immediate injunctive relief to avoid irreparable injury to any party shall be subject to arbitration in accordance with the rules and procedures of the NASD or NYSE, as appropriate.

The fact that arbitration has commenced shall not impair the exercise of any termination rights in accordance with the provisions of this Agreement, nor impair any rights JPMC may have under Section 6, including, but not limited to, the right to obtain injunctive relief in a court of competent jurisdiction.

## SECTION 10. AMENDMENT OR MODIFICATION; WAIVER

No provision of this Agreement may be amended, modified or waived unless such amendment, modification, or waiver is agreed to in writing, and signed by you and by an authorized officer of JPMC. Except as otherwise specifically provided in this Agreement, no waiver by any party of any breach by the other party hereto of any provision of this Agreement to be performed by such other party shall be deemed a waiver of a subsequent breach of such provision or a waiver of a similar or dissimilar provision at the same or at any prior or subsequent time.

## SECTION 11. SEVERABILITY

In the event that any Section of this Agreement or the application thereof shall be determined to be invalid or unenforceable for any reason, the remaining Sections of this Agreement shall be unaffected thereby and shall remain in full force and effect to the fullest extent permitted by law.

REVISED 4/2006

Employee Initials

## Supervision, Confidentiality, and Non-Solicitation Agreement (PCS)

Page 5 of 5

If it is determined by any court, or by an arbitrator in accordance with Section 9, that any restrictive covenants contained herein, or any part thereof, are unenforceable because of the duration or scope of such provision, the duration or scope of such provision, as the case may be, shall be reduced so that such provision becomes enforceable and, in its reduced form, such provision shall then be enforced.

### SECTION 12.  ASSIGNMENT; SUCCESSORS TO JPMC

Except as otherwise provided herein, this Agreement shall be binding upon and inure to the benefit of any successor or assignee of JPMC or any JPMC subsidiary, including, without limitation, any corporation or corporations acquiring directly or indirectly all or substantially all of the assets of JPMC whether by merger, consolidation, sale or otherwise.  This Agreement is not assignable by you.

### SECTION 13.  APPLICABLE LAW

This Agreement shall be deemed to have been made and formed in the State of New York and shall be governed by and construed in accordance with the laws of the State of New York regardless of the location of its execution or performance and without regard to the principles of conflicts of laws.

### SECTION 14.  ENTIRE AGREEMENT

This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof; all prior Agreements, representations, statements, negotiations, and undertakings are superseded hereby, provided, however, that the duties and obligations set forth in this Agreement are in addition to and do not abrogate your obligations under JPMC's policies, the Code of Conduct and any other non-solicitation or non-compete agreement with JPMC or any of its affiliates, all as in effect from time to time.

### SECTION 15.  NOTICE TO PROSPECTIVE EMPLOYERS

Prior to accepting employment with any other person or entity during the 12 months following the termination of your employment with JPMC for any reason, you will provide any prospective employer with a copy of this Agreement.

**YOU MUST COMPLETE THE FOLLOWING SECTION IF YOU ARE EMPLOYED IN LOUISIANA:** (You specifically agree that if you are not located in Louisiana, this Section does not apply to you)

The agreements and restrictions in Section 6 shall be effective in the following specified parishes within the State of Louisiana:

### EMPLOYEE SIGNATURE

Your signature below confirms your understanding and acceptance of all of the terms and conditions of this Agreement.

| Employee Signature | Date |
|---|---|
| X | 5/23/06 |

REVISED 4/2006

Employee Initials

# EXHIBIT D

# Supervision, Confidentiality, and Non-Solicitation Agreement (PCS)

Page 1 of 5

835589

| Employee Name (first, middle initial, last) | Employee Identification Number |
|---|---|
| David M. Jakubs | 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 |

This Agreement is entered into on the _____10th_____ day of _____May_____, _____2006_____, among the undersigned individual (hereinafter referred to as "you"), and JPMorgan Chase & Co. and its subsidiaries, including but not limited to, JPMorgan Chase Bank, N.A. a national banking association, JPMorgan Securities, Inc., ("JPMSI") a Delaware corporation registered and licensed as a broker-dealer and a member of the NASD and NYSE, Banc One Securities Corporation ("BOSC"), an Ohio corporation registered and licensed as a broker-dealer and a member of the NASD, JPMorgan Insurance Agency, Inc. ("AGENCY"), a Delaware corporation registered and licensed as an insurance agency in various states, and Bank One Trust Company, N.A. ("Trust"), a national banking association. JPMorgan Chase & Co. and its subsidiaries (and including any predecessor companies) are referred to collectively in the Agreement as "JPMC". This Agreement is intended to supersede and will automatically terminate prior agreements between you and BOSC, JPMSI, AGENCY, Trust or any other JPMC subsidiary or any predecessor organization concerning your conduct, responsibilities and compensation as a registered securities representative, licensed insurance agent or other investment management professional. Your obligations in this Agreement are in addition to the general obligations you have as a JPMC employee under JPMC policies, stock plans and awards and the Code of Conduct, all as in effect from time to time.

IN CONSIDERATION of the mutual promises and covenants herein contained, JPMC and you agree as follows:

## SECTION 1. RELATIONSHIP OF PARTIES

You are an at-will employee of a JPMC subsidiary bank or other JPMC company. Nothing in this Agreement changes anything relating to the at-will employment relationship or creates any new or different rights to continued employment or benefits.

You are being offered the opportunity to represent JPMC in making available to customers and prospective customers certain products and services sold through one or more regulated JPMC subsidiaries and to participate in the compensation programs applicable to such products from time to time. The products and services include products that are regulated as securities and/or insurance and which cannot be sold except by appropriately licensed persons. This Agreement governs your relationship with the applicable JPMC subsidiary with respect to the sale of regulated products and services as well as with respect to fiduciary and private banking services. When acting to promote, sell or service products which are regulated as insurance, you will be representing and under the supervision and control of AGENCY. When you are acting to promote, sell or service products that are regulated as securities, you will be representing, employed in the business of and under the supervision and control of BOSC and/or JPMSI. When you are acting to promote, sell or service products which are dually regulated as insurance and securities (e.g., variable annuities and life insurance products), you will be representing and under the dual supervision and control of BOSC and/or JPMSI and AGENCY.

If, during your employment by JPMC, you are requested to promote, sell or service products which involve the securities business of BOSC and/or JPMSI and/or the insurance business of AGENCY and therefore come under the supervision and control of BOSC and/or JPMSI and/or AGENCY, you will be required to obtain and maintain all necessary licenses, registrations and carrier appointments with any federal, state or other regulatory authority. You will also be required to comply with all rules, regulations, policies and procedures and standards established by the applicable JPMC subsidiary for the conduct of its business. If you were previously licensed as a securities registered representative or as an insurance agent, you will take any steps necessary under applicable laws to transfer your association to BOSC and/or JPMSI and AGENCY. You will not represent and will agree to terminate your appointment with any insurance carriers except those authorized and arranged by AGENCY from time to time. Additionally, you will not service any customer with respect to products sold by insurance carriers or other providers not approved by JPMC.

## SECTION 2. TERM

This Agreement shall continue indefinitely unless JPMC releases you in writing from your obligations hereunder.

## SECTION 3. DUTIES, RESPONSIBILITIES, AND POSITION

Your activities related to the sale of securities or insurance products shall be limited to those specific activities authorized and directed by BOSC, JPMSI and AGENCY.

You acknowledge that you have received, read and will adhere to the JPMC Code of Conduct (or similar document applicable to employees of any predecessor company to JPMC) as such Code may be amended from time to time. The duties set forth in this Agreement are in addition to and do not abrogate your obligations under any such Code of Conduct or other operational, procedural or other policies applicable to JPMC employees generally.

You agree to be aware of and adhere to all of the rules, regulations, requirements, standards, policies and procedures established by the applicable JPMC subsidiary for conduct of its representatives as set forth in compliance manuals and procedures manuals,

REVISED 4/2006

Employee Initials

**EXHIBIT D**

# Supervision, Confidentiality, and Non-Solicitation Agreement (PCS)

Page 2 of 5

---

as such manuals may be unilaterally modified from time to time You may be suspended at any time from selling BOSC, JPMSI, AGENCY, or fiduciary products or services with or without cause by the entity having authority for any such product.

You agree to adhere to all applicable rules, regulations, and reporting requirements of the Securities and Exchange Commission, the NASD, the New York Stock Exchange, the Municipal Securities Rulemaking Board, the Federal Reserve Board, the Office of the Comptroller of Currency, all applicable national and regional stock exchanges, the relevant state securities, insurance and banking regulatory authorities and all procedures of clearing brokers or insurance carriers with which BOSC, JPMSI or AGENCY may become associated at any time during the term of this Agreement.

## SECTION 4.  LICENSES

You represent and warrant to BOSC, JPMSI and AGENCY that you are a licensed securities registered representative and/or a licensed insurance agent in good standing, or will obtain such appropriate license within the time specified by BOSC, JPMSI or AGENCY, as applicable, in all states in which you are required to be licensed or registered. You agree not to sell any insurance products through AGENCY or accept any compensation in connection with the sale of any insurance policy until the appropriate insurance carrier appointments are in place in all applicable states.

You further warrant that, except as disclosed in writing to JPMC, there are no prior or pending investigations, customer complaints, civil or criminal lawsuits, administrative actions/complaints, or prior or pending arbitrations against you. You understand that you are required to immediately notify your management and the appropriate compliance officer of any investigations, complaints, lawsuits, or arbitrations instituted against or involving you.

You acknowledge that BOSC and/or JPMSI is required to file a Form U5 upon your termination as a registered securities representative associated with BOSC and/or JPMSI. You hereby waive any claims against JPMSI and BOSC relating to the filing or content of the Form U5.

## SECTION 5.  PRIOR OBLIGATIONS

You represent that you have provided JPMC with a copy of any written (or provided the full terms of any verbal) agreement or arrangement that purports to restrict you from competing with a prior employer or from soliciting a prior employer's customers or employees, or that in any way may restrict or interfere with your ability to perform the responsibilities of your position. You agree that you will not enter into any such agreement with a prior employer without the written consent of JPMC. You further understand that you may not disclose to JPMC or use in connection with your employment with JPMC any protected trade secrets or protected confidential or proprietary information of another entity or party, including any prior employer, unless and until such information becomes public either through the owner's failure to adequately protect such information or because it is readily ascertainable through proper means or you are permitted to disclose such information or materials by such other party or entity.

