FILED COPY: MAY 22, 2008
08CV3004
JUDGE NORDBERG
MAGISTRATE JUDGE DENLOW

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JPMORGAN CHASE BANK, N.A. | ) | |
| AND | ) | |
| JPMORGAN SECURITIES, INC. | ) | |
| Plaintiffs, | ) | |
| | ) | Case No._____ |
| v. | ) | |
| | ) | Judge:_____ |
| LESLIE (PETER) DEGROOT, | ) | |
| ET AL. | ) | |
| Defendants. | ) | |

**PLAINTIFFS' MEMORANDUM OF LAW IN
SUPPORT OF THEIR MOTION
FOR A TEMPORARY RESTRAINING ORDER**

Plaintiffs JPMorgan Chase Bank, N.A. and JPMorgan Securities, Inc. (hereinafter

JPMC) through their attorneys, respectfully submit this Memorandum of Law in Support

of Their Motion for Temporary Restraining Order.

**INTRODUCTION**

In January 2008, Defendants began to hatch a plan to steal Plaintiffs high net

worth clients and extremely sensitive and confidential information about those clients.

Last Friday afternoon, that plan came to fruition as, without prior notice, defendants

resigned en masse from employment, stole confidential information, and immediately

began to attempt to exploit the goodwill Plaintiffs had earned with their high net worth

clients. Defendants have been engaged in an ongoing solicitation of Plaintiffs' clients to

become clients of defendants new employer, UBS, a direct competitor of Plaintiffs. UBS

has hired Defendants to begin the Chicago branch of its recently developed "personal

wealth management" approach, which is similar to Plaintiffs' business model when

servicing its high worth clients. Defendants' unabashed attempt to steal Plaintiffs' clients

and their confidential information violates non-solicitation and non-disclosure agreements each have signed. Unless this Court immediately enjoins defendants from further solicitation, the loss of customer goodwill and market share will be immeasurable and irreparable.

## FACTUAL STATEMENT

**Plaintiffs devote substantial resources to develop a high net worth client base, promote defendants to service those clients, and provide extremely sensitive confidential information to defendants.**

In 2004, Plaintiffs created a private client services team (PCS), which included offering investment services to their high net worth clients.[1] Plaintiffs developed the PCS team by promoting several individuals, including defendants, from within the bank and to the position of Investment Advisor. The intent of this new PCS team was to provide additional services to Plaintiffs' existing high net worth clients.

Over the last four years, Plaintiffs have hired or promoted from within JPMC Defendants Leslie (Peter) DeGroot, Peter Foran, Fei Wang, Michael DiCosola, to their most recent position of Investment Advisors as part of the PCS Team and David Jakubs as a Private Banker. Each Defendant signed Confidentiality and Non-Solicitation Agreements and Code of Conduct Affirmations which included promises to maintain the confidentiality of JPMC business information, and to refrain from soliciting specific JPMC clients for one year after the termination of their employment with JPMC.

Defendants, former Investment Assistants employees of JPMC Kitty Schreiber, Graeme Wilson, Claire Choinere, Alan Arrrieta, Nadine Azzam all signed Code of

---

[1] The evidentiary support for this factual statement is provided with Plaintiffs' verified complaint.

Conduct Affirmations which included promises to maintain the confidentiality of JPMC business information.

The information made available to the Investment Advisors and their assistants is exactly the information listed as "Confidential Information" in the Agreement and described in the Code of Conduct.  This includes information received from third parties under confidential conditions such as the clients; confidential customer data, including but not limited to customer and prospect names, addresses, phone numbers, financial portfolio, financial account information, financial needs, investment preferences and similar information compiled by JPMC or by the Investment Advisors in connection with their employment by JPMC.  This also includes information concerning established business relationships.