You agree that during the term of this Agreement, you shall not own any private stock or have any direct or indirect financial interest in any other organization engaged in any securities, insurance, investment advisory or similar business without the written consent of BOSC's, JPMSI's or AGENCY's respective Compliance Department. Nothing in this provision shall limit your right to invest in securities that are publicly traded, except that the written consent of the applicable Compliance Department will be required with regard to stock ownership, or other financial interest, in any securities or similar business which is publicly traded if a control relationship exists between such entity and you or your family. In addition, any personal investments must be managed in accordance with the JPMC and Asset & Wealth Management personal trading policies applicable to your position, copies of which are available from the Compliance Department.

## SECTION 6.  SPECIAL OBLIGATIONS OF EMPLOYEE

You understand that by entering into this Agreement and by virtue of your association with JPMC, you hold a position of trust and as a result of that position JPMC will provide you with "Confidential Information" related to JPMC's business. The term "Confidential Information" as used in this Agreement, includes but is not limited to information described as such in the Code of Conduct and: (a) information received from third parties under confidential conditions; (b) confidential customer data, including but not limited to customer and prospect names, addresses, phone numbers, financial portfolio, financial account information, financial needs, investment preferences and similar information whether or not in tangible form developed or compiled by JPMC or by you in connection with your employment by JPMC; (c) information concerning established business relationships; (d) non-public information about JPMC's employees; (e) all records and documents concerning the business and affairs of JPMC, including without limitation methods, procedures, devices and other means used by JPMC in the conduct of its business (f) "trade secrets" as that term is defined by the Uniform Trade Secrets Act (UTSA), which term shall be deemed to include each item of Confidential Information specifically described in this Section 6; and (g) software and other technical, business or financial information, the use or disclosure of which might reasonably be construed to be contrary to the interest of JPMC or its clients. You understand that such

Employee Initials

# Supervision, Confidentiality, and Non-Solicitation Agreement (PCS)

Page 3 of 5

Confidential Information will be disclosed to you in confidence and for use only in connection with your employment with JPMC and therefore agree to the following restrictions:

## SECTION 6.1 CONFIDENTIALITY

Upon leaving JPMC's employ for any reason (voluntarily or otherwise), or upon JPMC's request at any time, you agree to immediately return to JPMC all Confidential Information in your possession, under your control or which you received or prepared in connection with your employment; and you agree not to retain any copies (whether manually or mechanically produced, including electronic or software versions), summaries, compilations, or excerpts thereof. You also agree to return upon leaving JPMC's employ, or at any time we request, any equipment including but not limited to computers, personal digital assistants, pagers or telephones issued to you for use in your employment, and not to destroy or copy any information contained thereon.

You agree (a) to keep Confidential Information confidential at all times during and after your employment with JPMC; (b) for as long as Confidential Information remains confidential, not to disclose or communicate Confidential Information to any third party unless permitted by JPMC policy, required by law, or with JPMC's written consent; and (c) not to use Confidential Information for your own benefit or for the benefit of a third party.

## SECTION 6.2 NON-SOLICITATION OF CUSTOMERS AND EMPLOYEES

*You acknowledge that JPMC's relationships with its customers are extremely valuable and are the result of the investment of substantial time, resources, and effort in developing them and keeping them confidential. In consideration of the provision of Confidential Information to you, your employment and continued employment, as well as all payments to you, including all compensation received from JPMC and its affiliates and commissions and other compensation paid to you in connection with the JPMC products, you agree for a period of twelve (12) months after the termination of your employment, regardless of the circumstances of the termination, not to, directly or indirectly, acting alone or with others, solicit or attempt to solicit, induce to leave or divert or attempt to induce to leave or divert from doing business with JPMC, any JPMC customer with whom you had professional contact, for whom you had responsibility or with respect to whom you were privy to any information during the last two years of your employment with JPMC.*

*This section does not apply to customer relationships you established prior to commencing employment with JPMC, provided that you can substantiate through documents or other suitable evidence that the relationship preceded your commencement of employment with JPMC. You have identified any persons you believe are subject to this exclusion prior to the signing of this Agreement, and any such persons as to whom you have provided suitable documentation are listed in Exhibit "A" attached hereto, which Exhibit shall be initialed and dated by you and your supervisor. The absence of any such Exhibit shall be conclusive evidence that this exclusion does not apply.*

*Nothing in this Agreement prevents you from seeking or accepting employment with any other financial institution, bank, trust company, brokerage firm or other competing entity after your term of employment with JPMC.*

*You also agree, for a period of 12 months after the termination of your employment for any reason, not to directly or indirectly: (1) hire or solicit any current JPMC employee, candidate for employment or former JPMC employee who resigned from JPMC within twelve months of any such solicitation, to apply for or accept employment with any business competing with JPMC, or (2) to otherwise induce any then current JPMC employee or candidate for employment with JPMC to become employed by any business competing with JPMC.*

*You also agree that you will not disrupt, damage, impair, or interfere with JPMC's business or reputation in any manner.*

*You also agree that JPMC may contact any person or entity with whom you become employed or associated during the term of these restrictions to inform them of the existence of this Agreement and the substance of the restrictions contained herein.*

## SECTION 6.3 REMEDIES

By signing below, you agree that any breach, evasion, violation or threatened violation of any term of this Section 6 by you will cause immediate and irreparable injury to JPMC that cannot be adequately remedied by monetary damages and will entitle JPMC to immediate injunctive relief and/or specific performance in any court of competent jurisdiction and/or before the NASD or NYSE, as well as to all other legal or equitable remedies and UTSA remedies, where applicable, to which JPMC may be entitled, including but not limited to the right to compel arbitration of disputes. Your covenants set forth in this Section 6 are independent of any other

Employee Initials

# Supervision, Confidentiality, and Non-Solicitation Agreement (PCS)

Page 4 of 5

provisions of this Agreement; and the existence of any claim or causes of action by you against JPMC, whether predicated on this Agreement or otherwise, shall not constitute a defense to JPMC obtaining relief as described in this section. If JPMC is (in its sole judgment) compelled to institute legal proceedings and/or arbitration to enforce this Agreement, you agree to reimburse JPMC for its actual attorney fees and other expenses incurred in the successful prosecution or settlement of such proceedings, in addition to its damages or other remedies.

## SECTION 6.4  REASONABLENESS OF COVENANTS

You acknowledge that you have carefully considered the nature and extent of the restrictions upon you and the rights and remedies conferred upon JPMC under this Section 6, and have had the opportunity to retain legal counsel at your own expense to review this Agreement. You acknowledge that these restrictions are reasonable in time and scope, are designed to eliminate competition which would be unfair to JPMC, are fully required to protect the legitimate interests of JPMC and its customers and do not confer a benefit upon JPMC which is disproportionate to any detriment to you.

You acknowledge that the terms and conditions of this Agreement incorporate and/or supplement the terms and conditions of your employment at JPMC and are reasonable and necessary to protect the valued business interests of JPMC and that you have received good and valuable consideration for entering into this Agreement.

You acknowledge that ~~you were made aware of this Agreement at the time you accepted employment with JPMC or at the time you were afforded the opportunity of receiving sales-related compensation for the sale of non-deposit investment products, and that~~ you are signing *this Agreement* knowingly and voluntarily and are accepting or continuing employment with full understanding of its terms and conditions, ~~and you will not challenge the enforceability or terms of this Agreement.~~

*Mgr*   *Employee*

## SECTION 6.5  SAVINGS CLAUSE

The provisions contained in this Section 6 shall survive the termination of this Agreement for whatever cause and shall be binding upon and inure to the benefit of the respective heirs, administrators, executors, assigns and successors in interest of you and JPMC.

## SECTION 7.  COMPENSATION/COMMISSION DRAWS

In connection with your services hereunder, you may be eligible for incentive compensation in accordance with certain compensation programs as in effect for certain subsidiaries and products from time to time. JPMC reserves the right to change such programs at any time, in its sole discretion.

## SECTION 8.  NOTICES

All notices, requests, demands, or other communications provided for by this Agreement shall be in writing and personally delivered to the party entitled thereto or sent by registered or certified mail, facsimile or electronic mail or private courier with receipt or other confirmation of delivery.

## SECTION 9.  ARBITRATION

Any dispute, controversy or claim which relates in any way to this Agreement and which has not been resolved by the parties using an informal dispute resolution process or which does not require immediate injunctive relief to avoid irreparable injury to any party shall be subject to arbitration in accordance with the rules and procedures of the NASD or NYSE, as appropriate.

The fact that arbitration has commenced shall not impair the exercise of any termination rights in accordance with the provisions of this Agreement, nor impair any rights JPMC may have under Section 6, including, but not limited to, the right to obtain injunctive relief in a court of competent jurisdiction.

## SECTION 10.  AMENDMENT OR MODIFICATION; WAIVER

No provision of this Agreement may be amended, modified or waived unless such amendment, modification, or waiver is agreed to in writing, and signed by you and by an authorized officer of JPMC. Except as otherwise specifically provided in this Agreement, no waiver by any party of any breach by the other party hereto of any provision of this Agreement to be performed by such other party shall be deemed a waiver of a subsequent breach of such provision or a waiver of a similar or dissimilar provision at the same or at any prior or subsequent time.

## SECTION 11.  SEVERABILITY

In the event that any Section of this Agreement or the application thereof shall be determined to be invalid or unenforceable for any reason, the remaining Sections of this Agreement shall be unaffected thereby and shall remain in full force and effect to the fullest extent permitted by law.

REVISED 4/2006

Employee Initials

# Supervision, Confidentiality, and Non-Solicitation Agreement (PCS)

Page 5 of 5

---

If it is determined by any court, or by an arbitrator in accordance with Section 9, that any restrictive covenants contained herein, or any part thereof, are unenforceable because of the duration or scope of such provision, the duration or scope of such provision, as the case may be, shall be reduced so that such provision becomes enforceable and, in its reduced form, such provision shall then be enforced.

### SECTION 12. ASSIGNMENT; SUCCESSORS TO JPMC

Except as otherwise provided herein, this Agreement shall be binding upon and inure to the benefit of any successor or assignee of JPMC or any JPMC subsidiary, including, without limitation, any corporation or corporations acquiring directly or indirectly all or substantially all of the assets of JPMC whether by merger, consolidation, sale or otherwise. This Agreement is not assignable by you.

### SECTION 13. APPLICABLE LAW

This Agreement shall be deemed to have been made and formed in the State of New York and shall be governed by and construed in accordance with the laws of the State of New York regardless of the location of its execution or performance and without regard to the principles of conflicts of laws.