JPMC has developed information about these high net worth clients primarily through lengthy associations between JPMC Middle Market Commercial Bankers and the clients.  During the course of providing these banking services to these high net worth clients, JPMC Middle Market Commercial Bankers gradually come to learn the specific needs of each of the banking clients. This very private and personal information from the clients includes their personal plans and aspirations for everything from their day to day personal and business cash flow needs and concerns, to their plans for acquisitions of businesses, their personal wealth management goals and strategies, their private and personal goals and plans for wealth transfer through estate planning, their personal and private plans for charitable donations, their personal and private plans and historic approaches to investments.  It takes a great deal of trust and personal commitment over a period of time for JPMC's  high net worth to be comfortable enough with their

3

Commercial Middle Market Bankers or other JPMC business units, and other members of

the PCS Banking Team before the clients will accept an internal referral to one of the

PCS Investment Advisors.   Only then are the Middle Market Commercial Bankers in a

position to make a referral of these high net worth clients to other members of the PCS

Team.

JPMC has taken extensive measures to safeguard the information its clients have

entrusted it with in addition to the contractual promises made by the former employees to

safeguard the information including: physical safeguards such as armed security guards,

locked, pass word protected access to its facilities, locked file cabinets, limited and

restricted access among employees to files on a need to know basis, encrypted electronic

mail, pass word protection of computers and computer databases, security and

confidentiality audits

The primary source of business for the PCS Team is referrals from Plaintiffs'

Middle Market Commercial Bankers.  Most, if not all, of the high net worth clients

serviced by Defendants were referrals from Plaintiff's Middle Market Commercial

Bankers.

JPMC spends in excess of Two Million Dollars to develop and maintain its high

net worth clients.  These costs include direct marketing costs, such as entertainment, and

salaries and overhead of persons with responsibility for developing and maintaining the

client.

**After benefiting from Plaintiffs' customer goodwill and confidential
information, Defendants resign en masse and immediately begin to
solicit Plaintiffs' clients in violation of their agreements.**

During the last four years, Defendants, Leslie (Peter) DeGroot, Peter Foran, Fei Wang, Michael Dicosola, David Jakubs, Kitty Schreiber, Graeme Wilson, Claire Choinere, Alan Arrrieta, Nadine Azzam, (hereinafter, the "former employees") benefited from Plaintiffs' training, business model of internal referrals, and access to extremely confidential information. Recently, those defendants hatched a plan to leave Plaintiffs' employment as a group and steal Plaintiffs' confidential information and high net worth clients. Defendant UBS Financial Services Inc. (UBS) bought into that plan and hired Defendants to begin the Chicago branch of its recently developed "personal wealth management" approach, which is similar to Plaintiffs' business PCS Team business

In furtherance of their covert plan, on Friday, May 16, 2008 at approximately 1:00 p.m. the Defendants resigned *en masse* The former employees immediately went to the Chicago offices of Defendant UBS and initiated a well-coordinated and targeted solicitation of JPMC clients. The solicitation of JPMC clients announced the arrival of each of the Investment Advisor former employees at UBS, included mailing of overnight packages from UBS with a letter directing clients to sign the enclosed forms "to help ensure a smooth and efficient transition."

The solicitation letters clearly showed that they were targeted to the JPMC clients by stating, for example in the letter that references Michael DiCosola, one of the former employees: "We look forward to continuing to provide a high level of service which you deserve and have come to expect from Michael and his team." JPMC clients have complained to JPMC that the solicitations are ongoing, unwelcome, and have shaken their confidence in JPMC.

JPMC sent a warning letter to the former employees reminding them of their contractual duties to refrain from soliciting JPMC clients for twelve months from the date of their departure from JPMC and form disclosing JPMC's confidential information. The JPMC Letter also sought the return of all confidential information in the possession of the former employees.

On May 20, 2008, counsel for the former employees, Steve Gomberg sent a letter ("the Gomberg Letter") confirming that his clients had the following information: "Client name, address, phone numbers, email addresses, and account title." Gomberg took the position that Defendants were justified in removing the client information and soliciting the client business.