### SECTION 14. ENTIRE AGREEMENT

This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof; all prior Agreements, representations, statements, negotiations, and undertakings are superseded hereby, provided, however, that the duties and obligations set forth in this Agreement are in addition to and do not abrogate your obligations under JPMC's policies, the Code of Conduct and any other non-solicitation or non-compete agreement with JPMC or any of its affiliates, all as in effect from time to time.

### SECTION 15. NOTICE TO PROSPECTIVE EMPLOYERS

Prior to accepting employment with any other person or entity during the 12 months following the termination of your employment with JPMC for any reason, you will provide any prospective employer with a copy of this Agreement.

**YOU MUST COMPLETE THE FOLLOWING SECTION IF YOU ARE EMPLOYED IN LOUISIANA:** (You specifically agree that if you are not located in Louisiana, this Section does not apply to you)

The agreements and restrictions in Section 6 shall be effective in the following specified parishes within the State of Louisiana:

---

### EMPLOYEE SIGNATURE

Your signature below confirms your understanding and acceptance of all of the terms and conditions of this Agreement.

| Employee Signature | Date |
|---|---|
| X | 5/10/2006 |

REVISED 4/2006

Employee Initials

08CV3004    EDA
JUDGE NORDBERG
MAGISTRATE JUDGE DENLOW

# EXHIBIT E

**Supervision, Confidentiality, and Non-Solicitation Agreement (PCS)**

Page 1 of 5

*911510*

| Employee Name (first, middle initial, last) | Employee Identification Number |
|---|---|
| Fei   Wang | 345 - 76 - 3123 |

This Agreement is entered into on the ___11___ day of ___MAY___, ___2006___, among the undersigned individual (hereinafter referred to as "you"), and JPMorgan Chase & Co. and its subsidiaries, including but not limited to, JPMorgan Chase Bank, N.A. a national banking association, JPMorgan Securities, Inc., ("JPMSI") a Delaware corporation registered and licensed as a broker-dealer and a member of the NASD and NYSE, Banc One Securities Corporation ("BOSC"), an Ohio corporation registered and licensed as a broker-dealer and a member of the NASD, JPMorgan Insurance Agency, Inc. ("AGENCY"), a Delaware corporation registered and licensed as an insurance agency in various states, and Bank One Trust Company, N.A. ("Trust"), a national banking association. JPMorgan Chase & Co. and its subsidiaries (and including any predecessor companies) are referred to collectively in the Agreement as "JPMC". This Agreement is intended to supersede and will automatically terminate prior agreements between you and BOSC, JPMSI, AGENCY, Trust or any other JPMC subsidiary or any predecessor organization concerning your conduct, responsibilities and compensation as a registered securities representative, licensed insurance agent or other investment management professional. Your obligations in this Agreement are in addition to the general obligations you have as a JPMC employee under JPMC policies, stock plans and awards and the Code of Conduct, all as in effect from time to time.

IN CONSIDERATION of the mutual promises and covenants herein contained, JPMC and you agree as follows:

### SECTION 1. RELATIONSHIP OF PARTIES

You are an at-will employee of a JPMC subsidiary bank or other JPMC company. Nothing in this Agreement changes anything relating to the at-will employment relationship or creates any new or different rights to continued employment or benefits.

You are being offered the opportunity to represent JPMC in making available to customers and prospective customers certain products and services sold through one or more regulated JPMC subsidiaries and to participate in the compensation programs applicable to such products from time to time. The products and services include products that are regulated as securities and/or insurance and which cannot be sold except by appropriately licensed persons. This Agreement governs your relationship with the applicable JPMC subsidiary with respect to the sale of regulated products and services as well as with respect to fiduciary and private banking services. When acting to promote, sell or service products which are regulated as insurance, you will be representing and under the supervision and control of AGENCY. When you are acting to promote, sell or service products that are regulated as securities, you will be representing, employed in the business of and under the supervision and control of BOSC and/or JPMSI. When you are acting to promote, sell or service products which are dually regulated as insurance and securities (e.g., variable annuities and life insurance products), you will be representing and under the dual supervision and control of BOSC and/or JPMSI and AGENCY.

If, during your employment by JPMC, you are requested to promote, sell or service products which involve the securities business of BOSC and/or JPMSI and/or the insurance business of AGENCY and therefore come under the supervision and control of BOSC and/or JPMSI and/or AGENCY, you will be required to obtain and maintain all necessary licenses, registrations and carrier appointments with any federal, state or other regulatory authority. You will also be required to comply with all rules, regulations, policies and procedures and standards established by the applicable JPMC subsidiary for the conduct of its business. If you were previously licensed as a securities registered representative or as an insurance agent, you will take any steps necessary under applicable laws to transfer your association to BOSC and/or JPMSI and AGENCY. You will not represent and will agree to terminate your appointment with any insurance carriers except those authorized and arranged by AGENCY from time to time. Additionally, you will not service any customer with respect to products sold by insurance carriers or other providers not approved by JPMC.

### SECTION 2. TERM

This Agreement shall continue indefinitely unless JPMC releases you in writing from your obligations hereunder.

### SECTION 3. DUTIES, RESPONSIBILITIES, AND POSITION

Your activities related to the sale of securities or insurance products shall be limited to those specific activities authorized and directed by BOSC, JPMSI and AGENCY.

You acknowledge that you have received, read and will adhere to the JPMC Code of Conduct (or similar document applicable to employees of any predecessor company to JPMC) as such Code may be amended from time to time. The duties set forth in this Agreement are in addition to and do not abrogate your obligations under any such Code of Conduct or other operational, procedural or other policies applicable to JPMC employees generally.

You agree to be aware of and adhere to all of the rules, regulations, requirements, standards, policies and procedures established by the applicable JPMC subsidiary for conduct of its representatives as set forth in compliance manuals and procedures manuals,

REVISED 4/2006

**EXHIBIT E**

*FW*
Employee Initials

# Supervision, Confidentiality, and Non-Solicitation Agreement (PCS)

Page 2 of 5

as such manuals may be unilaterally modified from time to time You may be suspended at any time from selling BOSC, JPMSI, AGENCY, or fiduciary products or services with or without cause by the entity having authority for any such product.

You agree to adhere to all applicable rules, regulations, and reporting requirements of the Securities and Exchange Commission, the NASD, the New York Stock Exchange, the Municipal Securities Rulemaking Board, the Federal Reserve Board, the Office of the Comptroller of Currency, all applicable national and regional stock exchanges, the relevant state securities, insurance and banking regulatory authorities and all procedures of clearing brokers or insurance carriers with which BOSC, JPMSI or AGENCY may become associated at any time during the term of this Agreement.

## SECTION 4. LICENSES

You represent and warrant to BOSC, JPMSI and AGENCY that you are a licensed securities registered representative and/or a licensed insurance agent in good standing, or will obtain such appropriate license within the time specified by BOSC, JPMSI or AGENCY, as applicable, in all states in which you are required to be licensed or registered. You agree not to sell any insurance products through AGENCY or accept any compensation in connection with the sale of any insurance policy until the appropriate insurance carrier appointments are in place in all applicable states.

You further warrant that, except as disclosed in writing to JPMC, there are no prior or pending investigations, customer complaints, civil or criminal lawsuits, administrative actions/complaints, or prior or pending arbitrations against you. You understand that you are required to immediately notify your management and the appropriate compliance officer of any investigations, complaints, lawsuits, or arbitrations instituted against or involving you.

You acknowledge that BOSC and/or JPMSI is required to file a Form U5 upon your termination as a registered securities representative associated with BOSC and/or JPMSI. You hereby waive any claims against JPMSI and BOSC relating to the filing or content of the Form U5.

## SECTION 5. PRIOR OBLIGATIONS

You represent that you have provided JPMC with a copy of any written (or provided the full terms of any verbal) agreement or arrangement that purports to restrict you from competing with a prior employer or from soliciting a prior employer's customers or employees, or that in any way may restrict or interfere with your ability to perform the responsibilities of your position. You agree that you will not enter into any such agreement with a prior employer without the written consent of JPMC. You further understand that you may not disclose to JPMC or use in connection with your employment with JPMC any protected trade secrets or protected confidential or proprietary information of another entity or party, including any prior employer, unless and until such information becomes public either through the owner's failure to adequately protect such information or because it is readily ascertainable through proper means or you are permitted to disclose such information or materials by such other party or entity.

You agree that during the term of this Agreement, you shall not own any private stock or have any direct or indirect financial interest in any other organization engaged in any securities, insurance, investment advisory or similar business without the written consent of BOSC's, JPMSI's or AGENCY's respective Compliance Department. Nothing in this provision shall limit your right to invest in securities that are publicly traded, except that the written consent of the applicable Compliance Department will be required with regard to stock ownership, or other financial interest, in any securities or similar business which is publicly traded if a control relationship exists between such entity and you or your family. In addition, any personal investments must be managed in accordance with the JPMC and Asset & Wealth Management personal trading policies applicable to your position, copies of which are available from the Compliance Department.

## SECTION 6. SPECIAL OBLIGATIONS OF EMPLOYEE

You understand that by entering into this Agreement and by virtue of your association with JPMC, you hold a position of trust and as a result of that position JPMC will provide you with "Confidential Information" related to JPMC's business. The term "Confidential Information" as used in this Agreement, includes but is not limited to information described as such in the Code of Conduct and: (a) information received from third parties under confidential conditions; (b) confidential customer data, including but not limited to customer and prospect names, addresses, phone numbers, financial portfolio, financial account information, financial needs, investment preferences and similar information whether or not in tangible form developed or compiled by JPMC or by you in connection with your employment by JPMC; (c) information concerning established business relationships; (d) non-public information about JPMC's employees; (e) all records and documents concerning the business and affairs of JPMC, including without limitation methods, procedures, devices and other means used by JPMC in the conduct of its business (f) "trade secrets" as that term is defined by the Uniform Trade Secrets Act (UTSA), which term shall be deemed to include each item of Confidential Information specifically described in this Section 6; and (g) software and other technical, business or financial information, the use or disclosure of which might reasonably be construed to be contrary to the interest of JPMC or its clients. You understand that such

Employee Initials

# Supervision, Confidentiality, and Non-Solicitation Agreement (PCS)
Page 3 of 5

Confidential Information will be disclosed to you in confidence and for use only in connection with your employment with JPMC and therefore agree to the following restrictions:

## SECTION 6.1 CONFIDENTIALITY

Upon leaving JPMC's employ for any reason (voluntarily or otherwise), or upon JPMC's request at any time, you agree to immediately return to JPMC all Confidential Information in your possession, under your control or which you received or prepared in connection with your employment; and you agree not to retain any copies (whether manually or mechanically produced, including electronic or software versions), summaries, compilations, or excerpts thereof. You also agree to return upon leaving JPMC's employ, or at any time we request, any equipment including but not limited to computers, personal digital assistants, pagers or telephones issued to you for use in your employment, and not to destroy or copy any information contained thereon.