## LEGAL ANALYSIS

A.    **New York Law Applies To Defendants' Breach Of Contract Claims While Illinois Federal Law Provides The Standards To Allow This Court To Grant Injunctive Relief.**

The parties agreed that the laws of the State of New York shall govern disputes over the terms of the Agreements[2]. A court sitting in diversity applies the choice of law rules of the state in which it sits. *Sound of Music Co. v. 3M*, 477 F.3d 910, 915 (7th Cir. 2007). Illinois courts respect a contractual choice of law provision. *Id.* Accordingly, New York law applies to Plaintiffs' claims that Defendants have breached the Agreements.

The law governing this Court's authority to grant injunctive relief, however, is a procedural matter. Accordingly, Illinois federal standards apply. *Vencor, Inc. v. Webb,*

---

[2] The parties also agreed that a complaint seeking injunctive relief to maintain the status quo is appropriate while a simultaneous parallel proceeding is pursued in arbitration to recover damages for the same conduct. *American Express Financial Advisors, Inc. v. Thorley*, 147 F.3d 229 (2d Cir 1998)

33 F.3d 840, 845 (7th Cir. 1994). *Olympia Express, Inc. v. Linee Aeree Italiane S.P.A.,* 2007 U.S. Dist. LEXIS 14307, *64 (N.D. Ill 2007).

**B.    Plaintiff Has Met The Elements For A Temporary Restraining Order.**

In Illinois, a party seeking a temporary restraining order must demonstrate as a threshold matter that: (1) its case has some likelihood of succeeding on the merits; (2) no adequate remedy at law exists; and (3) it will suffer irreparable harm if preliminary relief is denied. If the moving party meets the burden, the Court must weigh these factors along with any irreparable harm the non-moving party will suffer if preliminary relief is granted, balancing that harm against the irreparable harm to the moving party if relief is denied. Finally, the Court must consider the public interest served by granting or denying the injunction, including the effects of the injunction of the non-parties. *Credit Suisse First Boston, LLC v. Vender,* 2004 U.S. Dist. LEXIS 24525 (N.D. Ill. 2004), citing *Abbott Laboratories v. Mead Johnson & Co.,* 971 F.2d 6, 11 (7th Cir. 1992).

**1.    <u>JPMC Has "Some Likelihood" of Succeeding On The Merits Of Its Claims For Breach of Contract.</u>**

To demonstrate some likelihood of succeeding on the merits, JPMC need only show it has a better than negligible chance of success. *Alpha School Bus Co. v. Wagner,* 2004 U.S. Dist LEXIS 82 (N.D. Ill. 2004), citing *Platinum Home Mortgage Company v. Platinum Financial Group, Inc.,* 149 F.3d 772, 726 (7th Cir. 1990). JPMC can establish some likelihood of success on the merits on at least two independent legal theories: breach of contract related to Defendants' promise not to solicit JPMC customers, and breach of contract related to Defendants' promise not to disclose JPMC confidential

information and not to use the confidential information for their or a "third-party's" benefit.[3]

> a.    Defendants Have Solicited JPMC Customers In Violation of Their Contractual Obligations.

Defendants DeGroot, Foran, Wang, DiCosola, and Jakubs have agree for a period of 12 months following their termination with JPMC not to solicit JPMC customers with whom they had professional contact or with respect to whom they were privy to any confidential information. Specifically, those Defendants agreed that:

> In consideration of the provision of Confidential Information to you, your employment and continued employment, as well as all payments to you, including all compensation received from JPMC and its affiliates and commissions and other compensation paid to you in connection with the JPMC products, you agree for a period of twelve (12) months after the termination of your employment, regardless of the circumstances of the termination, not to, directly or indirectly, acting alone or with others, solicit or attempt to solicit, induce to leave or divert or attempt to induce to leave or divert from doing business with JPMC, any JPMC customer with whom you had professional contact, for whom you had responsibility or with respect to whom you were privy to any information during the last two years of your employment with JPMC.