You agree (a) to keep Confidential Information confidential at all times during and after your employment with JPMC; (b) for as long as Confidential Information remains confidential, not to disclose or communicate Confidential Information to any third party unless permitted by JPMC policy, required by law, or with JPMC's written consent; and (c) not to use Confidential Information for your own benefit or for the benefit of a third party.

## SECTION 6.2 NON-SOLICITATION OF CUSTOMERS AND EMPLOYEES

*You acknowledge that JPMC's relationships with its customers are extremely valuable and are the result of the investment of substantial time, resources, and effort in developing them and keeping them confidential. In consideration of the provision of Confidential Information to you, your employment and continued employment, as well as all payments to you, including all compensation received from JPMC and its affiliates and commissions and other compensation paid to you in connection with the JPMC products, you agree for a period of twelve (12) months after the termination of your employment, regardless of the circumstances of the termination, not to, directly or indirectly, acting alone or with others, solicit or attempt to solicit, induce to leave or divert or attempt to induce to leave or divert from doing business with JPMC, any JPMC customer with whom you had professional contact, for whom you had responsibility or with respect to whom you were privy to any information during the last two years of your employment with JPMC.*

*This section does not apply to customer relationships you established prior to commencing employment with JPMC, provided that you can substantiate through documents or other suitable evidence that the relationship preceded your commencement of employment with JPMC. You have identified any persons you believe are subject to this exclusion prior to the signing of this Agreement, and any such persons as to whom you have provided suitable documentation are listed in Exhibit "A" attached hereto, which Exhibit shall be initialed and dated by you and your supervisor. The absence of any such Exhibit shall be conclusive evidence that this exclusion does not apply.*

*Nothing in this Agreement prevents you from seeking or accepting employment with any other financial institution, bank, trust company, brokerage firm or other competing entity after your term of employment with JPMC.*

*You also agree, for a period of 12 months after the termination of your employment for any reason, not to directly or indirectly: (1) hire or solicit any current JPMC employee, candidate for employment or former JPMC employee who resigned from JPMC within twelve months of any such solicitation, to apply for or accept employment with any business competing with JPMC, or (2) to otherwise induce any then current JPMC employee or candidate for employment with JPMC to become employed by any business competing with JPMC.*

*You also agree that you will not disrupt, damage, impair, or interfere with JPMC's business or reputation in any manner.*

*You also agree that JPMC may contact any person or entity with whom you become employed or associated during the term of these restrictions to inform them of the existence of this Agreement and the substance of the restrictions contained herein.*

## SECTION 6.3 REMEDIES

By signing below, you agree that any breach, evasion, violation or threatened violation of any term of this Section 6 by you will cause immediate and irreparable injury to JPMC that cannot be adequately remedied by monetary damages and will entitle JPMC to immediate injunctive relief and/or specific performance in any court of competent jurisdiction and/or before the NASD or NYSE, as well as to all other legal or equitable remedies and UTSA remedies, where applicable, to which JPMC may be entitled, including but not limited to the right to compel arbitration of disputes. Your covenants set forth in this Section 6 are independent of any other

*FW*
Employee Initials

# Supervision, Confidentiality, and Non-Solicitation Agreement (PCS)
Page 4 of 5

provisions of this Agreement; and the existence of any claim or causes of action by you against JPMC, whether predicated on this Agreement or otherwise, shall not constitute a defense to JPMC obtaining relief as described in this section. If JPMC is (in its sole judgment) compelled to institute legal proceedings and/or arbitration to enforce this Agreement, you agree to reimburse JPMC for its actual attorney fees and other expenses incurred in the successful prosecution or settlement of such proceedings, in addition to its damages or other remedies.

## SECTION 6.4  REASONABLENESS OF COVENANTS

You acknowledge that you have carefully considered the nature and extent of the restrictions upon you and the rights and remedies conferred upon JPMC under this Section 6, and have had the opportunity to retain legal counsel at your own expense to review this Agreement. You acknowledge that these restrictions are reasonable in time and scope, are designed to eliminate competition which would be unfair to JPMC, are fully required to protect the legitimate interests of JPMC and its customers and do not confer a benefit upon JPMC which is disproportionate to any detriment to you.

You acknowledge that the terms and conditions of this Agreement incorporate and/or supplement the terms and conditions of your employment at JPMC and are reasonable and necessary to protect the valued business interests of JPMC and that you have received good and valuable consideration for entering into this Agreement.

You acknowledge that ~~you were made aware of this Agreement at the time you accepted employment with JPMC or at the time you were afforded the opportunity of receiving sales related compensation for the sale of non-deposit investment products, and that~~ you are signing **this Agreement** knowingly and voluntarily and are accepting or continuing employment with full understanding of its terms and conditions, ~~and you will not challenge the enforceability or terms of this Agreement.~~

*MJR. ——— employee*

## SECTION 6.5  SAVINGS CLAUSE

The provisions contained in this Section 6 shall survive the termination of this Agreement for whatever cause and shall be binding upon and inure to the benefit of the respective heirs, administrators, executors, assigns and successors in interest of you and JPMC.

## SECTION 7.  COMPENSATION/COMMISSION DRAWS

In connection with your services hereunder, you may be eligible for incentive compensation in accordance with certain compensation programs as in effect for certain subsidiaries and products from time to time. JPMC reserves the right to change such programs at any time, in its sole discretion.

## SECTION 8.  NOTICES

All notices, requests, demands, or other communications provided for by this Agreement shall be in writing and personally delivered to the party entitled thereto or sent by registered or certified mail, facsimile or electronic mail or private courier with receipt or other confirmation of delivery.

## SECTION 9.  ARBITRATION

Any dispute, controversy or claim which relates in any way to this Agreement and which has not been resolved by the parties using an informal dispute resolution process or which does not require immediate injunctive relief to avoid irreparable injury to any party shall be subject to arbitration in accordance with the rules and procedures of the NASD or NYSE, as appropriate.

The fact that arbitration has commenced shall not impair the exercise of any termination rights in accordance with the provisions of this Agreement, nor impair any rights JPMC may have under Section 6, including, but not limited to, the right to obtain injunctive relief in a court of competent jurisdiction.

## SECTION 10.  AMENDMENT OR MODIFICATION; WAIVER

No provision of this Agreement may be amended, modified or waived unless such amendment, modification, or waiver is agreed to in writing, and signed by you and by an authorized officer of JPMC. Except as otherwise specifically provided in this Agreement, no waiver by any party of any breach by the other party hereto of any provision of this Agreement to be performed by such other party shall be deemed a waiver of a subsequent breach of such provision or a waiver of a similar or dissimilar provision at the same or at any prior or subsequent time.

## SECTION 11.  SEVERABILITY

In the event that any Section of this Agreement or the application thereof shall be determined to be invalid or unenforceable for any reason, the remaining Sections of this Agreement shall be unaffected thereby and shall remain in full force and effect to the fullest extent permitted by law.

*FW*

# Supervision, Confidentiality, and Non-Solicitation Agreement (PCS)

Page 5 of 5

If it is determined by any court, or by an arbitrator in accordance with Section 9, that any restrictive covenants contained herein, or any part thereof, are unenforceable because of the duration or scope of such provision, the duration or scope of such provision, as the case may be, shall be reduced so that such provision becomes enforceable and, in its reduced form, such provision shall then be enforced.

## SECTION 12.  ASSIGNMENT; SUCCESSORS TO JPMC

Except as otherwise provided herein, this Agreement shall be binding upon and inure to the benefit of any successor or assignee of JPMC or any JPMC subsidiary, including, without limitation, any corporation or corporations acquiring directly or indirectly all or substantially all of the assets of JPMC whether by merger, consolidation, sale or otherwise. This Agreement is not assignable by you.

## SECTION 13.  APPLICABLE LAW

This Agreement shall be deemed to have been made and formed in the State of New York and shall be governed by and construed in accordance with the laws of the State of New York regardless of the location of its execution or performance and without regard to the principles of conflicts of laws.

## SECTION 14.  ENTIRE AGREEMENT

This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof; all prior Agreements, representations, statements, negotiations, and undertakings are superseded hereby, provided, however, that the duties and obligations set forth in this Agreement are in addition to and do not abrogate your obligations under JPMC's policies, the Code of Conduct and any other non-solicitation or non-compete agreement with JPMC or any of its affiliates, all as in effect from time to time.

## SECTION 15.  NOTICE TO PROSPECTIVE EMPLOYERS

Prior to accepting employment with any other person or entity during the 12 months following the termination of your employment with JPMC for any reason, you will provide any prospective employer with a copy of this Agreement.

**YOU MUST COMPLETE THE FOLLOWING SECTION IF YOU ARE EMPLOYED IN LOUISIANA:** (You specifically agree that if you are not located in Louisiana, this Section does not apply to you)

The agreements and restrictions in Section 6 shall be effective in the following specified parishes within the State of Louisiana:

_____

### EMPLOYEE SIGNATURE

Your signature below confirms your understanding and acceptance of all of the terms and conditions of this Agreement.

| Employee Signature | Date |
|---|---|
| X | 5 | 10 | 06 |

Employee Initials

**EXHIBIT F**

**JPMorganChase** ⚙

## CODE OF CONDUCT
### AFFIRMATION RECORD

I hereby affirm that I have read, understand, and am in compliance with the provisions of the JPMorgan Chase Code of Conduct. I also affirm that I am in compliance with any supplemental policies that apply to me, including without limitation any supplemental personal investment policies.

I understand that the Code is updated periodically as necessary, and that the most current version is posted on the JPMorgan Chase intranet. I agree, as a condition of my employment, to comply with the Code and the supplemental policies that apply to me, all as amended from time to time.

I acknowledge that I am a Senior-Level Employee* for purposes of the Code and supplemental policies. As such:

- I am required to discuss any planned transactions in JPMorgan Chase securities, for my own account or that of any of my employee-associated accounts, with a supervisor in advance. I agree to abide by this requirement.
- I have certain responsibilities that will continue after my employment with the firm terminates, including restrictions on hiring or soliciting the firm's employees and soliciting the firm's customers. I agree to abide by those responsibilities after my employment terminates.