> This section does not apply to customer relationships you established prior to commencing employment with JPMC, provided that you can substantiate through documents or other suitable evidence that the relationship preceded your commencement of employment with JPMC. You have identified any persons you believe are subject to this exclusion prior to the signing of this Agreement, and any such persons as to whom you have provided suitable documentation are listed in Exhibit "a" attached hereto, which Exhibit shall be initialed and dated by you and your

---

[3] It appears likely that numerous other causes of action exist for damages arising from Defendants' conduct, including claims under the Uniform Trade Secrets Act, the Computer Fraud and Abuse Act, and tortious interference with JPMC's business relationships with these clients. Claims for damages arising from these separate violations of the law are being pursued through arbitration. For purposes of this motion, however, it is enough for JPMC to establish that Defendants are inflicting irreparable injury upon it by their breaches of their nonsolicitation agreements.

supervisor.  The absence of any such Exhibit shall be conclusive evidence that this exclusion does not apply.[4]

Agreement § 5.2.   These Defendants do not deny that they have breached and will continue to breach these agreements.   See for example Affidavits in support of the verified complaint.   An injunction is therefore necessary to protect Plaintiffs legitimate interests in its client goodwill and to protect it confidential client information.

New York law recognizes that agreements not to solicit customers generally are enforceable, provided the restriction "is no greater than is required for the protection of the legitimate interest " of the party seeking enforcement *BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 388, 690 N.Y.S.2d 854, 712 N.E.2d 1220 (1999).  Legitimate employer interests include protecting its confidential customer information, and the goodwill of customers generated and maintained at the employer's expense.   *Gunderman & Gunderman Insurance v. Brassill,* 46 A.D. 3d 615, 853 NYS 2d 82 (2007).

For example, in *Gunderman,* the employer was an insurance agency that incurred significant costs in training employees, in overhead expenses, and in developing its client base.   The employer built up significant business goodwill as it developed its client base. The employer there established a legitimate interest in protecting the client information that the defendants acquired from their employment with the employer, and the good will that the defendants were attempting to exploit.   The court found that the employer was entitled to a preliminary injunction to enforce the non-competition clause.

Similarly, in *BDO Seidman,* the court held that *"BDO's* legitimate interest here is protection against defendants' competitive use of client relationships which *BDO* enabled him to acquire through his performance of accounting services for the firm's clientele

---

[4] None of the Defendants have an Exhibit A attached to their Agreements.

during the course of his employment." BDO Seidman was accordingly able to enforce its

non-solicitation agreement. *BDO*, 93 N.Y.2d at 392.

In *Maltby v. Harlow Meyer Savage, Inc.,* 633 N.Y.S.2d 926 (Sup.Ct.NY. 1995),

the court entered an injunction prohibiting several brokers from competing in the

brokerage industry. The court found the restrictive covenant at issue was reasonable

because the defendants had a unique relationship with the customers with whom they had

been dealing and had been developed while employed with the Plaintiff and partially at

the plaintiff's expense. See also *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dunn,*

191 F. Supp. 2d 1346, 1352 (M.D. Fla 2002) (applying New York law, court enjoined

financial advisors from soliciting the plaintiff's clients or using plaintiff's customer

information).

Like *Gunderman, Merrill Lynch, Maltby, and BDO Seidman*, JPMC in the case

before this Court merely seeks to protect its legitimate business interests of customer

goodwill and confidential information. Plaintiffs promoted defendants from within to

their Investment Advisor positions. Plaintiffs provided internal referrals of their clients

to defendants, and supplied confidential information. Defendants serviced only clients

Plaintiffs supplied to them. JPMC spends tens of thousands of dollars per year (more

than $50,000.00) to develop and maintain its high net worth clients. These costs include

direct marketing costs, such as entertainment, and salaries and overhead of persons with

responsibility for developing and maintaining the clients.

JPMC'S request for injunctive relief in narrowly tailored to protect specific

business relationships. JPMC seeks only to prohibit solicitation of those customers

whom it developed while defendants were its employees and using JPMC resources. In

10

fact, the Agreements are written in a way that *specifically permits* each employee to take customers they brought along with them to JPMC. By their terms, the nonsolicit provisions of these Agreements simply prevent any one of the Defendants from making contact with customers they developed during their employment with JPMC in order to benefit one of JPMC's competitors.