*If you are an employee in an area that requires pre-clearance of personal securities transactions and/or maintenance of your employee and employee-associated accounts with a designated broker, you further certify the following:*

To the extent required by personal trading policies and procedures applicable to me:

- all securities transactions for my own account, or for any of my employee-associated accounts, are being pre-cleared by Compliance, and
- all of my employee and employee-associated accounts are maintained with a designated broker or will be moved to a designated broker within the applicable time period, except for any accounts that have been granted a written exemption by Compliance.

**Standard ID:** E063180
**Name:** Degroot, Leslie P
**Company:** JPMorgan Securities Inc.
**Department:** 100010 - CHICAGO BUSINESS OWNERS 1 PAM
**Affirmation Date:** Mar 27 2007
**Confirmation Number:** 2573615

### AN ELECTRONIC AFFIRMATION BY THE ABOVE-NAMED EMPLOYEE WAS RECEIVED BY THE OFFICE OF THE SECRETARY

* A Senior-Level Employee is any employee whose (a) annual base salary rate is US$150,000 (or the local currency equivalent) or higher, OR (b) annual total cash compensation is US$250,000 (or the local currency equivalent) or higher. "Annual total cash compensation" means the employee's annual base salary rate plus job/shift differentials as of the last preceding August 1, plus cash earnings under any incentive plans or programs (e.g., annual bonus, commissions, draws, overrides, and special recognition payments or incentives) that are paid to or deferred by the employee during the 12-month period ending the last preceding July 31. It does not include overtime pay. (For US employees, annual total cash compensation is the same as benefits pay for medical purposes, as shown in the employee's last annual benefits enrollment materials.)

**EXHIBIT F**

# EXHIBIT G

**JPMorganChase** ⬦

## CODE OF CONDUCT
### AFFIRMATION RECORD

I hereby affirm that I have read, understand, and am in compliance with the provisions of the JPMorgan Chase Code of Conduct. I also affirm that I am in compliance with any supplemental policies that apply to me, including without limitation any supplemental personal investment policies.

I understand that the Code is updated periodically as necessary, and that the most current version is posted on the JPMorgan Chase intranet. I agree, as a condition of my employment, to comply with the Code and the supplemental policies that apply to me, all as amended from time to time.

I acknowledge that I am a Senior-Level Employee* for purposes of the Code and supplemental policies. As such:

- I am required to discuss any planned transactions in JPMorgan Chase securities, for my own account or that of any of my employee-associated accounts, with a supervisor in advance. I agree to abide by this requirement.
- I have certain responsibilities that will continue after my employment with the firm terminates, including restrictions on hiring or soliciting the firm's employees and soliciting the firm's customers. I agree to abide by those responsibilities after my employment terminates.

*If you are an employee in an area that requires pre-clearance of personal securities transactions and/or maintenance of your employee and employee-associated accounts with a designated broker, you further certify the following:*

To the extent required by personal trading policies and procedures applicable to me:

- all securities transactions for my own account, or for any of my employee-associated accounts, are being pre-cleared by Compliance, and
- all of my employee and employee-associated accounts are maintained with a designated broker or will be moved to a designated broker within the applicable time period, except for any accounts that have been granted a written exemption by Compliance.

> **Standard ID:** P000846
> **Name:** Foran, Peter D
> **Company:** JPMorgan Securities Inc.
> **Department:** 100010 - CHICAGO BUSINESS OWNERS 1 PAM
> **Affirmation Date:** Mar 20 2007
> **Confirmation Number:** 2528136

**AN ELECTRONIC AFFIRMATION BY THE ABOVE-NAMED EMPLOYEE WAS
RECEIVED BY THE OFFICE OF THE SECRETARY**

* A Senior-Level Employee is any employee whose (a) annual base salary rate is US$150,000 (or the local currency equivalent) or higher, OR (b) annual total cash compensation is US$250,000 (or the local currency equivalent) or higher. "Annual total cash compensation" means the employee's annual base salary rate plus job/shift differentials as of the last preceding August 1, plus cash earnings under any incentive plans or programs (e.g., annual bonus, commissions, draws, overrides, and special recognition payments or incentives) that are paid to or deferred by the employee during the 12-month period ending the last preceding July 31. It does not include overtime pay. (For US employees, annual total cash compensation is the same as benefits pay for medical purposes, as shown in the employee's last annual benefits enrollment materials.)

**EXHIBIT G**

# EXHIBIT H

**JPMorganChase** ⬡

## CODE OF CONDUCT
## AFFIRMATION RECORD

I hereby affirm that I have read, understand, and am in compliance with the provisions of the JPMorgan Chase Code of Conduct. I also affirm that I am in compliance with any supplemental policies that apply to me, including without limitation any supplemental personal investment policies.

I understand that the Code is updated periodically as necessary, and that the most current version is posted on the JPMorgan Chase intranet.

I agree, as a condition of my employment, to comply with the Code and the supplemental policies that apply to me, all as amended from time to time.

*If you are an employee in an area that requires pre-clearance of personal securities transactions and/or maintenance of your employee and employee-associated accounts with a designated broker, you further certify the following:*

To the extent required by personal trading policies and procedures applicable to me:

- all securities transactions for my own account, or for any of my employee-associated accounts, are being pre-cleared by Compliance, and
- all of my employee and employee-associated accounts are maintained with a designated broker or will be moved to a designated broker within the applicable time period, except for any accounts that have been granted a written exemption by Compliance.

|  |  |
|---|---|
| **Standard ID:** | W003522 |
| **Name:** | Wang, Fei |
| **Company:** | JPMorgan Securities Inc. |
| **Department:** | 100010 - CHICAGO BUSINESS OWNERS 1 PAM |
| **Affirmation Date:** | Apr 9 2007 |
| **Confirmation Number:** | 2642863 |

**AN ELECTRONIC AFFIRMATION BY THE ABOVE-NAMED EMPLOYEE WAS
RECEIVED BY THE OFFICE OF THE SECRETARY**

**EXHIBIT H**

# EXHIBIT I

**JPMorganChase**

## CODE OF CONDUCT
## AFFIRMATION RECORD

I hereby affirm that I have read, understand, and am in compliance with the provisions of the JPMorgan Chase Code of Conduct. I also affirm that I am in compliance with any supplemental policies that apply to me, including without limitation any supplemental personal investment policies.

I understand that the Code is updated periodically as necessary, and that the most current version is posted on the JPMorgan Chase intranet.

I agree, as a condition of my employment, to comply with the Code and the supplemental policies that apply to me, all as amended from time to time.

*If you are an employee in an area that requires pre-clearance of personal securities transactions and/or maintenance of your employee and employee-associated accounts with a designated broker, you further certify the following:*

To the extent required by personal trading policies and procedures applicable to me:

- all securities transactions for my own account, or for any of my employee-associated accounts, are being pre-cleared by Compliance, and
- all of my employee and employee-associated accounts are maintained with a designated broker or will be moved to a designated broker within the applicable time period, except for any accounts that have been granted a written exemption by Compliance.

|  |  |
|---|---|
| **Standard ID:** | E102419 |
| **Name:** | DiCosola, Michelangelo |
| **Company:** | JPMorgan Securities Inc. |
| **Department:** | 100010 - CHICAGO BUSINESS OWNERS 1 PAM |
| **Affirmation Date:** | May 2 2008 |
| **Confirmation Number:** | 3122091 |

**AN ELECTRONIC AFFIRMATION BY THE ABOVE-NAMED EMPLOYEE WAS
RECEIVED BY THE OFFICE OF THE SECRETARY**

**EXHIBIT I**

# EXHIBIT J

**JPMorganChase** ⚙

## CODE OF CONDUCT
## AFFIRMATION RECORD

I hereby affirm that I have read, understand, and am in compliance with the provisions of the JPMorgan Chase Code of Conduct. I also affirm that I am in compliance with any supplemental policies that apply to me, including without limitation any supplemental personal investment policies.

I understand that the Code is updated periodically as necessary, and that the most current version is posted on the JPMorgan Chase intranet.

I agree, as a condition of my employment, to comply with the Code and the supplemental policies that apply to me, all as amended from time to time.

*If you are an employee in an area that requires pre-clearance of personal securities transactions and/or maintenance of your employee and employee-associated accounts with a designated broker, you further certify the following:*

To the extent required by personal trading policies and procedures applicable to me:

- all securities transactions for my own account, or for any of my employee-associated accounts, are being pre-cleared by Compliance, and
- all of my employee and employee-associated accounts are maintained with a designated broker or will be moved to a designated broker within the applicable time period, except for any accounts that have been granted a written exemption by Compliance.

**Standard ID:** E117901
**Name:** Jakubs, David M
**Company:** JPMorgan Chase Bank, NA
**Department:** 685500 - AFS PAS CHICAGO BUSINESS OWN 1
**Affirmation Date:** Apr 9 2007
**Confirmation Number:** 2643520

**AN ELECTRONIC AFFIRMATION BY THE ABOVE-NAMED EMPLOYEE WAS
RECEIVED BY THE OFFICE OF THE SECRETARY**

**EXHIBIT J**

# EXHIBIT K

**JPMorganChase** ⬡

### CODE OF CONDUCT
### AFFIRMATION RECORD

I hereby affirm that I have read, understand, and am in compliance with the provisions of the JPMorgan Chase Code of Conduct. I also affirm that I am in compliance with any supplemental policies that apply to me, including without limitation any supplemental personal investment policies.

I understand that the Code is updated periodically as necessary, and that the most current version is posted on the JPMorgan Chase intranet.

I agree, as a condition of my employment, to comply with the Code and the supplemental policies that apply to me, all as amended from time to time.

*If you are an employee in an area that requires pre-clearance of personal securities transactions and/or maintenance of your employee and employee-associated accounts with a designated broker, you further certify the following:*

To the extent required by personal trading policies and procedures applicable to me:

- all securities transactions for my own account, or for any of my employee-associated accounts, are being pre-cleared by Compliance, and
- all of my employee and employee-associated accounts are maintained with a designated broker or will be moved to a designated broker within the applicable time period, except for any accounts that have been granted a written exemption by Compliance.

|  |  |
|---:|:---|
| **Standard ID:** | E082613 |
| **Name:** | Schreiber, Kitty J |
| **Company:** | JPMorgan Chase Bank, NA |
| **Department:** | 685500 - AFS PAS CHICAGO BUSINESS OWN 1 |
| **Affirmation Date:** | May 7 2008 |
| **Confirmation Number:** | 3146512 |

**AN ELECTRONIC AFFIRMATION BY THE ABOVE-NAMED EMPLOYEE WAS
RECEIVED BY THE OFFICE OF THE SECRETARY**

**EXHIBIT K**

# EXHIBIT L

**JPMorganChase** ⬙

## CODE OF CONDUCT
## AFFIRMATION RECORD

I hereby affirm that I have read, understand, and am in compliance with the provisions of the JPMorgan Chase Code of Conduct. I also affirm that I am in compliance with any supplemental policies that apply to me, including without limitation any supplemental personal investment policies.