In this case, JPMC has not sought to prohibit Defendants from making a living or engaging in their chosen profession. Each Defendant is free to work for UBS and to compete in any geographic region of the country. JPMC simply is trying to enforce the terms of its agreement, which only prevent Defendants from stealing JPMC's current clients.

In addition to protecting its goodwill, JPMC is entitled to an injunction because New York court will protect sensitive customer information from misappropriation by former employees. One New York court has stated, "with regard to customer lists, courts have held that where a company's customers are not readily ascertainable, but must be cultivated with great effort and secured through the expenditure of considerable time and money, the names of those customers are protectable trade secrets." *Ivy Mar*, 907 F.Supp. at 556-57 (citing *Leo Silfen, Inc. v. Cream*, 29 N.Y.2d 387, 393, 328 N.Y.S.2d 423, 428, 278 N.E.2d 636, 639 (1972)); *See also, Panther Sys. II, Ltd. v. Panther Computer Sys., Inc.*, 783 F. Supp. 53, 57 (E.D.N.Y. 1991) (where detailed information concerning plaintiff's customers was developed in direct response to review in magazine concerning plaintiff's product, and could not be obtained from public sources, defendants were enjoined from soliciting those customers); *Webcraft Techs., Inc. v. McCaw*, 674 F.Supp. 1039, 1045 (S.D.N.Y. 1987) (where company sold unusual, highly specialized

in-line finishing process, and educating and converting prospective customers was long and difficult process, company's customer list was a trade secret).

New York also requires that a restrictive covenant must be reasonably limited temporally and geographically. *See American Para Professional Sys. v. Examination Mgt. Servs.*, 214 A.D.2d 413, 625 N.Y.S.2d 33. The Agreements in question here meet these standards. The Agreements are limited temporally to twelve months (which has been recognized as a reasonable period under New York law),[5] and geographically by reference to particular customers (which also has been recognized as a reasonable geographic limitation under New York law).[6]

b.    The "Protocol for Broker Recruiting" has no relevance to this case.

Defendants unquestionably have breached the clear and enforceable prohibitions in their Agreements. Defendants do not deny that they resigned and took with them client names, addresses, phone numbers, email addresses, and account titles. Nor do Defendants deny that they used this confidential information on behalf of their new employer to solicit Plaintiffs' clients to terminate their relationship with Plaintiff and to allow Defendant's new employer to provide the same services as Plaintiff currently provide. Instead, Plaintiff's attempt to justify their conduct by claiming that the "Protocol for Broker Recruiting" permits this conduct. Yet, as Plaintiffs are not

---

[5] *See, e.g, Merrill Lynch Pierce, Fenner & Smith Inc. v. Dunn*, 199 F.Supp. 2d 1346, 1353, nn. 4 & 5 (M.D. Fla. 2002) (applying New York Law) (securities firm 1 year nonsolicitation provision enforceable against former financial advisors); *Stiepelman Coverage Corp. v. Raifman*, 258 A.D.2d 515, 685 N.W.S.2d 283, 284 (2d Dept. 1999) (same with regard to insurance agent).

[6] *See, e.g., HBD, Inc. v. Ryan*, 642 N.Y.S.2d 913 (App. Div. 2d Dept. 1996) and *Mallory Factor, Inc. v. Schwartz*, 146 A.D.2d 465, 536 N.Y.S.2d 752 (1st Dept. 1989) (holding 18 month covenant that only restricted the employee from working on any account that the employee or the company had been involved with during the term of employee's employment was upheld).

signatories to the Protocol, it has no relevance to this case and further Defendants did not follow the protocol.