I understand that the Code is updated periodically as necessary, and that the most current version is posted on the JPMorgan Chase intranet.

I agree, as a condition of my employment, to comply with the Code and the supplemental policies that apply to me, all as amended from time to time.

*If you are an employee in an area that requires pre-clearance of personal securities transactions and/or maintenance of your employee and employee-associated accounts with a designated broker, you further certify the following:*

To the extent required by personal trading policies and procedures applicable to me:

- all securities transactions for my own account, or for any of my employee-associated accounts, are being pre-cleared by Compliance, and
- all of my employee and employee-associated accounts are maintained with a designated broker or will be moved to a designated broker within the applicable time period, except for any accounts that have been granted a written exemption by Compliance.

|  |  |
|---|---|
| **Standard ID:** | I021506 |
| **Name:** | Wilson, Graeme S |
| **Company:** | JPMorgan Securities Inc. |
| **Department:** | 100010 - CHICAGO BUSINESS OWNERS 1 PAM |
| **Affirmation Date:** | Mar 26 2007 |
| **Confirmation Number:** | 2565507 |

**AN ELECTRONIC AFFIRMATION BY THE ABOVE-NAMED EMPLOYEE WAS
RECEIVED BY THE OFFICE OF THE SECRETARY**

EXHIBIT L

# EXHIBIT M

**JPMorganChase** 🔷

## CODE OF CONDUCT
## AFFIRMATION RECORD

I hereby affirm that I have read, understand, and am in compliance with the provisions of the JPMorgan Chase Code of Conduct. I also affirm that I am in compliance with any supplemental policies that apply to me, including without limitation any supplemental personal investment policies.

I understand that the Code is updated periodically as necessary, and that the most current version is posted on the JPMorgan Chase intranet.

I agree, as a condition of my employment, to comply with the Code and the supplemental policies that apply to me, all as amended from time to time.

*If you are an employee in an area that requires pre-clearance of personal securities transactions and/or maintenance of your employee and employee-associated accounts with a designated broker, you further certify the following:*

To the extent required by personal trading policies and procedures applicable to me:

- all securities transactions for my own account, or for any of my employee-associated accounts, are being pre-cleared by Compliance, and
- all of my employee and employee-associated accounts are maintained with a designated broker or will be moved to a designated broker within the applicable time period, except for any accounts that have been granted a written exemption by Compliance.

**Standard ID:** E117036
**Name:** Choiniere, Claire F
**Company:** JPMorgan Securities Inc.
**Department:** 100010 - CHICAGO BUSINESS OWNERS 1 PAM
**Affirmation Date:** May 7 2008
**Confirmation Number:** 3152163

**AN ELECTRONIC AFFIRMATION BY THE ABOVE-NAMED EMPLOYEE WAS
RECEIVED BY THE OFFICE OF THE SECRETARY**

**EXHIBIT M**

# EXHIBIT N

**JPMorganChase** ⬡

## CODE OF CONDUCT
## AFFIRMATION RECORD

I hereby affirm that I have read, understand, and am in compliance with the provisions of the JPMorgan Chase Code of Conduct. I also affirm that I am in compliance with any supplemental policies that apply to me, including without limitation any supplemental personal investment policies.

I understand that the Code is updated periodically as necessary, and that the most current version is posted on the JPMorgan Chase intranet.

I agree, as a condition of my employment, to comply with the Code and the supplemental policies that apply to me, all as amended from time to time.

*If you are an employee in an area that requires pre-clearance of personal securities transactions and/or maintenance of your employee and employee-associated accounts with a designated broker, you further certify the following:*

To the extent required by personal trading policies and procedures applicable to me:

- all securities transactions for my own account, or for any of my employee-associated accounts, are being pre-cleared by Compliance, and
- all of my employee and employee-associated accounts are maintained with a designated broker or will be moved to a designated broker within the applicable time period, except for any accounts that have been granted a written exemption by Compliance.

|  |  |
|---:|:---|
| **Standard ID:** | F020568 |
| **Name:** | Arrieta, Alan |
| **Company:** | JPMorgan Securities Inc. |
| **Department:** | 100010 - CHICAGO BUSINESS OWNERS 1 PAM |
| **Affirmation Date:** | May 6 2008 |
| **Confirmation Number:** | 3139596 |

**AN ELECTRONIC AFFIRMATION BY THE ABOVE-NAMED EMPLOYEE WAS
RECEIVED BY THE OFFICE OF THE SECRETARY**

EXHIBIT N

**EXHIBIT O**

**JPMorganChase** ⬡

## CODE OF CONDUCT
## AFFIRMATION RECORD

I hereby affirm that I have read, understand, and am in compliance with the provisions of the JPMorgan Chase Code of Conduct. I also affirm that I am in compliance with any supplemental policies that apply to me, including without limitation any supplemental personal investment policies.

I understand that the Code is updated periodically as necessary, and that the most current version is posted on the JPMorgan Chase intranet.

I agree, as a condition of my employment, to comply with the Code and the supplemental policies that apply to me, all as amended from time to time.

*If you are an employee in an area that requires pre-clearance of personal securities transactions and/or maintenance of your employee and employee-associated accounts with a designated broker, you further certify the following:*

To the extent required by personal trading policies and procedures applicable to me:

- all securities transactions for my own account, or for any of my employee-associated accounts, are being pre-cleared by Compliance, and
- all of my employee and employee-associated accounts are maintained with a designated broker or will be moved to a designated broker within the applicable time period, except for any accounts that have been granted a written exemption by Compliance.

**Standard ID:** F048312
**Name:** Azzam, Nadine C
**Company:** JPMorgan Securities Inc.
**Department:** 100010 - CHICAGO BUSINESS OWNERS 1 PAM
**Affirmation Date:** Apr 23 2007
**Confirmation Number:** 2696678

**AN ELECTRONIC AFFIRMATION BY THE ABOVE-NAMED EMPLOYEE WAS
RECEIVED BY THE OFFICE OF THE SECRETARY**

**EXHIBIT O**

# EXHIBIT P

May 16, 2008

Mr. Perry Mangione
Branch Manager
J.P. Morgan Securities, Inc.
10 S. Dearborn Street
IL1-1245
Chicago, IL 60603

**Re:**    **Letter of Resignation**

Dear Mr. Mangione:

This is to inform you that I hereby resign from my employment at J.P. Morgan Securities, Inc. effective immediately. I have returned my key to the office. Please advise everyone, including any client, who calls for me or who inquires as to my whereabouts that I may be contacted at UBS Financial Services, Inc., One North Wacker Drive, Suite 3700, Chicago, IL 60606 (telephone 312-525-7500). Please send my final compensation, any personal mail, and my personal belongings to me at that address.

Please be advised that my counsel is Steven P. Gomberg of Freeborn & Peters LLP, 311 South Wacker Drive, Suite 3000, Chicago, IL 60606, 312-360-6647. In the event that J.P. Morgan Securities, Inc. decides to take any legal action against me, which would be totally unwarranted, I request that J.P. Morgan Securities, Inc. provide my counsel with adequate written notice of such action.

Very Truly Yours,

Michelangelo DiCosola

**EXHIBIT P**

# EXHIBIT Q

Laura Ferris Anderson/IL/ONE

To Steve D Merwise/JPMCHASE@JPMCHASE

cc debora.oberling@jpmorgan.com

05/20/2008 10:27 AM

Subject DeGroot Client

Hi Steve-

Just a note to let you know that one of my mutual clients with Peter, Bob Bourke, reported that Peter had been pressuring him over the last few weeks to play golf. He had really wanted to play this past week, but Bob had scheduled to play with him this week instead.

When I explained to Bob that Peter was had moved to UBS, he told me that Peter had been unusually insistent and that now he understood why.

I also spoke with Bob this morning and learned that he received the letter from Peter's new boss and account opening docs for all of his family members early on Saturday morning. Bob expressed concern regarding the breach of his private information. He was appalled. He also let me know that Peter has been calling him insistently, and Bob has been avoiding speaking with him for the time being.

I let him know that others had received similar packages and that the bank was pursing action in defense of our clients and their privacy expectations, but that was all I could say about it as a result. He understood my position (he is a banker himself) and promised to drop off the package that Peter had sent him this afternoon.

By the way, Bob plans to keep his business with us and I am going to work with Deb to get new Advisor assigned asap.

Thanks!
Laura

Laura Ferris Anderson

**EXHIBIT Q**

5/20/2008

# EXHIBIT R

**JPMorganChase** ◆

🖳 Click to print

## Desktop and Laptop Computers
Apr. 27, 2006: JPMorgan Chase Personal Computer & Corporate Laptop Usage Policy - Global

## Effective Date:  January 1, 2006

This policy governs the use of Corporate Laptops and Personal Computers (PC's) for JPMorgan Chase employees.  This policy is intended to provide managers and employees with guidelines by which they can effectively meet business needs in a cost-efficient manner.  Global Technology Infrastructure (GTI) oversees this policy and procedures.

### Scope

The following policy and procedures are effective January 1, 2006 for JPMorgan Chase employees in Asia Pacific, EMEA, Latin America and the North American regions.

### Usage Policy

**Only one laptop or personal computer** will be approved for each qualified employee. Exceptions to this policy may be made to support Disaster Recovery situations or where application functionality or business functions require multiple computers. Exceptions to this policy will require Chief Financial Officer (CFO) approval. All qualified employees and new-hires will receive a personal computer unless they meet laptop eligibility requirements.

### Corporate Laptop Eligibility and Approval

Eligible employees may qualify for a single Corporate Laptop and supporting hardware including, an external monitor, mouse, keyboard and port replicator **or** ultra-light media slice.  Docking stations are not permitted for employees with laptops. **Employees who receive a laptop may not continue to use a personal computer.**

Employees may be eligible for corporate laptops if they:

- Spend 25% or more of their time traveling between cities or within the same city where extended travel time between Bank buildings is required.
- Work from home one or more days per week, under a Human Resources approved flexible schedule.
- Provide operations support for 24x7 processes or systems that require real-time access. Field support employees are also eligible if they physically support multiple locations, require the ability to attach directly to equipment, or routinely use laptops as diagnostic tools.
- Make regular presentations to clients or customers.
- Work in Disaster Recovery or Business Continuity functions or where a laptop is a critical component of the program.
- Other exceptions may be approved if the need is justified.