The Court in *Hilliard v. Clark*, 2007 US Dist. LEXIS 64792 (WD MI 2007) addressed the very issue of the Protocol applied to a non signatory. In *Hillard*, the court entered an injunction prohibiting several former brokers from soliciting the former employer clients and compelling the return of the employer files in the broker's possession. The defendants argued that the Protocol controlled the dispute. The court disagreed. It first held that because the plaintiff did not sign the protocol, it was not bound. Also, the court rejected the defendant's argument that the Protocol created an industry standard. The Protocol was irrelevant to the dispute since the plaintiff had not signed it.

Defendants' misplaced reliance on the Protocol simply demonstrates their belief that they are justified in their agreements with Plaintiffs, and can continue with their anti-competitive conduct. This is further reason to enjoin this behavior.

2.    **There Is No Adequate Remedy At Law For, And JPMC Will Be Irreparably Injured, Because Of Defendants' Continued Breaches Of Their Nonsolicitation Obligations.**

The potential loss of Private Client Services clients to the former employees with whom JPMC entrusted their service is a clear and direct injury that cannot adequately be remedied. The Seventh Circuit has held that "it is virtually impossible to ascertain the precise economic consequences of intangible harms, such as damage to reputation and loss of goodwill . . ." *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 902 (7th Cir. 2001). Thus, these type of injuries are presumed irreparable. *Id.*; *Gateway E. Ry. Co. v. Terminal R.R. Ass'n of St. Louis,* 35 F.3d 1134, 1140 (7th Cir. 1994). ("We have stated that showing injury to goodwill can constitute irreparable harm that is not compensable

by an award of money damages."); *Reinders Bros. v. Rain Bird E. Sales Corp.,* 627 F.2d 44, 53 & n. 7 (7th Cir. 1980) (loss of small but valuable portion of clientele not compensable in monetary damages).

Likewise, the destruction or misappropriation of key customer relationships has been recognized as an irreparable injury under New York law, as calculation of monetary damages to redress the loss of that relationship is nearly impossible. *See, e.g. Register.com, Inc. v. Verio, Inc.,* 356 F.3d 393, 404 (2nd Cir. 2004); *Gunderman,* 853 N.Y.S. 2d 82, 84 (As lost goodwill and lost opportunity are damages which are difficult to quantify, the Plaintiff would suffer irreparable harm absent the issuance of a preliminary injunction). *Ticor Title Insurance Co. v. Cohen,* 173 F.3d 63, 69 (2d Cir. 1999) (applying New York law, it would be very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come).

Money damages will not restore the loss of market share and goodwill caused by defendant's unlawful solicitation. Nor can it repair the damage to JPMC's reputation caused by Defendants' disparaging remarks about Plaintiff's business practices and client lost trust in Plaintiffs as confidential information is shared outside of the PCS Team. *See* Mangione affidavit in support of the verified complaint.

3.  **An Injunction Will Not Harm The Defendants As They Are Able To Solicit All Customers Other Than Those They Met Using JPMC Assets.**

In balancing the harms, this Court must weigh the error of denying a preliminary injunction to the party who would win the case on the merits against the error of granting an injunction to the party who would lose." *FoodComm Intern. v. Barry,* 328 F.3d 300, 305 (7th Cir. 2003). The harm to the defendants from an injunction would be that they

could not solicit business from any of JPMC's customers which they met by virtue of their relationship with JPMC. This list is limited only to the clients, The Former Employees any contact with leaving open to Defendants a number of other opportunities. By contrast, the harm to JPMC is much greater, and potentially irreparable, in the form of its lost ability to maintain and pursue relationships with its customers, whom the defendants have admitted to soliciting. *See, FoodComm Intern.,* 328 F.3d at 305. Therefore, any potential harm to defendants is outweighed by the harm to JPMC.