To be approved for a corporate laptop, employees must:

- Obtain Line of Business Chief Financial Officer (CFO) and Chief Information Officer (CIO) approval.

**EXHIBIT R**

Departments that previously provided both a home and office desktop computer for employees will now provide one laptop instead, and turn in the two desktop computers for redeployment.

## Requests and Changes

### Requesting, Changing, or Canceling
Employees should submit all requests to turn in "secondary PC's or corporate laptops using their heritage systems and service request processes until further notice. Requests for new corporate laptops must follow the guidelines above and should also follow heritage **procurement and** service request processes.

Types of requests:

- Requesting a new or replacement PC or corporate laptop
- Turning in a secondary PC due to firm policy
- Changing cost centers due to a job transfer within JPMorgan Chase
- Reporting a PC or corporate laptop damaged, lost or stolen
- Returning a PC or corporate laptop because your job no longer requires it or because you are leaving the organization

Employees that no longer need a personal computer or laptop, either because their job responsibilities have changed or because they have resigned from JPMorgan Chase, should turn the asset in to their manager.

### Termination
Managers **must ensure** a cancellation notice is submitted using heritage service request processes for all PC's or Corporate laptops when their employees leave JPMorgan Chase or when returning a secondary PC.   The cancellation request will ensure the asset is handled appropriately and any sensitive information contained therein will be properly addressed.

### Billing
Monthly PC and laptop charges are billed directly to the employees cost center.   This policy requires that each employee be billed for only one PC or laptop.  Exceptions are noted above and require CFO approval.

For additional information on billing, please see  TITAN - GTI Product & Pricing.

### Reporting
Global Technology Infrastructure provides cost center managers with monthly reports that detail expenses for their cost centers.  Chief Financial Officers (CFOs) **will** receive summaries of PC and laptop expenses for their employees.  Cost center managers and CFOs are responsible for monitoring their departments' PC and corporate laptop usage and for ensuring that all secondary PC's have approved exceptions

## Security

### Corporate-ownedPersonal Computers and Laptops
All information stored on corporate-owned personal computers and laptops are considered strictly confidential and the property of JPMorgan Chase.   Therefore, proper laptop use and conduct must be followed as per the JPMorgan Chase Code of Conduct at all times. The corporate build installed on these machines, protect it with an Anti-virus, Personal firewall, and PC encryption, and must remain installed on the machine at all times.

## Personally-Owned Laptops and home computers

Personally-owned laptops and home computers must never connect to JPMorganChase's network with VPN remote access software or directly to the network within any JPMorganChase facility. If remote access is required from a personally owned laptop or home computer, the myAnytime/Anywhere browser based remote access solution must be used to access the firm from that machine.

**Contractor Laptops**
Business areas that employ contractors must supply them with JPMorgan Chase owned computers if they need to attach to JPMorgan Chase's network to use email or to print. Contractors may not attach non-Bank computers to JPMorgan Chase's network.

**Loss or Theft**
Personal computers or corporate laptops that are lost or stolen should be immediately reported to Corporate Security at (800) 727-7375.

© 2007 JPMorgan Chase & Co. All rights reserved.

# EXHIBIT S

# Global Secure Shred Disposal Policy
# For All Paper Documents

**Policy Statement:** It is the policy of JPMorgan Chase (JPMC) to ensure on site destruction, or locked and controlled movement to offsite shred facilities operated by approved program service providers, of all paper documents being discarded by employees, or other people working for JPMC in our owned or leased buildings and at remote locations ( at home, while commuting, etc.) Accordingly, JPMC has adopted a "shred all" policy, which mandates that any paper material (other than food waste and refuse) be securely disposed of by third party secure shred providers or shredded in the building, on the floor, in order to safeguard customer, employee, and other bank information.

**Scope & Applicability:** The Global Secure Shred Disposal Policy for all Paper Documents applies to all paper documents including documents produced by hand, copier, printer, etc. This includes all material except waste or refuse, such as food, beverages, food/beverage containers, newspapers and magazines which should continue to be placed in the waste receptacles at your desk.

This policy serves as the "baseline" or minimum requirements for all desktop paper document disposal or shred and applies to everyone working in a JPMC owned or leased building or remote location (the policy may slightly vary in JPMC non-US regions). **If your line of business has established more rigorous standards, those are what you should adhere to.**

Employees or other people working for JPMC from remote locations (at home, while commuting, etc.), must be authorized to do so and are responsible for safeguarding customer, employee and other bank information. This includes proper secure destruction of documents in a method consistent with JPMC standards.

**Policy Administration & Compliance:** This policy will be administered by Global Security & Investigations

Compliance with this policy is the responsibility of everyone working in a JPMC building. Managers are responsible for ensuring all current, new employees, consultants and others are familiar with and comply with the policy and procedures on a daily basis.

**Procedures**

1.  Before leaving the workplace each day, employees must empty all unwanted paper into the locked "secure shred" containers furnished by the approved secure shred service provider or shred  the documents in the building, on the floor, in an approved cross-cut shredder
2.  Secure shred suppliers will:
    - Provide locked containers to safely collect all paper material
    - Secure the locked containers in locked vehicles for transportation of JPMC's materials/documents to secure shredding facilities or shred the materials on site using a mobile shred unit.
    - Shred the documents in a controlled process that meets JPMC specifications for complete destruction
    - Provide certificates of destruction
    - Recycle 100% of the paper collected and securely destroyed.

**What this policy doesn't cover:**
- Disposal and destruction of personal computers, servers, personal digital assistants, computer disks, CDs, DVDs, electronic tape, microfiche or film. Standards governing these materials can be found on the JPMC Policy Portal under *IT Risk Management Information and Media Retention and Destruction Standard*. View this policy: http://web2.bankone.net/purchaseconnect/PC0607/products-assetdisposal.asp

- Documentation which is subject to the Firm's Global Records Retention Policy is to be retained and eventually disposed of in according to the Firm's *Global Records Retention Policy*. View this policy: http://legalweb.legal.chase.com/HOME/LegalExt.nsf/Policy.

**EXHIBIT S**

**References**

Paper Personal Information Policy

Privacy Policy – Global

Code of Conduct

# EXHIBIT T

# JPMorganChase ⬡

**William J. Daley**
Assistant General Counsel
Legal and Compliance Department

May 16, 2008

**VIA OVERNIGHT MAIL (Saturday Delivery)**

Mr. Michaelangelo DiCosola
5140 Cumnor Rd.
Downers Grove, Illinois 60515

RE:     **Your Continuing Obligations to JPMorgan Chase**

Dear Mr. DiCosola:

I am an attorney with the Legal Department of JPMorgan Chase & Co. (together with its affiliates "JPMC" or the "Company"). I understand that today, May 15, 2008, you resigned your employment with JPMC to accept a position with UBS Financial Services ("UBS"). I therefore write to remind you of your on-going obligations to JPMC.

In addition to certain restrictions on your post-employment activities outlined in JPMC's Code of Conduct, you executed a Supervision, Confidentiality and Non-Solicitation Agreement with the Company. This Agreement contains certain restrictions on your post-employment activities, including, but not limited to, requiring you to refrain from soliciting JPMC customers and employees. More specifically, you are prohibited from contacting JPMC customers in person, by telephone, by letter or in any other manner for a one (1) year period beginning the date of your resignation. You are also prohibited from retaining or using any JPMC confidential information, including JPMC customer lists or customer lists derived from information learned while employed by JPMC. Additionally, you may not recruit or hire any JPMC employees for a period of one (1) year following your resignation. Any actions taken by UBS or any employer on your behalf or at your direction, including sending out mass mailings or engaging in telephone solicitations, may constitute prohibited tortious activity.

In light of your continuing obligations, we expect you immediately to confirm in writing that you have not engaged in, and will not engage in, directly or indirectly, any prohibited activities, including, but not limited to: (a) soliciting and/or recruiting JPMC employees; (b) soliciting JPMC customers with whom you worked during the last two years of your employment with JPMC; or (c) using JPMC proprietary, confidential and trade secret information. We also expect you immediately to confirm that you have returned any and all information about JPMC, its employees or its customers, including its customer's financial or business information, regardless of form and without retaining copies or the information in any form, which may have been in your possession.

We also expect UBS to provide us immediately with written assurance that it has directed you: (1) to refrain from directly or indirectly engaging in any prohibited activities, including soliciting JPMC customers with whom you worked while employed with JPMC or using JPMC proprietary, confidential and trade secret information; (2) to refrain from directly or indirectly soliciting JPMC employees; and (3) immediately to return any and all information about

**EXHIBIT T**

Page 2
May 16, 2008

JPMC, its employees or its customers, including its customer's financial or business information, regardless of form and without retaining copies or the information in any form, which may have been in your possession.

If we do not receive these written assurances or we confirm that you have in any way violated your continuing obligations, JPMC specifically reserves all of its rights and remedies, legal and otherwise, including the right to institute an action at any time for injunctive relief, monetary damages, attorney's fees and costs, and/or other damages.

Please contact me with any questions you have regarding this matter.    I look forward to your prompt response.

Sincerely,

William J. Daley

cc:    Steven P. Gomberg
       Freeborn & Peters, LLP
       311 South Wacker Drive
       Suite 300
       Chicago, Illinois 60606
       (via overnight mail)

FILED COPY: MAY 22, 2008
08CV3004  EDA
JUDGE NORDBERG
MAGISTRATE JUDGE DENLOW

| | |
|---|---|
| STATE OF ILLINOIS | ) |
| | ) |
| COUNTY OF COOK | ) |

## DECLARATION OF WILLIAM J. DALEY

I, WILLIAM J. DALEY, the undersigned, hereby declare as follows based on my personal knowledge and information:

1.    I am currently employed as Assistant General Counsel in the Legal and Compliance Department of JPMorgan Chase & Co. in Chicago, Illinois.

2.    On May 20, 2008, I received a letter dated May 20, 2008 via electronic mail from Steven Gomberg, attorney for Defendants Leslie (Peter) DeGroot, Peter Foran, Fei Wang, Michael Dicosola, David Jakubs, Kitty Schreiber, Graeme Wilson, Claire Choinere, Alan Arrieta and Nadine Azzam.  In this letter, Mr. Gomberg acknowledges that Defendants are in possession of client information JPMC considers confidential and proprietary.  A true and correct copy of this letter is attached hereto as Exhibit A.