4.    **The Public Interest Is Served By Granting JPMC's Motion For Injunction.**

Finally, the Court must consider the interest of and harm to non-parties from a denial or grant of the injunction, i.e., the public interest. *Reid L. v. Illinois State Bd. of Educ.,* 289 F.3d 1009, 1021 (7th Cir. 2002). Courts in this District have recognized that the public interest is served by enforcing valid contracts. *SMC Corp., Ltd. V. Lockjaw, LLC,* 481 F. Supp. 2d 918, 929 (N.D. Ill. 2007); *Cook Inc. v. Boston Scientific Corp.,* 2002 U.S. Dist. LEXIS 19223, (N.D. Ill. Oct. 1. 2002); *Arcadia Health Servs., Inc. v. A+ Health Care, Inc.,* No. 96 C 8363, 1997 U.S. Dist. LEXIS 705, (N.D. Ill. Jan. 17, 1997).

Respectfully submitted,

By:    _____
One of the Attorneys for Plaintiffs
JPMorgan Chase Bank, N.A. and
JPMorgan Chase & Co.

Gregory H. Andrews
David L. Miller
Dykema Gossett PLLC
10 South Wacker Drive
Suite 2300
Chicago, Illinois 60606
(312) 876-1700

could not solicit business from any of JPMC's customers which they met by virtue of their relationship with JPMC. This list is limited only to the clients, The Former Employees any contact with leaving open to Defendants a number of other opportunities. By contrast, the harm to JPMC is much greater, and potentially irreparable, in the form of its. lost ability to maintain and pursue relationships with its customers, whom the defendants have admitted to soliciting. *See, FoodComm Intern.,* 328 F.3d at 305. Therefore, any potential harm to defendants is outweighed by the harm to JPMC.

4.   **The Public Interest Is Served By Granting JPMC's Motion For Injunction.**

Finally, the Court must consider the interest of and harm to non-parties from a denial or grant of the injunction, i.e., the public interest. *Reid L. v. Illinois State Bd. of Educ.,* 289 F.3d 1009, 1021 (7th Cir. 2002). Courts in this District have recognized that the public interest is served by enforcing valid contracts. *SMC Corp., Ltd. V. Lockjaw, LLC,* 481 F. Supp. 2d 918, 929 (N.D. Ill. 2007); *Cook Inc. v. Boston Scientific Corp.,* 2002 U.S. Dist. LEXIS 19223, (N.D. Ill. Oct. 1. 2002); *Arcadia Health Servs., Inc. v. A+ Health Care, Inc.,* No. 96 C 8363, 1997 U.S. Dist. LEXIS 705, (N.D. Ill. Jan. 17, 1997).

Respectfully submitted,

By:   s/Gregory H. Andrews
One of the Attorneys for Plaintiffs
JPMorgan Chase Bank, N.A. and
JPMorgan Chase & Co.

Gregory H. Andrews (6209480)
David L. Miller (6195953)
Dykema Gossett PLLC
10 South Wacker Drive
Suite 2300
Chicago, Illinois 60606
(312) 876-1700

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JPMORGAN CHASE BANK, N.A. )<br>AND )<br>JPMORGAN CHASE & CO. )<br>         Plaintiffs, )<br>         )<br>      v.     )<br>         )<br>LESLIE (PETER) DEGROOT, )<br>PETER FORAN, FEI WANG, )<br>MICHAEL DICOSOLA, )<br>DAVID JAKUBS, KITTY SCHREIBER, )<br>RAEME WILSON, CLAIRE CHOINERE, )<br>ALAN ARRRIETA, NADINE AZZAM )<br>and UBS FINANCIAL SERVICES, INC. )<br>         Defendants. ) | Case No._____<br><br>Judge:_____ |

## CERTIFICATE OF SERVICE

I, Gregory H. Andrews, an attorney, state that I electronically filed **Plaintiffs' Memorandum of Law in Support of Their Motion for a Temporary Restraining Order** with the Clerk of the Court using the CM/ECF system and hand delivery which will send notification of such filing to the following:

James L. Komie
Schuyler Roche
One Prudential Plaza
Suite 3800
130 East Randolph Street
Chicago, IL 60601
jkomie@SchuylerRoche.com


Steven P. Gomberg
Freeborn & Peters LLP
311 South Wacker
Suite 3000
Chicago, IL 60606
sgomberg@freebornpeters.com

This 22nd day of May, 2008.

s/Gregory H. Andrews