Further, Declarant Sayeth Not.

_____
William J. Daley

_____5/21/2008_____
Date

1

Freeborn & Peters LLP

May 20, 2008

**VIA ELECTRONIC MAIL AND FIRST CLASS MAIL**
william.j.daley@jpmchase.com

William J. Daley
Assistant General Counsel
JPMorgan Chase & Co.
IL1-0087
10 S. Dearborn
Chicago, IL 60603

*Attorneys at Law*

311 South Wacker Drive
Suite 3000
Chicago, Illinois
60606-6677
Tel 312.360.6000

Steven P. Gomberg
Partner
Direct 312.360.6647
Fax 312.360.6574
sgomberg@
freebornpeters.com


*Chicago*

*Springfield*

Re:     L. Peter DeGroot IV, Peter D. Foran, Fei F. Wang, Michael DiCosola, David
        M. Jakubs, Kitty J. Schreiber, Claire F. Choiniere, Graeme S. Wilson, Alan J.
        Arrieta, Nadine C. Azzam
        Client/Matter #26311-0001

Dear Mr. Daley:

This firm represents the above named individuals, all of whom received a letter from
you dated May 16, 2008. In your letter, you identify customer contact information as
"Confidential Information" and demand its return. As you are aware, The Protocol for
Broker Recruiting ("Protocol") permits Registered Representatives ("RRs"), when
moving from one firm to another, to take the following information: "Client name,
address, phone numbers, email addresses, and account title ("The Client
Information").

The United States District Judge Ann Aldrich, in the case of *Merrill, Lynch, Pierce,
Fenner & Smith, Inc. vs. Brennan, et al.*, No 1:07 cv 475, (N.D. Ohio Feb. 23, 2007)
denied a request by Merrill Lynch to impose a temporary restraining order because
"Brokers routinely switch firms and take their client list with them." Judge Aldrich
reached her conclusion even though the brokerage firm for which the RR worked,
Bear Stearns, was not a signatory to the Protocol.

Judge Aldrich went on to explain that she denied the TRO because "the times have
changed and granting TROs because potential damages to the brokerage firm are
incalculable is no longer a valid reasoning. Although the Court found such
arguments persuasive in 1998, the changed circumstances of the securities industry
convinces the Court that such arguments no longer merit such weight." The Court
also concluded that "Specifically, given the existence of the Protocol, it appears that
Merrill and industry peers are well aware of, and content with, the idea that brokers
will leave and take client lists with them. Such an agreement significantly undercuts
the notion that such behavior destroys customer goodwill."

**Freeborn & Peters LLP**

William J. Daley
May 20, 2008
Page 2

The Securities and Exchange Commission ("SEC") has recently proposed amendments to Regulation S-P which is intended to conform with the Protocol:

> "The proposed exception would permit one firm to disclose to another only the following information: the customer's name, a general description of the type of account and products held by the customer, and contact information, including address, telephone number and e-mail information. We propose to include this particular information as it would be useful for a representative seeking to maintain contact with investors, but appears unlikely to put an investor at serious risk of identity theft. It also is the type of information an investor would expect a representative to remember."

My clients advise me that they are not in possession of any information other than the Client Information permitted by the Protocol. If you have any contrary information or questions, do not hesitate to contact me.

Sincerely,

Steven P. Gomberg
SPG/hm

Cc:    L. Peter DeGroot IV
       Peter D. Foran
       Fei F. Wang
       Michelangelo DiCosola
       David M. Jakubs
       Kitty J. Schreiber
       Claire F. Choiniere
       Graeme S. Wilson
       Alan J. Arrieta
       Nadine C. Azzam

1540581v1

**XHIBIT A**

STATE OF ILLINOIS      )
                            )
COUNTY OF COOK      )

### AFFIDAVIT OF JAMIE COVERT

I, JAMIE COVERT, the undersigned, hereby state that if sworn as a witness under oath, I would testify to the following facts based on personal knowledge and information:

1.      I am currently an Investment Advisor for J.P. Morgan Securities, Inc. ("JPMC").

2.      I have been employed by JPMC since approximately June of 2005.

3.      In August of 2007, Peter DeGroot told me that he was no longer happy working for JPMC and that he was actively looking around for another place where he could continue to work with the same clients he was working with at JPMC.

4.      In December of 2007, Peter DeGroot told that he me was in talks with Smith Barney to explore the possibility of moving JPMC clients over to Smith Barney where he could continue to handle the same clients' investments.

5.      Also in December of 2007 Peter DeGroot told me he would engage in talks with financial services firms on behalf of our team, by which I understood that he meant the Investment Advisors in our Personal Client Services (PCS) Team, DeGroot, Peter Foran, Fei Wang, Michael DiCosola, David Jakubs and myself.

6.      There was discussion between members of the group that one of the problems with finding the right firm to take the team and the clients to was that in order to make a switch to another firm, we would have to find a firm that had the same business model as JPMC because the other firms were primarily traditional brokerage firms and to make a successful move the team would have to have the full suite of services at the new firm.

7.      The JPMC business model is built on a team approach where Investment Advisors are just one member of a team led by Client Advisors and includes Private Bankers, Fiduciary Advisors, also know as Trust Officers, and Wealth Advisors, who perform Estate Planning and Financial Planning Functions.

8.      In January of 2008, I attended, at the request of Peter DeGroot, a dinner meeting hosted by Smith Barney's Chicago Branch manager and Chicago Sales Manager. Also in attendance at the dinner meeting were Peter DeGroot, Peter Foran, Fei Wang, Michael DiCosola and David Jakubs.

9.      From January to March of 2008, there were a number of phone calls from Smith Barney to me and the other Investment Advisors on our team.

10.      Sometime between January and March of 2008, I filled out an employment application with Smith Barney at the request of Peter DeGroot.

11.    Peter DeGroot told me that he provided revenue numbers to Smith Barney for the revenue our team of Investment Advisors had generated in the past year at JPMC.

12.    At some point between January and March of 2008, I made a contact at Bear Stearns but our team decided that Bear Stearns would not be a fit there because they did not have a banking platform or a trust platform.

13.    In late January of 2008, Peter DeGroot invited me and the other Investment Advisors in our team to a dinner meeting with representatives of UBS where there were discussions about our team of Investment Advisors with end result of bringing clients from JPMC to UBS.

14.    Also at this January dinner meeting with UBS representatives were Dennis Drecher, and a UBS Sales Manager, a UBS Operations Manager and Dennis Drecher's excutive assistant.

15.    At this dinner with UBS, Dennis Drecher said that a wealth management, or private bank, was a new concept for UBS here in the United States but that it would be very similar to what JPMC was offering its clients and that we would be part of the "build out" of this concept at UBS.

16.    In mid-February of 2008, there was another meeting between our team of Investment Advisors and the UBS representatives to discuss moving our clients from JPMC to UBS.

17.    At this same meeting in mid-February of 2008 there was also a conference call between our team of Investment Advisors and UBS representatives in NewYork to further discuss UBS' capabilities with the end result of moving our clients from JPMC to UBS.

18.    In March of 2008, Peter DeGroot hosted a meeting for the Investment Advisors in our JPMC team at his home.

19.    At this meeting in Peter DeGroot's home I voiced concerns about whether clients would really move to UBS and a concern that UBS would not be able to support the JPMC client needs with all of the same services as at JPMC.

20.    There were discussions among those at the meeting about the non-solicitation agreement and Fei Wang said not to worry about the non-solicitation and that in the past when some people left for Smith Barney there was a settlement where Smith Barney paid JPMC.

21.    At this meeting at DeGroot's house, Peter DeGroot gave us all numbers from a contract with UBS. I was shown a copy of the draft contract from UBS, in which I was offered 1.25 Million Dollars as a signing bonus for going to UBS in the form of a nine year forgivable loan.

22.    The proposed contract with UBS provided for a 20% bonus if we were able to generate an amount of commissions and banking revenue at UBS equal to at least fifty percent of the business we had experienced in the last twelve months at JPMC within the first 12 to 14

2

months after joining UBS and this was followed with another 20% bonus if we were able to generate business equal to at least 75 % percent of our business over the previous twelve months from the JPMC clients to UBS within the first 24 to 27 months of joining UBS.

23.    Sometime after the meeting at DeGroot's home, I told Peter DeGroot to count me out and that I was not interested in leaving JPMC.

24.    Shortly after I told Peter DeGroot that I did not want to leave JPMC, Peter told me that UBS upped the offer for my signing bonus with them from 1.25 Million Dollars to 1.4 Million Dollars.

25.    I again told Peter DeGroot that I was not interested in leaving JPMC and he stopped talking to me about the potential move to UBS.

26.    I did not know exactly when or whether they were really going to move until last Friday when the Investment Advisors and the Investment Assistants all began turning in their resignations at about noon on Friday.

Further, Affiant Sayeth Not.

_____
Jamie Covert

Subscribed and sworn to before me
this 21ST day of ____MAY____, 2008.

_____
Notary Public

```
"OFFICIAL SEAL"
VALER EMINI
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 2/19/2012
```

CHICAGO\2452137.5
ID\GHA

3

FILED COPY: MAY 22, 2008
08CV3004  EDA
JUDGE NORDBERG
MAGISTRATE JUDGE DENLOW

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JPMORGAN CHASE BANK, N.A. | ) | |
| AND | ) | |
| JPMORGAN CHASE & CO. | ) | |
| Plaintiffs, | ) | |
| | ) | Case No._____ |
| v. | ) | |
| | ) | Judge:_____ |
| LESLIE (PETER) DEGROOT, | ) | |
| PETER FORAN, FEI WANG, | ) | |
| MICHAEL DICOSOLA, | ) | |
| DAVID JAKUBS, KITTY SCHREIBER, | ) | |
| RAEME WILSON, CLAIRE CHOINERE, | ) | |
| ALAN ARRRIETA, NADINE AZZAM | ) | |
| and UBS FINANCIAL SERVICES, INC. | ) | |
| Defendants. | ) | |

**CERTIFICATE OF SERVICE**

I, Gregory H. Andrews, an attorney, state that I electronically filed **Plaintiffs Verified Complaint for Injunctive Relief** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

James L. Komie
Schuyler Roche
One Prudential Plaza
Suite 3800
130 East Randolph Street
Chicago, IL  60601
jkomie@SchuylerRoche.com

Steven P. Gomberg
Freeborn & Peters LLP
311 South Wacker
Suite 3000
Chicago, IL  60606
sgomberg@freebornpeters.com

This 22nd day of  May, 2008.

s/Gregory H. Andrews_____